New York University Office of General Counsel
Nancy Kilson (NK 4557)
Associate General Counsel
70 Washington Square South, Rm. 1158
New York, New York 10012
Tel.: (212) 998 2258
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

AYAL ROSENTHAL,

                Plaintiff,                08 CV 5338 (LAK)
                                               ECF Case

    v.

NEW YORK UNIVERSITY, *et al.,*          **DEFENDANTS' RULE
                                                   56.1 STATEMENT**

                Defendants

_____

        Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, Defendants New York University ("NYU" or the "University"), the NYU Stern School of Business ("Stern"), and Dean Thomas F. Cooley ("Dean Cooley") (collectively, "Defendants"), hereby state that there is no genuine issue for trial as to the following facts:

        1.      Rosenthal began his studies as a part-time Masters of Business Administration ("MBA") degree candidate in Stern's Langone Program in January 2005. Declaration of Thomas F. Cooley, executed on January 26, 2010 ("Cooley Dec."), ¶ 3; Declaration of Nancy Kilson, executed on February 1, 2010 ("Kilson Dec."), Exhibit C (Transcript of December 4, 2009 Rosenthal deposition), at 9.

2. Rosenthal remained a Stern student until October 2007 when, as a result of a disciplinary process and on academic grounds, the Stern faculty voted not to confer his MBA degree because of, among other things, his violation of the Stern MBA Code of Conduct. Cooley Dec. ¶ 3; Order, *Rosenthal v. New York University*, 08 Civ. 5338 (LAK), July 21, 2009, at 2 (noting that the contract between the parties includes the University Charter and Bylaws, under which "[d]egrees in courses are granted by the Board to candidates recommended to the President . . .").

3. On January 22, 2005, Rosenthal signed Stern's "MBA Code of Conduct." Kilson Dec. Exh. C at 165-66 and Exh. D-27.

4. Rosenthal's signature on the Code of Conduct affirmed that he understood that Stern "[s]tudents are expected in all of their actions to reflect personal honesty, integrity and respect for others." Kilson Dec. Exh. D-27.

5. Rosenthal was a "matriculated and continuing" student in Stern's part-time MBA program until October 2007, when the faculty voted not to confer his MBA degree. Cooley Dec. ¶ 3; Declaration of Gary Fraser, executed on January 27, 2010 ("Fraser Dec.") ¶ 7.

6. During the course of his studies at Stern, Rosenthal served as a teaching assistant in certain courses and was, therefore, a part-time employee of Stern. Kilson Dec. Exh. C at 88-89; Cooley Dec. ¶ 4.

7. As a part-time employee, Rosenthal was subject to the NYU "Code of Ethical Conduct," which requires all University employees to, among other things, "at all times, [act] in accordance with the highest professional and community ethical standards." Cooley Dec. ¶ 4 and Exh 1 at 2.

8. Rosenthal completed the coursework for his MBA degree in December 2006. Kilson Dec. Exh. C. at 9, 84. But for the disciplinary proceedings described below, he would have received his degree "as of" January 2007. Cooley Dec. ¶ 5.

9. In May 2005, when Rosenthal committed the acts that led to his criminal conviction, he was a Stern student, a certified public accountant and an employee of PricewaterhouseCoopers LLP ("PwC"), where he had worked since 2001. *See* Kilson Dec. Exhs. C at 25-27, 117 and Exhs. D-6, D-8 ¶ 1, D-9 (at 83-84) and D-11 at 6.

10. While Rosenthal was attending part-time summer classes at Stern in late May 2005, he learned certain confidential information from his supervisors at PwC in connection with a pending acquisition of one of PwC's clients. Kilson Dec. Exh. C at 83, 102-03, 117; Kilson Dec. Exh. D-8, at ¶ 6.

11. As a PwC employee, Rosenthal had received certain "manuals [that] emphasized the inappropriateness of insider trading." Kilson Dec. Exh. C at 30-33.

12. Nonetheless, Rosenthal has admitted that in late May 2005, "in breach of duties [he] owed to [PwC] and other professional duties, [he] communicated . . . material, non-public information concerning the contemplated transaction . . . to [his brother] Amir Rosenthal so that Amir Rosenthal could use the information to execute profitable securities transactions." Kilson Dec. Exh. D-8 at ¶ 7; Exh. C at 83, 102-03.

