9

# *New York University Code of Ethical Conduct*



*By action of the Audit Committee*

*New York University Board of Trustees*

*June 22, 1999*

*Updated: December 2006*

# *New York University*
# *Code of Ethical Conduct*

### PREFACE

In furtherance of maintaining and promoting New York University's reputation for excellence and integrity, the Board of Trustees has promulgated this Code of Ethical Conduct, which sets forth the general principles to which we subscribe and to which we expect every member of the University - every part-time and full-time employee, faculty member, officer, trustee, overseer, and advisory board member - to adhere. These principles have been derived from federal, state, and local laws and regulations, University policies and procedures, contractual and grant obligations, and generally accepted principles of ethical conduct.

### I. ADHERENCE TO THE HIGHEST ETHICAL STANDARDS

Every member of the University shall, at all times, conduct his or her activities in accordance with the highest professional and community ethical standards.

### II. RESPECT FOR AND COMPLIANCE WITH THE LAW

Every member of the University is expected to become familiar with those laws, regulations, and University rules which are applicable to his or her position and duties, and to comply with both their letter and spirit. The University will implement programs to further members' awareness and to monitor and promote compliance. All questions and concerns about the legality or propriety of any action or failure to take action by or on behalf of the University should be referred to either the member's supervisor or to the Office of Legal Counsel.

### III. COMPLIANCE WITH ALL CONTRACTUAL AND GRANT TERMS AND CONDITIONS

Every member of the University is expected to maintain access to and to comply strictly with the terms and conditions of each University grant and contract on which he or she is working. All questions or concerns about whether a particular term or condition violates the law or whether the grantor or contractor has breached its obligations to the University should be referred promptly to the Office of Legal Counsel.

### IV. SUPPORT OF THE UNIVERSITY'S GOALS AND AVOIDANCE OF CONFLICTS OF INTEREST

New York University is a not-for-profit institution which is dedicated to teaching and research. Every member of the University is expected to faithfully carry out his or her professional duties in furtherance of the University's mission. Every member has a duty to avoid conflicts between his or her personal interests and official responsibilities and to comply with University and applicable School codes and guidelines for reporting and reviewing actual and potential conflicts of interest and conflicts of commitment. Additionally, a member may not utilize his or her position with the University for his or her personal benefit. Members are also expected to consider and avoid, not only an actual conflict but also, the appearance of a conflict of interest.

NYU000200

### V. MAINTENANCE OF THE HIGHEST STANDARDS OF ACADEMIC INTEGRITY

Every member of the University involved in teaching and research activities is expected to conform to the highest standards of honesty and integrity. Activities such as plagiarism, misrepresentation, and falsification of data are expressly prohibited. All research at the University must be conducted in strict conformity with the applicable University policies, procedures, and approvals and the requirements of all governmental and private research sponsors.

### VI. RESPECT FOR THE RIGHTS AND DIGNITY OF OTHERS

New York University is committed to a policy of equal treatment, opportunity, and respect in its relations with its faculty, administrators, staff, students, and others who come into contact with the University. Every member of the University is prohibited from discriminating on the basis of race, color, religion, sexual orientation, gender and/or gender identity or expression, marital or parental status, national origin, citizenship status, veteran or military status, age, disability, and any other legally protected status; physically assaulting, emotionally abusing, or harassing anyone; and depriving anyone of rights in his or her physical or intellectual property, under University policy, or under federal, state, and local laws.

### VII. STRIVING TO ATTAIN THE HIGHEST STANDARDS OF PATIENT CARE

Every member of the University involved in furnishing medical and dental services is expected to provide the highest quality of services responsive to the needs of patients, their families, and the communities in which the University functions. All patient care must be reasonable, necessary, and appropriate to the situation and be provided only by duly qualified University personnel. All patient records and documentation must conform to all applicable legal and payor requirements as well as professional standards. Every member of the University is expected to protect the confidentiality of patient information.

### VIII. MAINTENANCE AND PRESERVATION OF ACCURATE RECORDS

Members of the University are expected to create and maintain records and documentation which fully conform to all applicable laws and professional, and ethical standards. Every member of the University who is involved, directly or indirectly, in the preparation or submission of a bill to any governmental or private payor is expected to use his or her best efforts to ensure the bill addresses only those services rendered and products delivered and in the correct amount, supported by appropriate documentation.