**The Government's Investigation of Rosenthal**

13. By early 2006, Rosenthal knew that the government had begun an investigation. Kilson Dec. Exh. C at 36-37.

14. This investigation eventually culminated in criminal proceedings against Rosenthal. Kilson Dec. Exh. C at 102-03, Exhs. D-8, D-9.

15. Rosenthal therefore retained criminal defense counsel by May 2006. Kilson Dec. Exh. C at 49-50 and Exh. D-26 at 3.

16. By May 2, 2006, Rosenthal had resigned his position with PwC. Kilson Dec. Exh. C at 31, 52-53 and Exh. D-6.

17. One week after Rosenthal resigned from PwC, it received an extensive subpoena from the SEC concerning Rosenthal. Declaration of Richard J. DeMarco, executed on January 12, 2010 ("DeMarco Dec.") ¶ 2 and Exh. 1.

18. Within two weeks of Rosenthal's resignation from PwC, he received a $500,000 check from Aragon Partners LP ("the Aragon account"). Kilson Dec. Exh. C at 73-74 and Exh. D-26.

19. According to an opinion that Magistrate Judge Frank Maas recently filed in a related SEC proceeding against Rosenthal, the Aragon account held profits resulting from illegal trading of one or more of Rosenthal's family members. *See SEC v. Aragon Capital Management, LLC,* Dkt. No. 07 Civ. 919 (FM), 2009 WL 4277244 at *12 (S.D.N.Y. Nov. 24, 2009).

20. In addition to the $500,000 check, Rosenthal received further payments from the Aragon account to pay taxes and to pay his criminal defense attorneys. Kilson Dec. Exh. C at 49, 185-86; Kilson Dec. Exh. D-26.

21. After Rosenthal stopped working at PwC, he supported himself using the funds he had received from Aragon, which may have been "tainted" because they resulted from illegal activity. Kilson Dec. Exh. C at 117-19.

22. In addition, after Rosenthal resigned from PwC, he sought and obtained positions as a teaching assistant in three courses at Stern: Financial Accounting &

4

Reporting (Summer 2006), Principles of Accounting (Fall 2006) and Professional Responsibility (Fall 2006). Kilson Dec. Exh. C at 88-89 and Exh. D-24 at 1-2.

23. Rosenthal had previously been a teaching assistant in two Stern courses, during the Fall 2005 and Spring 2006 semesters. *Id.*

24. Rosenthal received tuition remission from Stern in return for his work as a teaching assistant. Kilson Dec. Exh. C at 15.

25. Rosenthal did not disclose to any of the Stern faculty members who engaged him as a teaching assistant that, for much of the time while he served in that capacity, he was the subject of an ongoing criminal investigation involving insider trading that he had engaged in while studying at Stern and working at PwC, in violation of his obligations to PwC and its clients and in violation of the commitment he had made to Stern in the MBA Code of Conduct. Kilson Dec. Exh. C at 89.

26. Similarly, Rosenthal did not disclose to anyone at Stern that he was the subject of a criminal investigation until he mentioned it to Dean Fraser at the request of his criminal defense attorneys, who wanted information. Kilson Dec. Exh. C at 97-100.

27. Rosenthal's conversation with Dean Fraser post-dated the public disclosure that he had pled guilty to a securities violation. *Id*. at 98-99.

28. On February 8, 2007, in a plea before Judge Gleeson of the Eastern District of New York which has never been withdrawn, Rosenthal pled guilty to a one-count information charging conspiracy to commit securities fraud. Kilson Dec. Exh. C at 83, 185; Exh. D-8; Exh. D-9 at 82-83.

29. In his allocution, Rosenthal stated that he had "consciously turned a blind eye to what would have otherwise been obvious . . . : that [his] brother was going to

5

trade, in violation of United States securities laws, on [the] information that [Rosenthal] provided to him." Kilson Dec. Exh. C at 103, Exh. D-9 at 84.

30. The charge to which Rosenthal pled guilty was conspiracy to violate the antifraud provisions of the federal securities laws. Kilson Dec. Exh. D-8 at 4.

31. The transcript of Rosenthal's sentencing hearing reflects Judge Gleeson's comment on the record as follows:

> There's a difference between a mistake and what happened here. This isn't a mistake. You are an adult, you're well educated. You lack the circumstances that render your crime understandable that so often exist[] in the criminal cases that come into this courthouse.
>
> You made a choice to violate the duty of confidentiality. I'm not a hundred percent persuaded that . . . the knowledge component of this crime is really filled by just conscious avoidance given your circumstances.