### IX. CONDUCTING BUSINESS PRACTICES WITH HONESTY AND INTEGRITY

Every member of the University is expected to conduct all business with patients, payors, vendors, competitors, and the academic community with honesty and integrity. This duty includes, but is not limited to: adherence to federal and state anti-fraud and referral prohibitions in dealing with vendors and referral sources; adherence to all antitrust laws (such as those governing prices and other sales terms and conditions; improper sharing of competitive information, allocation of territories, and group boycotts); and protecting and preserving University property and assets--including proprietary intellectual property, buildings, equipment, books, supplies, and funds.

### X. CONCERN FOR HEALTH AND SAFETY; RESPECTING THE ENVIRONMENT

Every member of the University is expected, in the performance of his or her duties, to comply with all laws and regulations which govern occupational and patient health and safety and to make every reasonable effort to ensure that students, faculty, patients, employees, and visitors are protected from undue health risks and unsafe conditions.

NYU000201

Every member of the University is expected, in the course of his or her activities: to comply with all applicable environmental laws and regulations; to ensure that the University has obtained all necessary licenses, permits, and approvals; and to employ the proper procedures and controls in the storage and handling of radioactive and toxic materials and in the handling and disposition of hazardous and biohazardous wastes.

## XI. REPORTING SUSPECTED VIOLATIONS OF THE CODE; ENFORCEMENT OF THE CODE

This Code of Conduct has been created and exists for the benefit of the entire University and all of its members. It exists in addition to and is not intended to limit the specific policies, procedures, and rules enacted by the University and each of its Schools.

Each member of the University is expected to uphold the standards of New York University and to report suspected violations of the Code or any other apparent irregularity to either his or her Supervisor, Human Resources, Financial Compliance and Internal Audit, Research Compliance, Operational Risk Management, the School Compliance Officer, the Office of Legal Counsel, the University Compliance Officer, or the NYU NO CALLER ID toll-free COMPLIANCE LINE (877) 360-7626. If a member prefers, he or she may make the report anonymously (by mail, by web (www.nyu.edu/compliance), or by the Compliance Line). The University will, if requested, make every reasonable effort to keep confidential the identity of anyone reporting a suspected violation, to the extent permitted by law, and except if doing so would effectively prevent the University from conducting a full and fair investigation of the allegations.

This Code of Ethical Conduct will be enforced. Reports of suspected violations will be investigated by authorized University personnel. Officers, managers, and supervisors have a special duty to adhere to the principles of the Code, to encourage their subordinates to do so, and to recognize and report suspected violations. Each member of the University is expected to cooperate fully with any investigation undertaken. If it is determined that a violation has occurred, the University reserves the right to take corrective and disciplinary action against any person who was involved in the violation or who allowed it to occur or persist due to a failure to exercise reasonable diligence. Additionally, the University may make an appropriate disclosure to governmental agencies (including law enforcement authorities). Disciplinary actions will be determined on a case-by-case basis and in accordance with the applicable disciplinary codes.

## XII. PROMISE OF NO RETALIATION

The University promises that there will be no adverse action, retribution, or other reprisal for the good faith reporting of a suspected violation of this Code, even if the allegations ultimately prove to be without merit. The University will, however, pursue disciplinary action against any member who is shown to have knowingly filed a false report with the intention to injure another.

The University reserves the right, at any time, and without notice, to amend this Code of Conduct in its sole, good faith, discretion. This Code does not form a contract.

---

For more interpretation of the articles of this Code as it relates to members of the faculty please refer to Questions and Answers for Faculty Members Regarding the Compliance Program and the NYU Code of Ethical Conduct.

NYU000202

10

Zimbra: rkowal@stern.nyu.edu                          http://connect.stern.nyu.edu/zimbra/?client=preferred

Connect@Stern                                                              rkowal@stern.nyu.edu

Re: FW: Insider Trading Case                    Sunday, February 11, 2007 8:57:44 AM

From: rkowal@stern.nyu.edu
To: bbuchana@stern.nyu.edu
Cc: jennifer.bergenfeld@alliancebernstein.com; rkowal@stern.nyu.edu
Attachments: AYAL ROSENTHAL resume-5.doc (35.3KB)

Bruce & Jennifer,
There is an Ayal Rosenthal at Stern - he has been a TA for several Stern courses including most recently the PR Law & Business course taught by Jerry Rosenfeld and Sy Lorne. Ayal's vita is attached. Seems like the Ayal that we have at Stern is a different one but we should check to be sure.
Bruce - Do you want me to check with Kim Corfman about this?
Rachel