Kilson Dec. Exh. D-11 at 6.

**The Disciplinary Proceeding Against Rosenthal at Stern**

32. In early February 2007, Stern professor Bruce Buchanan advised Dean Cooley that the SEC had charged a number of individuals, including Rosenthal and several of his family members, with "running an insider trading operation . . . ." Cooley Dec. ¶ 6 and Exhibit 2.

33. In his message, Professor Buchanan noted that Rosenthal, "in addition to receiving stolen information from his father [was] charged with leaking confidential information from PwC to the family hedge fund [Aragon] for the purpose of insider trading." *Id.*

34. On February 12, 2007, Dean Cooley raised the issue of Rosenthal's misconduct at a meeting of Stern Vice-Deans. Cooley Dec. ¶ 7 and Exh. 3.

6

35. As the minutes reflect, at the meeting, the Vice Deans reached a consensus that "the School should review whether [Rosenthal's] criminal activity … means that has not fulfilled the explicit and implicit requirements of the degree." Cooley Dec. Exh. 3 at 2.

36. The *Wall Street Journal* and the *New York Law Journal* published articles on February 9, 2007 reporting on the guilty pleas of Rosenthal and several of his family members to charges involving insider trading. Cooley Dec. ¶ 8 and Exh. 4.

37. Professor Buchanan brought the *Wall Street Journal* article and to Dean Cooley's attention on February 13, 2007. Cooley Dec. ¶ 8.

38. At about the same time, Dean Cooley received and reviewed a transcript of Rosenthal's plea hearing in federal court. Cooley Dec. ¶ 9 and Exh. 5.

39. On February 22, 2007, the Stern faculty held a regularly scheduled meeting to vote on, among other things, the approval of MBA candidates for graduation from Stern as of January 2007. Cooley Dec. ¶ 10 and Exh. 6.

40. The faculty approved the award of degrees to some 155 January 2007 MBA degree candidates. Cooley Dec. ¶ 10 and Exh. 6 at 1.

41. The faculty also unanimously voted, however, that "the case of Ayal Rosenthal, having pleaded guilty to the intent to commit securities fraud, be remanded to the Stern School's Judiciary Committee and [its] procedures." *Id.*

42. Under NYU's Bylaws, "[d]egrees in course are granted by the Board [of Trustees] to candidates recommended by the President [of the University] on certification by a faculty as having fulfilled the requirements for a degree." Cooley Dec. ¶ 11 and Exh. 7, § 63(a).

43. The Stern faculty never certified that Rosenthal was qualified to receive the MBA degree. Cooley Dec. ¶ 11.

44. Instead, based on the February 22, 2007 faculty vote to remand Rosenthal's case to the Stern Judiciary Committee, the Stern Dean's Office began working to draft a written complaint against Rosenthal on February 22, 2007. *Id.*

45. Lee Sproull, formerly Stern's Vice-Dean of Faculty, signed the resulting faculty complaint, which was dated February 28, 2007. Cooley Dec. ¶ 12 and Exh. 8.

46. The faculty complaint notes that Rosenthal "was in serious violation of the NYU Stern MBA Code of Conduct and the NYU Code of Ethical Conduct in actions he took while a matriculated student at Stern." *Id.* at 1.

47. Further, the complaint notes the NYU Policy on Student Conduct that "'[s]tudents are expected to conduct themselves as mature and law-abiding members of both the University community and the general community." *Id.*

48. In addition, the complaint correctly notes that Rosenthal had entered a plea of guilty before Judge Gleeson "to conspiracy to commit securities fraud . . . in an insider trading scheme involving his father, brother and a childhood friend." *Id.*

49. In the complaint, Dean Sproull noted the Stern faculty's belief that, in light of his guilty plea, Rosenthal "was not qualified to receive the degree of Master of Business Administration." *Id.* at 2.

50. She further noted the faculty vote to remand Rosenthal's case to the Judiciary Committee, and asked that committee "at the earliest opportunity to review the case and provide its recommendations to the Dean of the School." *Id.*

51.     Dean Cooley believed that a Judiciary Committee proceeding would be appropriate in Rosenthal's case because it would give him an opportunity to explain his conduct.   Cooley Dec. ¶ 14.