Bruce Buchanan wrote:

> Jennifer & Rachel,
>
> We should first verify that we have the right Ayal Rosenthal. I tried
> to google him to see if I could verify that the person named in the
> complaint had graduated Stern, but could not. It does seem, however,
> that his brother Amir graduated from NYU Law.
>
> This is a very sad story. Clearly this was a family of achievers who
> were capable of success on the merits. Why would they do such a
> a stupid thing?
>
> I am going to alert Tom, and get the registrar to verify the facts.
>
> Jennifer, thanks for bringing this to our attention.
>
> Best regards,
>
> Bruce
>
> ----- Original Message -----
> From: "Bergenfeld, Jennifer" <jennifer.bergenfeld@alliancebernstein.com>
> Date: Friday, February 9, 2007 1:59 pm
> Subject: FW: Insider Trading Case
>
> > I wanted to make you aware of this situation. I found an article
> > aboutinsider trading and sent it to my students, to find out that
> > one of the
> > fraudsters was a Langone student. This is obviously upsetting to
> > all of
> > us. I hope that this case as it develops is discussed in the Ethics
> > course. As well, I would suggest that this be brought to the attention
> > of the Dean to prepare a communication to all students.
> >
> > -----Original Message-----
> > From: Bali, Tapasya [tapasya.bali@credit-suisse.com]
> > Sent: Thursday, February 08, 2007 3:24 PM

NYU000599

To: 'jbergenf@stern.nyu.edu'
Subject: RE: Insider Trading Case

Hi Prof,

I was really shocked to receive this article from you because I happen to know one of the guys- Ayal. He just graduated from the Langone program and was in my core group and lot of classes with me-- I think probably some others in our class know him as well...

-----Original Message-----
From: jbergenf@stern.nyu.edu [jbergenf@stern.nyu.edu]
Sent: Thursday, February 08, 2007 2:55 PM
To: jbergenf@stern.nyu.edu
Subject: Insider Trading Case

The following is a recent insider trading case touching upon Wall Streetand the pharmaceutical world, which I will discuss in future courses.Hope everyone is doing well with their final papers.

SEC Charges Family-Run Hedge Fund With a $3.7 Million Insider Trading Scheme FOR IMMEDIATE RELEASE 2007-17 Washington, D.C., Feb. 8, 2007
-
The Securities and Exchange Commission today charged seven individuals with engaging in an insider trading scheme that netted over $3.7 millionin profits and losses avoided over four years. The defendants include a
father and his three sons, a family-run hedge fund, and other relativesand friends. The defendants also include accountants and lawyers at some
of the nation's largest firms.

The SEC's complaint, filed in federal court in New York, alleges that the father, Zvi Rosenthal, formerly an executive with Taro Pharmaceuticals Industries, tipped his sons with confidential information concerning at least 13 separate Taro announcements, including earnings results and FDA drug approvals. The family pooled their money into a hedge fund in order to help conceal their trading in
Taro securities from detection. In addition to trading in Taro stock and
options in advance of the announcements, one of the sons tipped his supervisor at his law firm, a friend who worked at an accounting firm, and his father-in-law. Two of the defendants are also charged with usingconfidential information obtained from their employers, PricewaterhouseCoopers (PwC) and Ernst & Young (E&Y), concerning two possible mergers.

Mark K. Schonfeld, Director of the Commission's Northeast Regional Office, said, "This case is particularly troubling, not just because this appears to have been a 'family business' built on insider trading,but also because the defendants include accountants and lawyers at
prominent firms. These are professionals who understand their obligationnot to use confidential information for their own benefit."

The Commission's complaint, filed in the U.S. District Court for the Southern District of New York, charges seven individuals, two hedge funds, one investment adviser, and two relief defendants, including thefollowing.

Zvi Rosenthal (Zvi), age 62, was, from 2001 to January 2006, Taro's VicePresident of Materials Management and Logistics in Taro's

office in
Hawthorne, N.Y.

Amir Rosenthal (Amir), age 28, is Zvi's middle son. From September 2004to April 2006, Amir was a corporate attorney at a large New York-based
law firm.

Oren Rosenthal (Oren), age 30, is Zvi's eldest son. From September 2003to January 2007, Oren was a litigation associate in the New York and Los
Angeles offices of a large California-based law firm.