**The Applicable Disciplinary Rules**

52.     Stern's "Policies and Procedures, Student Disciplinary Rules" in effect during 2007 (the "Policies and Procedures") provide that "[s]tudent discipline is the responsibility of the faculty of [Stern] . . . .".   Cooley Dec. ¶ 15 and Exh. 9 at p. 5 § 1.

53.     The Policies and Procedures reflect that the Stern faculty has delegated its disciplinary authority to Stern's "MBA Judiciary Committee" (the "Judiciary Committee").   *Id*.

54.     Pursuant to the Policies and Procedures, the Judiciary Committee "has jurisdiction over disciplinary matters involving matriculated and continuing MBA students of Stern" in situations involving violations of the MBA Code of Conduct and Honor Code, University Policies and Procedures, and federal, state or local laws.   *Id.*, § 2.

55.     There was no infraction affecting any part of the University other than Stern in Rosenthal's case.   Cooley Dec. ¶ 16.

56.     As the Policies and Procedures reflect, at the relevant time, a disciplinary proceeding against a Stern student began with the filing of a complaint by "[a]ny member of the faculty, administration or staff, or any student."   Cooley Dec. Exh. 9 at p. 7, § 4.a.

57.     Melchior Ochoa became Chair of the Judiciary Committee during the Spring of 2007 and continued to perform that function during the 2007-08 academic year. Declaration of Melchior Ochoa, executed on January 26, 2010 ("Ochoa Dec.") ¶ 1.

58. As Chair of the Judiciary Committee, Ochoa became involved with the case of Ayal Rosenthal ("Rosenthal") in the Spring of 2007. *Id*.

59. There was a delay of several weeks from February 28, 2007, the date of the faculty complaint initiating the disciplinary proceeding against Rosenthal, before the Judiciary Committee, through its incoming Chair, Melchior Ochoa, actively began work on Rosenthal's "case." Fraser Dec. ¶ 3.

60. This delay occurred because of the unusual nature of Rosenthal's violation. *Id.*

61. Nearly all other recent student disciplinary matters at Stern had involved commonplace academic violations such as plagiarism or cheating. Fraser Dec. ¶ 4; Kilson Dec. Exh. F at 16-19.

62. Rosenthal's case, by contrast, involved an unusual and much more serious issue, a plea of guilty to a securities violation. Fraser Dec. ¶ 4.

63. Because of the unusual nature of Rosenthal's infraction, Dean Fraser, the Stern faculty liaison to the Judiciary Committee, was initially uncertain how to proceed, and therefore discussed the question of "jurisdiction" with other Stern and NYU administrators and with the Judiciary Committee during March and April 2007. *Id.*

64. Ochoa received the faculty complaint in the Rosenthal case from the outgoing Chair of the Judiciary Committee, Tim Colvin. Ochoa Dec. ¶ 2 and Exh. 1.

65. Ochoa then began work on the case by analyzing whether it should proceed to a hearing. *Id*. at ¶ 2.

66. In the course of this analysis, he drafted a document, initially dated May 15, 2007, and finally dated May 20, 2007, discussing the case. *Id*. and Exh. 2.

67. Ochoa concluded that Rosenthal's guilty plea was a sufficient basis to have a hearing, which Ochoa promptly began attempting to schedule. Ochoa Dec. ¶ 2.

68. In addition, having concluded that the case should proceed to a hearing, Ochoa advised Rosenthal of the existence of the faculty complaint pursuant to Stern's Policies and Procedures. Ochoa Dec. ¶ 2 and Exh. 3, § 4.d.

69. Ochoa concluded that no investigative committee was necessary, because he understood from the faculty complaint that Rosenthal had pled guilty in open court to a felony criminal securities law violation. Ochoa Dec. ¶ 3.

70. Ultimately Dean Fraser left the question of jurisdiction to the Judiciary Committee itself to decide. Fraser Dec. ¶ 5.

71. On or about May 15, 2007, Mr. Ochoa, the Chair of the Judiciary Committee, decided to let the Committee resolve the question of its jurisdiction at a subsequent hearing. Ochoa Dec. ¶ 2.

72. Because Ochoa was new to the role of Chair of the Judiciary Committee, he initially made certain procedural errors, believing that the University disciplinary procedures were applicable. Ochoa Dec. ¶ 4.

73. After May 20, 2007, Ochoa sent many messages to Rosenthal and to the members of the Judiciary Committee attempting to find a date when both Rosenthal and a quorum of committee members could attend a hearing in person or by telephone. Ochoa Dec. ¶ 7.