Ayal Rosenthal (Ayal), age 26, is Zvi's youngest son and a certified public accountant. From 2001 to May 2006, Ayal worked at PwC, first as an auditor and, subsequently, in the Transactions Services Group.

Aragon Partners, LP and Aragon Capital Advisors, LLC (together, Aragon),is a Rosenthal family-owned and controlled hedge fund and investmentadviser.

David Heyman (Heyman), age 29, is a certified public accountant. From 1999 to January 2006, Heyman was an E&Y auditor and, ultimately, a senior manager in E&Y's On-Call Consulting Group.

Heyman & Son Investment Partnership LP is a limited partnership and hedge fund with Heyman as its general partner.

Bahram Delshad (Delshad), age 55, is Amir's father-in-law. Delshad is a
retired jewelry shop owner.

Young Kim (Kim), age 34, was Amir's supervisor at a large New York-basedlaw firm where he was a corporate attorney in the Structured FinanceGroup.
The Taro Scheme
In its complaint, the Commission alleged that Zvi, a Vice President at Taro, abused his position at Taro by systematically stealing material, nonpublic information concerning 13 separate company announcements, including earnings results and pending generic drug approvals by the Food and Drug Administration. Typically, Zvi provided information to Amir who traded in personal accounts he controlled, and in Aragon's account. Amir also tipped his brothers, Oren and Ayal; his father-in-law, Delshad; his best friend, Heyman; and his work supervisor, Kim, with information he received from Zvi, and each of themtraded. Allegations of the Taro scheme include the following.

Taro's internal policies specifically prohibited Zvi or any member of his family from trading in Taro securities during specific blackout periods before and after public earnings announcements.

The defendants aggressively traded Taro options instead of Taro stock to
maximize their profits on the information Zvi stole from Taro. In some instances, the defendants liquidated stock positions and bought optionsto maximize profits.

In 2003, Amir created a hedge fund and an unregistered investment adviser, Aragon, to obscure the family's identity and pool money from family members to trade in Taro securities. Amir also used his wife's account to hide the identity of his trades.

Two of the defendants paid kickbacks to Amir in exchange for profitabletips. Heyman gave Amir at least $6,300 in cash to pay for a plasma
television. Delshad paid Amir $66,000 in $11,000 installments that Delshad routed through his children.
Insider Trading in Other Securities

In its later stages, certain defendants broadened the scheme to includetrading on nonpublic information stolen from entities other than Taro.
On at least two occasions, Ayal and Heyman misappropriated material, nonpublic information concerning impending mergers from their respectiveemployers, PwC and E&Y, and tipped Amir with the information. Amir
immediately traded on the information using Aragon's account. Amir alsotipped Kim with the information from Ayal and Heyman, and Kim traded on
the information.

The insider trading scheme generated for the defendants total profits and losses avoided in excess of $3.7 million.

The complaint charges all of the defendants with illegal insider tradingin violation of the antifraud provisions of the federal securities laws.
In its complaint, the Commission seeks permanent injunctive relief, disgorgement of all illegal profits and losses avoided plus prejudgmentinterest, and the imposition of civil monetary penalties. The complaint
also seeks an officer and director bar against Zvi.

The Commission has reached an agreement with Kim to settle the insider trading charges against him. Kim has consented to a final judgment permanently enjoining him from future violations of the antifraud provisions of the federal securities laws, and ordering him to pay $4,287.71 in disgorgement of his ill-gotten gains plus prejudgment interest, and $41,702.29 in civil penalties. Kim consented to the finaljudgment without admitting or denying the allegations in the complaint.The Commission will file the proposed judgment with the U.S. District
Court in New York, New York for consideration and approval.

The Commission appreciates the cooperation of the United States Attorney's Office for the Eastern District of New York and the Federal Bureau of Investigation in the investigation of this matter.