74. The academic year had already ended, however, and the student members of the committee were away from the University for summer internships. *Id*.

11

75. On July 6, 2007 Rosenthal told Ochoa in an electronic mail message that he had "taken some time off this summer" and could be "available after Labor Day." Ochoa Dec. ¶ 8 and Exh. 4, although Rosenthal was in fact about to spend two months as an inmate in Otisville. Kilson Dec. Exh. C at 106, 107-08, 123, 148.

76. Thus, Rosenthal consented to postpone the hearing from July until September 2007. Ochoa Dec. ¶ 8.

77. Rosenthal experienced frustration because Stern did not advise him in the late winter or spring of 2007 when or whether he would receive his MBA degree, but suffered no prejudice. Kilson Dec. Exh. C at 135-38, 171-75.

78. The delay in conducting Rosenthal's Judiciary Committee hearing did not affect where he lived or worked or his employment. Kilson Dec. Exh. C at 173-175.

79. Rosenthal's Judiciary Committee hearing took place on September 13, 2007. Kilson Dec. Exh. C at 152; Fraser Dec. ¶ 6; Ochoa Dec. ¶ 10.

80. Rosenthal attended his Judiciary Committee hearing on September 13, 2007. Kilson Dec. Exh. C at 152.

81. A quorum of Committee members attended, including two faculty members (Dean Fraser and Professor Rachel Kowal), the Chair, and seven student members (Chair Ochoa and Jamila Williams, Debraj Ghosh, Catherine Zhang, Brad Doyle, Andy Cho and Spencer Jones), in accordance with Stern's Policies and Procedures. Ochoa Dec. ¶ 10.

82. At that time, the Judiciary Committee concluded that it had jurisdiction in the case. Fraser Dec. ¶ 6; Ochoa Dec. ¶ 12.

83. This conclusion was consistent with the Policies and Procedures of the Stern Judiciary Committee in effect at the time, under which the Judiciary Committee had "jurisdiction over disciplinary matters involving matriculated and continuing MBA students . . . in the full-time or part-time MBA Programs" of Stern, including "without limitation" cases involving "[v]iolations of the MBA Code of Conduct & Honor Code of the Stern School of Business and the MBA Program . . . [and] [v]iolations of federal, state or local laws."  Cooley Dec. Exh. 9 at pp. 5-6, § 2; Fraser Dec. ¶ 6.

84. The Committee as a whole determined that *Stern's* procedural rules, rather than the *University's* procedural rules, applied in Rosenthal's case.  Ochoa Dec. ¶ 18 and Exh. 7.

85. The hearing began with the Committee members reviewing written materials, including the faculty complaint and Ochoa's May 20, 2007 analysis of the case.  Ochoa Dec. ¶ 11 and Exh. 2.

86. Rosenthal then came in to the hearing room.  Ochoa Dec. ¶ 11.

87. The Committee did not allow Rosenthal to bring counsel with him, based on the applicable Stern Policies and Procedures.  Ochoa Dec. ¶ 11; Cooley Dec. Exh. 9 at p. 10, § 6.g.

88. Rosenthal admittedly waived his right to bring witnesses to his Judiciary Committee hearing.  Kilson Dec. Exh. C. at 155-56.

89. After Ochoa read the faculty complaint aloud, Rosenthal read a prepared statement, and he then left a written version of that statement with the Committee before departing from the hearing room.  Ochoa Dec. ¶ 12 and Exh 5.

90.     In addition to Rosenthal's written testimony, the Committee had access to a copy of a transcript of the hearing before United States District Judge John Gleeson in which Rosenthal had pled guilty to a securities law violation. Ochoa Dec. ¶ 13 and Exh. 6.

91.     The Committee also had Rosenthal's academic transcript, and a May 24, 2007 letter from Rosenthal raising his concerns about the faculty complaint, among other things. *Id*.

92.     After the conclusion of the hearing and a discussion, the student members voted unanimously to recommend that the Dean impose discipline on Rosenthal based on his guilty plea (the advisory faculty members of the Committee did not vote). Ochoa Dec. ¶ 14 and Exh. 7.

### **Rosenthal's Hearing Before the Judiciary Committee**

93.     An October 1, 2007, letter to Dean Cooley from the Chair of the Judiciary Committee reported on the result of Rosenthal's Judiciary Committee hearing. Cooley Dec. ¶ 18 and Exh. 11; Ochoa Dec. ¶ 16 and Exh. 7.