# # #

For more information, contact:
Helene T. Glotzer (212) 336-0078
Associate Regional Director, Northeast Regional Office

Bruce Karpati (212) 336-0104
Assistant Regional Director, Northeast Regional Office

Additional materials: Litigation Release No. 19995; Complaint

Please access the attached hyperlink for an important electronic communications disclaimer:

http://www.credit-suisse.com/legal/en/disclaimer_email_ib.html

---

The information contained in this transmission may be privileged and confidential and is intended only for the use of the person(s) named above. If you are not the intended recipient, or an employee or agent responsible
for delivering this message to the intended recipient, any review, dissemination,distribution or duplication of this communication is

```
strictly prohibited. If you are
not the intended recipient, please contact the sender immediately
by reply e-mail
and destroy all copies of the original message. Please note that we
do not accept
account orders and/or instructions by e-mail, and therefore will
not be responsible
for carrying out such orders and/or instructions.  If you, as the
intended recipient
of this message, the purpose of which is to inform and update our
clients, prospects
and consultants of developments relating to our services and
products, would not
like to receive further e-mail correspondence from the sender,
please "reply" to the
sender indicating your wishes.  In the U.S.: 1345 Avenue of the
Americas, New York,
NY 10105.
```

**AYAL ROSENTHAL, CPA**
98 Walnut Dr.
Tenafly, NJ 07670
Tel: 732-763-8125
E-mail: ayal@stern.nyu.edu

| | | |
|---|---|---|
| Education: | **NEW YORK UNIVERSITY** | New York, NY |

**Leonard N. Stern School of Business, The Langone Program**
Master of Business Administration Candidate, January 2007
Specialization in Finance, Financial Instruments & Markets, Entertainment Media & Technology
- Teaching Fellow – Financial Accounting & Reporting, Fall 2005, Spring 2006, Summer 2006
- Teaching Fellow – Principles of Financial Accounting, Fall 2006
- Member of the Career Services Task Force and the Graduate Finance Association

**UNIVERSITY OF TEXAS – AUSTIN** — Austin, TX
**Red McCombs School of Business**
Master of Professional Accountancy, August 2002

**RUTGERS UNIVERSITY – RUTGERS COLLEGE** — New Brunswick, NJ
Bachelor of Science, Double major in Management and Economics, May 2001

| | | |
|---|---|---|
| Experience: 2006 | **NOVA CAPITAL PARTNERS, LLC** | New York, NY |

**Associate – Emerging Markets**
- Research and prepare information memorandum for debt and equity raises by Nigerian, Chinese, and South African companies and analyze client financial models for the pending transactions

2005-2006 **PRICEWATERHOUSECOOPERS, LLP** — New York, NY
**Senior Associate – Financial Due Diligence**
- Performed financial due diligence for buy-side and sell-side transactions
- Analyzed net working capital, sales to price/volume trends, channel contributions, operating and non-operating expenses, and other key metrics
- Proposed quality of earnings and quality of asset adjustments to target companies' financial statements, resulting in revaluation of final deal price.
- Advised supervisors and a private equity firm of pharmaceutical industry developments resulting in a significant revaluation of the private equity's bid for the target
- Evaluated target companies' management team and internal control structure
- Performed document review alongside target's external lawyers in search of potential unrecorded future liabilities, earn-out clauses, recent terms changes in customer contracts, and other key risks

2004-2005 **Senior Associate – Assurance Services**
- Managed the US audit of the world's largest private confectionary and pet-food manufacturer, with US revenue greater than $5 billion
- Supervised a team of seven auditors and facilitated the relationship with client's corporate audit team
- Researched accounting pronouncements and advised the client of their effects on the company
- Advised the client during its internal re-organization on separating departments to prevent internal controls violations

2001-2004 **Associate – Assurance Services**
- Audited common balance sheet accounts, including accruals, accounts receivable, and inventory
- Successfully audited client global pension and deferred compensation plans for senior executives and identified $2.5 million adjustments and $100,000 cost savings
- Researched GAAP accounting questions that arose within engagements

Additional:
- New Jersey and New York Certified Public Accountant (CPA)
- Fluent in Hebrew, Proficient in Spanish
- Extensive foreign travel in over 20 countries including India, Thailand, Argentina, and Egypt

NYU000604

11

Zimbra: rkowal@stern.nyu.edu                                            http://connect.stern.nyu.edu/zimbra/?client=preferred

Connect@Stern                                                                                    rkowal@stern.nyu.edu

### Re: SEC COMPLAINT - Needs Attention     Sunday, February 11, 2007 3:56:38 PM

From: tcooley@stern.nyu.edu
To: bbuchana@stern.nyu.edu
Cc: kcorfman@stern.nyu.edu; tpugel@stern.nyu.edu; rkowal@stern.nyu.edu; ndiamant@stern.nyu.edu

Bruce,

I agree this is pretty serious. We have a Vice Dean's meeting tomorrow
at 12. If you could stop by around 1 we could discuss it with others.
If we haven't awarded his degree we may wish to withhold it. Kim can
update us on our options. Since we haven't had our faculty meeting to
vote degrees yet I assume that option is open to us. Jerry and Sy
shoould be alerted. I seem to recall that I read this in the paper last
week and that they pleade guilty.