94.      The report reflects that the Judiciary Committee decided to recommend that Mr. Rosenthal should not receive his MBA degree. *Id.*

**The Faculty Vote Against Conferring Rosenthal's Degree**

95.     At an October 3, 2007 meeting of the Stern faculty, Professor Buchanan advised the faculty of the result the Judiciary Committee hearing.  Cooley Dec. ¶ 19 and Exh. 12.

96.     After discussion, the faculty approved a motion "[t]hat Mr. Ayal Rosenthal not be recommended to the NYU President and Board of Trustees for a degree of Masters of Business Administration."  Cooley Dec. ¶ 19 and Exh. 12 at 2.

97.     After the faculty's vote, by letter dated October 25, 2007, Dean Cooley wrote to Rosenthal to advise him that, based on his guilty plea, he would not receive his degree.  Cooley Dec. ¶ 20 and Exh. 13.

98.     In his October 25, 2007 letter to Rosenthal, the Dean noted that he had the prerogative to accept, deny or modify the Judiciary Committee's recommendations. Cooley Dec. Exh. 13 at 2.

99.     The Dean advised Rosenthal of his decision, given Rosenthal's plea of guilty to a federal crime, based on conduct that occurred while Rosenthal was a Stern student, that Rosenthal would not receive the MBA degree.  *Id.*, at 1-2.

100.    The Dean emphasized that, at every stage of the proceeding, Rosenthal's guilty plea had been "the deciding factor."  *Id.* at 3.

101.    Rosenthal submitted an appeal to Dean Cooley from this decision on December 14, 2008.  Cooley Dec. ¶ 21 and Exh. 14.

102.    Dean Cooley rejected Rosenthal's appeal by letter dated February 19, 2008.  Cooley Dec. ¶ 22 and Exh. 15.

103. In denying Rosenthal's appeal, Dean Cooley noted that Stern had jurisdiction over Rosenthal because he was a "matriculated and continuing MBA [student]" at Stern when he committed the underlying violation. Cooley Dec. Exh. 15 at 1.

104. The Dean further noted that, pursuant to Stern's Policies and Procedures, the Stern Judiciary Committee has "jurisdiction over 'violations of federal, state or local laws'," among other things. *Id.* at 2.

105. Dean Cooley further noted, among other things, that Rosenthal had suffered no prejudice because he did not have counsel present during the Judiciary Committee hearing, since Rosenthal did not request that witnesses attend the hearing, and Rosenthal's "allocution in federal court obviated the need to summon witnesses to [his] crime." Cooley Dec. Exh. 15 at 2-3.

106. In addition, Stern's Policies and Procedures do not authorize counsel for an accused to participate in a Judiciary Committee hearing. Ochoa Dec. ¶ 4; Cooley Dec. Exh. 9 at p. 10, § 6.g.

107. Dean Cooley emphasized that Rosenthal's guilty plea was the "determining factor throughout this process" and that his admission of guilt rebutted the presumption of innocence. Cooley Dec. Exh. 15 at 3.

108. Dean Cooley noted that Stern's MBA Code of Conduct "encompasses the Stern School's philosophy that its students – as future business leaders – have an obligation to adhere to . . . principles [of personal honesty, integrity and respect for others] in their behavior." *Id.*

109. As of December 4, 2009, Rosenthal did not know whether his criminal violation reflected honesty, integrity, and respect for the rights of others, the values he committed to uphold when he signed Stern's MBA Code of Conduct.  Kilson Dec. Exh. C at 93-96.

110. Dean Cooley further noted that Stern's curriculum reflects its philosophy, and that Stern has "made business ethics a central and integral component of its business education program."  Cooley Dec. Exh. 15 at 3.

111. Further, Dean Cooley observed that conferring an MBA degree on Rosenthal would have "undermine[d] the Stern School's position as a moral authority on business ethics and the integrity of a Stern degree."  *Id.*

112. Finally, the Dean rejected Rosenthal's reliance on certain procedural rules which he characterized as "inapplicable."  *Id.* at 4.

Dated: New York, New York
       February 1, 2010

                                          Respectfully submitted,

                                        New York University
                                        Office of General Counsel

                                By: s/_____
                                        Nancy Kilson (NK-4557)
                                        Associate General Counsel
                                        70 Washington Square South
                                        New York, New York 10012
                                        (212) 998 2258

                                        Attorney for Defendants.