Tom

Bruce Buchanan wrote:

>TO:
>
>Tom Cooley
>Tom Pugel
>Kim Corfman
>
>On Thursday 2/8 the SEC charged a number of individuals, including several members of the Rosenthal
>family, with running an insider trading operation tied to a hedge fund. It seems the father of the family, Zvi
>Rosenthal, was a senior executive of Taro Pharmaceuticals, and he passed on confidential information to his
>sons who then traded the information, and who eventually set up a hedge fund to mask their identities.
>
>Two of the sons, Amir and Ayal, are recent graduates of NYU - Amir from NYU Law (2004), and Ayal from Stern
>(apparently January 2007, according to his resume). They were both employed professionally in NYC in
>addition to their involvement with this fund.
>
>Ayal - the Stern student - was employed by PWC from 2001-06, and in addition to receiving stolen information
>from his father is charged with leaking confidential information from PWC to the family hedge fund for the
>purpose of insider trading.
>
>It turns out Ayal was a TA for Professional Responsibility, and specifically for the Business/Law section of the
>course co-taught be Jerry Rosenfeld and Sy Lorne. Based upon his resume, this was a reasonable
>assignment: he already had a Master's in Accountancy (UTexas), was a licensed CPA, and had been working
>at PWC's Transactions Services Group performing due diligence and related functions in support of major
>corporate transactions (presumably tender offerings, private equity, and re-structurings - the focus of this
>special section of the course). Unfortunately, it seems he had also been brought into an ongoing insider trading
>operation with his father and older brothers.
>
>Th SEC has filed its complaint in U. S. Court Eastern District of New York. As I understand it, SEC charges are
>Civil, not Criminal charges, and it is not clear that criminal charges have been or will be filed. The SEC
>acknowledges the help of the DOJ and FBI, so clearly those agencies are involved. The SEC estimates the
>total illicit gain/avoided-loss at about $3.7 million. Given the size of the theft, and the orgainzed ongoing nature
>of the activity, it would not be a surprise to see criminal charges as well. Criminal charges would, I believe, be
>filed through the U. S. Attorney's office pursuant to a directive from the Department of Justice.
>
>It seems to me that the school has to be prepared to answer questions about this situation, should they arise.
>So we need to become fully informed and probably bring Joanne's office into the loop to speak with the press,
>should they inquire.
>



PLAINTIFF'S EXHIBIT 9  11/6/09

1 of 2                                                                                           10/7/2009 8:09 AM

NYU000605

>In my review of the SEC documents, I do not see any mention of Ayal's connection to Stern, nor is there any in
>the other press accounts - perhaps because Ayal was still a student when the investigation took place. His
>brother's NYU Law degree is mentioned in both the SEC complaint and press accounts, but then he had
>graduated in 2004.
>
>We might have to consider some substantial actions with respect to Ayal. We need to know his status - has he
>graduated? If not, should the school initiate some disciplinary procedures, given that at least some of the
>activities described in the SEC complaint occurred while he was a student at the school? If he has graduated,
>does the school have any disciplinary options? Again, he appears to have been involved with this illegal
>activity while a student. In considering any of these options, we also have to consider procedural issues: does
>the school conduct any inquiry itself, or rely upon the SEC and othe court materials?
>
>I have attached Ayal's resume, and a document containing the SEC News release and two paragraphs from
>the full SEC complaint describing Ayal and Amir.
>
>I will be around tomorrow and through the week. I can be reached this afternoon at either 203-318-8866 or
>203-430-4218. Tomorrow morning I should be at 212 614-8045.
>
>Regards,
>
>Bruce
>
>
>
>
>
>
>
>
>
>

--
**********************
Thomas F. Cooley                    tcooley@stern.nyu.edu
Office of the Dean                  http://www.stern.nyu.edu/~tcooley
Stern School of Business
New York University
44 West Fourth St., Suite 11-58
New York, NY 10012-1126
(212) 998-0870
(212) 995-4212 Facsimile