Rules. Thus, for example: defendants did not provide Rosenthal with timely notice of the complaint against him, but waited until almost three months after the complaint was filed to do so (Pl. 56.1 ¶¶ 56, 30); Rosenthal's objections to the Stern School's improper assumption of jurisdiction over his case were ignored (Pl. 56.1 ¶¶ 82-83); no Investigative Committee was appointed by the Judiciary Committee Chair at all, let alone within two academic days as mandated by the Stern School Rules (Pl. 56.1 ¶¶ 59, 35); no Investigative Report was ever produced, let alone within seven academic days as mandated by the Stern School Rules (*id.*); the disciplinary hearing was not tape recorded as required (Pl. 56.1 ¶¶ 90, 30); the Judiciary Committee's decision was devoid of any factual findings and was based exclusively on the presumption that his guilty plea constituted a violation of Stern School Rules, rather than assessing whether his conduct damaged on the University or negatively affected his standing in the academic community (Pl. 56.1 ¶¶ 30, 92, 98); a copy of the committee's decision was never sent to him (Pl. 56.1 ¶¶ 30, 94); and his attorney was prevented from representing him at the hearing (Pl. 56.1 ¶ 30, 89).

NYU and the Stern School are obligated under New York Law to abide closely by their written policies. They are not free to disregard them when they yield an outcome that some administrators find personally objectionable. "It is well established that once having adopted rules or guidelines establishing the procedures to be followed in relation to suspension or expulsion of a student, colleges or universities—both public and private—must *substantially comply* with those rules and guidelines." *Weidemann v. State Univ. of New York College*, 188 A.D.2d 974, 975 (N.Y. App. Div. 3d Dep't 1992) (emphasis added) (citing *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 660, 404 N.E.2d 1302, 427 N.Y.S.2d 760 (N.Y. 1980)("when a university has adopted a rule or guideline establishing the procedure to be followed in relation to

17

suspension or expulsion that procedure must be substantially observed."); *see also Machosky v. State University of New York*, 145 Misc. 2d 210 (N.Y. Sup. Ct. 1989)(dismissing disciplinary charges against student based on school's refusal to permit student an advisor at a disciplinary hearing and three-month delay in bringing charges against "unreasonable and an abuse of discretion" that "resulted in significant prejudice" to student).

The basic disciplinary procedures for all NYU students – including of course Stern School students – are set forth in NYU Student Disciplinary Procedures, which are published on line and in the NYU Student Handbook. In cases where the University Senate designated jurisdiction over the case to the faculty of the school in which the student is enrolled has jurisdiction over a case, the Student Disciplinary Procedures permit that faculty to delegate its authority to the school dean or to a "Discipline Committee." Hernstadt Decl., Exh. 5 at NYU 255 (§ II.E.1); Pl. 56.1 ¶¶ 25, 27, 31. In the Stern School Student Disciplinary Rules, the Stern School faculty delegated the circumscribed responsibility for student discipline granted to it under the Student Disciplinary Procedures[6] to the MBA Judiciary Committee of the Stern School of Business at New York University ("Judiciary Committee"). Hernstadt Decl., Exh. 8 at NYU 75 (§ 1); Pl. 56.1 ¶ 32.

---

[6]    The NYU Student Disciplinary Procedures set out the minimum and fundamental procedural and due process rights that the University affords its students, and require each Discipline Committee to "file its own *additional* written rules of procedure with the Secretary of the University." Hernstadt Decl., Exh. 5 at 255 (§ II.E) (emphasis added.) The Stern Student Disciplinary Rules constitute these required supplemental rules and procedures. Although the Stern School Disciplinary Rules in some instances provide for fewer or lesser rights and protections than the NYU Student Disciplinary Procedures, the University Senate has mandated that the latter applies to all NYU students, regardless of school, and nothing in the Stern School Disciplinary Rules can be read to derogate any due process or procedural rights granted NYU students by the University Senate.

The NYU Student Disciplinary Procedures provide that, upon the filing of a complaint against a student, "[n]otice of the filing shall be mailed to the student within 48 hours." Hernstadt Decl., Exh. 5 at NYU 255 (§ II.A); Pl. 56.1 ¶ 30. Under the Stern School Disciplinary Rules, the Judiciary Committee must appoint an Investigative Committee, which must submit a written Investigative Report. *Id.* § 4.b; Pl. 56.1 ¶ 35.

Contrary to these clear and reasonable due process protections, the faculty complaint against Rosenthal was submitted to the Stern School on February 28, 2007, yet Rosenthal was not notified about it until nearly three months later in late May 2007, after two different Chairs of the Stern Judiciary Committee had been subjected to almost two months of lobbying by Stern School administrators to pursue the case. Pl. 56.1 ¶¶ 57-69, 77-80. Rosenthal contacted the school to complain about various procedural and due process violations, and to object to the school's exercise of jurisdiction over him; these complaints were simply ignored. Pl. 56.1 ¶ 82-83. A disciplinary hearing was scheduled for September 13, 2007, almost seven months after the initial complaint. Pl. 56.1 ¶ 87.

After the complaint was filed on February 28, 2008, the Judiciary Committee followed *none* of the procedures mandated by Stern School and NYU disciplinary rules. The Chair (who was improperly appointed rather than elected as required by Stern School Disciplinary Rule § 3.c, Pl. 56.1 ¶ 58) did not appoint a two-student Investigative Committee, and, obviously, no Investigative Report was submitted by such Investigative Committee. Pl. 56.1. ¶ 59. Instead, the Chair and Vice Chair of the Judiciary Committee, Tim Colvin and Amy Margolis, apparently improperly took on the job of "investigating" the complaint to see if "there is sufficient evidence to suspect a Violation." *Id.*

19

Both Colvin and Margolis repeatedly informed the Stern School through Dean of Students Gary Fraser that they did not believe the Judiciary Committee had jurisdiction over the complaint. Pl. 56.1 ¶¶ 60, 62-64, 69, 72. Instead of accepting this decision, from at least April 5 through May 9, 2007, while Tim Colvin was Chair of the Judiciary Committee, senior Stern School administrators, including Cooley, Corfman, and Fraser, blatantly and improperly sought to influence – indeed, pressure – the student Chair of the Judiciary Committee to find that the Stern School had jurisdiction over the Rosenthal Complaint. Pl. 56.1 ¶¶ 60-73.

Thus, starting on or about April 5, 2007, Fraser applied to Thomas Grace, then Director of Judicial Affairs and Compliance in the NYU Division of Student Affairs, for advice on jurisdictional issues because the Stern School "student led judiciary council would like some assistance in determining if in fact his admittance of what he did classifies as a NYU code of conduct violation." Pl. 56.1 ¶ 60. At Grace's suggestion, Cooley, Corfman, and Fraser also applied to the NYU Office of Legal Counsel for a determination of the question of jurisdiction. But NYU has admitted that, notwithstanding the assignment of the decision-making function to it under both NYU and Stern School rules, the Office of Legal Counsel did not make a determination of jurisdiction in the Rosenthal case. Pl. 56.1 ¶¶ 70-71. The advice of that Office has been deemed privileged legal advice and was not produced in this litigation.

The various emails in April and May 2007, exchanged by and among Cooley, Corfman, Fraser, Grace, and Chamberlin, on the one hand, and Colvin and his successor as (also improperly un-elected) Chair of the Judiciary Committee Mel Ochoa on the other hand, paint an ugly picture of institutional pressure on students to violate the clear rules of the University and the Stern School. Pl. 56.1 ¶¶ 60-73. Thus in response to the Judiciary Committee's informing the

Stern School that it was "leaning against taking the case because they feel no Stern or NYU rule applies," Cooley instructed Fraser to "[p]lease make sure the Committee considers" his "view is that this does fall within the domain of behavior outlined by Tom Grace. The Student's behavior damages the School's relationship with the public . . . because it affects our reputation." Hernstadt Decl., Exhs. 17-18; Pl. 56.1 ¶ 63.

By May 9, 2007, it is clear that the intervention by Stern administrators had worked as intended. As Colvin wrote to the incoming Ochoa: "At first, Amy and I did not want to investigate it, so we pushed back, because it did not seem like it fell under our area of responsibility. Recently, however, it has become more clear that NYU legal wants us to look at it. So I think we have to." *Id.*, Exh. 20; Pl. 56.1 ¶ 72. In a memorandum about the Rosenthal case dated May 20, 2007 (the "Ochoa Memo"), Ochoa essentially "punted" on the serious jurisdictional questions that had persuaded Colvin and Margolis that the Rosenthal complaint did not fall "under our area of responsibility," stated his "opinion . . . that the Student's plead of guilt . . . is sufficient evidence to suspect a violation," and sent the complaint to a disciplinary hearing. Hernstadt Decl., Exh. 21 at NYU 344-46; Pl. 56.1 ¶81.

The disciplinary hearing was also fraught with procedural problems.[7] The NYU Student Disciplinary Procedures direct a faculty's Discipline Committee to hold a hearing to address the charges against the student. Hernstadt Decl., Exh. 5 at NYU 255 (§ II.D.) The Discipline Committee has broad discretion on how to conduct the hearing, but at a bare

---

[7]    Not least among these problems was the fundamental unfairness of assigning as the two faculty members of the disciplinary hearing committee professors [Bruce Buchanan] and Rachel Kowal, who were both intimately involved in the discovery of Rosenthal's legal issues in early February 2007.

minimum, NYU rules expressly require that the following three provisions be observed: (1) that

the hearing be tape recorded, (2) that within seven days of the hearing the committee submit to

the dean, the student, and the secretary of the University a final written report containing

findings of fact and reasons for the decision, and (3) that the student has the right to be

accompanied by counsel or an adviser. *Id.* (§ II.D); Pl. 56.1 ¶ 30.

Shockingly, the Judiciary Committee observed *none* of these three simple yet

essential requirements. The September 13, 2007 disciplinary hearing was not tape recorded,

Rosenthal did not receive the final written report from the Judiciary Committee, which itself was

not submitted within seven days and did not contain any findings of fact, and Rosenthal's

counsel was not allowed to be present with Rosenthal during the hearing. Defendants' blatant

disregard of *all* the significant due process protections mandated in the NYU Student

Disciplinary Procedures made a mockery of the proceeding. Moreover, it severely hampered

Rosenthal's ability to appeal the unsupportable finding against him, as he was denied both the

NYU-mandated record of the hearing (the tape recording) and the NYU-mandated written

findings of the disciplinary committee. Pl. 56.1 ¶¶85-90.

The written report of the disciplinary committee of the Judiciary Committee,

dated October 1, 2007, consists of a two-page letter from Judiciary Committee Chair Ochoa to

Cooley. In it, Ochoa summarily rejected Rosenthal's demonstration that the Stern School did not

have jurisdiction to pursue a claim against him by ignoring the NYU Student Disciplinary

Procedures and University Policy on Student Conduct, and relying exclusively on the reference

in Stern School Disciplinary Rules that it has jurisdiction over violations of federal, state and

local law. Pl. 56.1 ¶¶ 92-93. Under the applicable NYU rules and procedures, the Stern School

22

would have such jurisdiction, *if, and only if*, the complained of conduct fell into one of the five enumerated cases designated to Faculty Jurisdiction by the University Senate. It is undisputed that Rosenthal's conduct does not. Hernstadt Decl., Exh. 3 at NYU 43. Ochoa similarly rejected Rosenthal's allegations that his procedural and due process rights were violated by discounting those procedural rights the Judiciary Committee admittedly ignored – the appointment of an Investigative Committee and the issuance of a written Investigative Report – and simply failing to address all of the procedural and due process rights granted by the NYU Student Disciplinary Procedures. *Id.* at NYU 44.

Finally, the Ochoa letter implicitly acknowledge that the discipline committee engaged in no fact-finding at all, but wrote that "the Judiciary Committee cannot speculate if Mr. Rosenthal's actions have harmed or will harm the reputation" of NYU or the Stern School, but that "Rosenthal has violated the Honor Code and Code of Conduct based on his own admission at the Hearing Panel that he broke the law while a student . . . For this, Mr. Rosenthal is subject to the sanctions recommended by this body." *Id.* In other words, without finding any facts, or analyzing the applicability of the Stern School Honor Code or Code of Conduct or the NYU Student Disciplinary Procedures, the Judiciary Committee concluded unanimously that Rosenthal's guilty plea was a *per se* violation of the Stern School Honor Code and Code of Conduct. Pl. 56.1 ¶ 98. The absence of fact finding and the solipsistic conclusion is itself a brutal denial and violation of one the Stern School Disciplinary Rules: "The Accused is presumed innocent until proven guilty by standard of beyond a reasonable doubt." Hernstadt Decl., Exh. 8 at NYU 78-79 (§§ 5.h and 6.a).

Defendants also denied Rosenthal a copy of October 1, 2007 report, and by failing to make one, the required tape recording of the hearing in violation of NYU and Stern School rules and procedures. Cooley's stated that his determination not to confer an MBA upon Rosenthal was based at least in part upon that report. Defendants' blatant denial of Rosenthal's due process rights, even after Rosenthal specifically requested the materials under NYU procedures (Pl. 56.1 ¶ 101), meant that in appealing Cooley's determination against him, Rosenthal had no access to the disciplinary hearing committee's findings of fact and recommendations upon which that determination was base. Defendants' refusal to satisfy the most fundamental due process rules under NYU's own published procedures was prejudicial to Rosenthal.

Defendants' denial of Rosenthal's rights did not stop at ignoring the NYU Student Disciplinary Procedures. Cooley underscored the fact that Rosenthal was prejudged in the disciplinary hearing and before by making it clear that Cooley and the Judiciary Committee found that Rosenthal violated Stern School policies and denied him an MBA degree simply and solely because he plead guilty to a crime: "I wish to emphasize that at every stage of the proceeding, your guilty plea to conscious avoidance of securities law has been the deciding factor in the decisions made." Hernstadt Decl., Exh. 24 at NYU 42.

Defendants blatantly and egregiously breached their own rules, and in doing so denied Rosenthal crucial due process protections to which he was entitled. Students at a private school have to be able to rely upon the school to follow the established procedures it voluntarily promulgated. Here, there are so many irregularities in the way the case was handled that Rosenthal is entitled to summary judgment as a matter of law that NYU did not substantially

24

comply with the letter and the spirit of its written regulations. Other than paying minimal lip service to its procedures by providing Rosenthal with a disciplinary hearing, defendants failed to follow virtually every rule established to protect student rights in the NYU Student Disciplinary Procedures and Stern School Disciplinary Rules. In light of the vast procedural errors and intentional violations of the disciplinary rules, the determination not to confer upon Rosenthal an MBA degree should be annulled and the degree awarded.

IV.    **Plaintiff Is Entitled to Summary Judgment Because the Disciplinary Process Against Him Was Fundamentally Unfair**

As a student, Rosenthal had the right to be treated fairly by defendants and to have an impartial disciplinary hearing on his case. From its inception, however, the process by which defendants stripped Rosenthal of his MBA degree was fundamentally unfair. Not only did defendants deliberately refuse to follow nearly every single one of the applicable NYU and Stern School disciplinary rules, revealing a clear pattern of disregard for Rosenthal's rights, but this case was also marred by a series of highly unethical acts by Stern administrators that demonstrate bad faith in their dealings with Rosenthal.

The Stern Student Disciplinary Rules state that "The student has the right for a fair and timely hearing." Pl. 56.1 ¶ 33. The hearing against Rosenthal was anything but fair and timely. First, defendants waited for more than three months before notifying Rosenthal of the Complaint against him, and an additional three months before they held a hearing on the complaint. Pl. 56.1 ¶¶ 54, 76, 85. Courts in other cases have ruled that such a long and unjustified delay is fundamentally unfair to the student. *Machosky v. State Univ. Of New York as Oswego*, 546 N.Y.S.3d 513 (NY Sup. Ct. 1989). Second, Rosenthal was denied his right to an attorney, also a crucial right. Pl. 56.1 ¶ 89. *Id.* Third, the failure to record the hearing (Pl. 56.1 ¶

90), and both the sparse hearing minutes and unsupported and conclusory determination by the

Disciplinary Hearing, both of which Cooley refused to send Rosenthal (Pl. 56.1 ¶¶ 92-98, 101)

deprived Rosenthal of the opportunity to effectively challenge the committee's decision on

appeal.

Fourth, the committee based its decision, in part, on Rosenthal's alleged violation

of the Stern Code of Conduct. Pl. 56.1 ¶ 92. This allegation was not part of the Complaint, was

not mentioned in any of the preparatory documents sent to Rosenthal and the committee, and

Rosenthal never received notice of this allegation. Pl. 56.1 ¶¶ 95-96. Thus, Rosenthal was

deprived of the right to defend himself against this charge. *See Ebert v. Yeshiva Univ.*, 780

N.Y.S.2d 283 (NY Sup. Ct. 2004) (annulling decision to expel student accused of attacking

another student because the university did not provide adequate notice of the "exact charges

against him" as required by its disciplinary rules; "basic standard of fairness" requires "[p]roper

notice of charges and an opportunity to prepare a defense is certainly a right of all, and should

not be easily taken away").

Fifth, the faculty members appointed to the disciplinary hearing committee, or

otherwise involved in the hearing, had all been involved in Rosenthal's case from the first day

that the Stern School learned of Rosenthal's legal issues, and should all have been recused based

on conflicts of interest. Hernstadt Decl., Exhs. 11-12. Fraser was the intermediary between the

Judiciary Committee and the Stern deans, relaying to Colvin, Margolis and Ochoa all of the

emails and messages pressuring the Judiciary Committee to back down from its position that it

had no jurisdiction to hear the complaint against Rosenthal. Pl. 56.1 ¶¶ 60-69. More troubling

was Buchanan's involvement with the disciplinary hearing committee, given that it was he who

26

presented the case against Rosenthal to the Faculty at its October 3, 2007 meeting.[8] Hernstadt

Decl., Exh. 23. These professors, who were intimately involved in the events leading to the filing

of the complaint against Rosenthal and voted to refer the matter to the Judiciary Committee,

were clearly biased against him and had no place judging him. Pl. 56.1 ¶ 88.

        Even more egregious were defendants' improper extra-judicial interference with

the disciplinary process. NYU and Stern had a duty to treat Rosenthal's case in a fair, impartial,

and even-handed manner. "Implicit in the implied contract between the student and the

university are the obligation of the university to act in good faith when dealing with the student

and the student's obligation to satisfy the university's academic requirements and to comply with

the institution's procedures if she wishes to receive her degree." *Gally v. Columbia Univ.*, 22 F.

Supp. 2d 199, 206 (S.D.N.Y. 1998) (citing Olsson, 49 N.Y.2d at 414); *See also Radin v. Albert

Einstein College of Med. of Yeshiva Univ.*, 2005 U.S. Dist. LEXIS 9772 (S.D.N.Y. May 20,

2005).

        The discovery obtained in this case manifestly shows how various Stern deans

worked for weeks to exert undue influence on the Judiciary Committee. When the committee

expressed its initial reluctance to bring charges against Rosenthal, Cooley and Corfman asked

Fraser to advise the Committee that the deans' perspective was different and that jurisdiction

existed. Pl. 56.1 ¶ 63. Once it appeared that the Judiciary Committee was "leaning against

taking the case because they feel no Stern or NYU rule applies," Cooley directed Fraser to

inform the student that the "The NYU Office of Legal Counsel has the official word on matters

---

[8]     Although Ochoa sent Buchanan a copy of the disciplinary hearing materials the day of the hearing, according to the minutes of the hearing, he did not attend it. Hernstadt Decl., Exhs. 21, 3 (at NYU 53).

of jurisdiction" (Pl. 56.1 ¶ 66) and that "Judiciary Committee's job is to determine (a) whether

the student's behavior damaged or endangered the School's reputation and (b) what punishment

is appropriate." Pl. 56.1 ¶ 68. By April 21, 2007, the Judiciary Committee was "still not 100%

sure as to whether the Rosenthal case is something [the Committee] should take on. [The

Committee is] still feeling that this is not within [its] jurisdiction . . ." When that initial pressure

tactics did not achieve their intended purpose, defendants delayed the process long enough for

the instatement of a new Judiciary Committee—with more complicit and less knowledgeable

members.

      The deans' high pressure and dilatory approach worked. By mid-May 9, 2007, a

new Judiciary Committee was preparing to replace the outgoing one. Pl. 56.1 ¶ 72. Colvin, the

outgoing chair, wrote incoming Chair Ochoa that "[a]t first, Amy and I did not want to

investigate it, so we pushed back, because it did not seem like it fell under our area of

responsibility. Recently, however, it has become more clear that NYU legal wants us to look at

it. So I think we have to." Pl. 56.1 ¶ 72. Ochoa, and subsequently the Judicial Committee, did

not investigate the genuine jurisdictional issue, but, bizarrely, deferred the question of whether

jurisdiction existed to conduct a hearing to the hearing itself. At the hearing, the Judiciary

Committee simply concluded, with reference only to Stern School rules, that the "complaint falls

within the Judiciary Committee's jurisdiction" because it has jurisdiction over matters involving

"matriculated and continuing MBA students," and over "violations of federal, state and local

laws". Pl. 56.1 ¶ 92.

      The Stern deans' and NYU attorneys' unethical interjection of themselves into the

Judiciary Committee's decision-making process, pressuring the Committee to review the case

against its purportedly independent judgment, irreparably tainted the determination against

28

Rosenthal. It was obvious that the first Judiciary Committee did not want to adjudicate this case because it believed it was beyond its power to do so. So the deans stalled the process long enough for a new Judiciary Committee Chair, with less experience and understanding of the relevant issues (except for the fact that the Stern School and NYU wanted the matter to proceed against Rosenthal) could take over. The potential for mistake, prejudice, and abuse under such conditions was very high. Indeed, when the incoming Chair took on the case, he did not appoint an Investigative Committee, or even inform any other member of the committee about the Rosenthal case, but decided on his own, with the materials provided to him by the Stern School deans, that the case was a *fait accompli*. Thus it cannot be said that the Judiciary Committee reached its decision upon the exercise of honest discretion after a full review of the operative facts.

Cooley's obstruction of the disciplinary process did not end there. Remarkably, shortly after the Complaint against Rosenthal was filed, while the Stern School deans were working to influence the Judiciary Committee Chair to change his mind that there was no jurisdiction to take up the case against Rosenthal, Cooley conducted a class discussion with MBA students about a *Wall Street Journal* article regarding the securities case against several members of Rosenthal's family. Pl. 56.1 ¶ 74. In the discussion about the case, Cooley informed the students that the Ayal Rosenthal in the article was a Stern School student, which the article did not include. The discussion also included the question of how the Stern School should punish a student such as Rosenthal who was convicted of violating federal securities laws. At that time, Cooley knew of the pending disciplinary proceedings against Rosenthal, and either knew, or should have known, that some of the students may be members of the Judiciary Committee. *Id.*; Hernstadt Decl., Exh. 30.

29

Cooley's class discussion not only violated Rosenthal's privacy rights, and may have prejudiced Judiciary Committee members against Rosenthal, but it may have also run afoul of federal law. *See* 20 USC § 1232g (Family Educational Rights and Privacy Act); *See also United States v Miami Univ.* 91 F. Supp. 2d 1132(SD Ohio 2000), affd 294 F3d 797 (6th Cir. 2002) (universities violated FERPA by releasing student disciplinary records containing personally identifiable information without prior consent of students or their parents). Even if no such prejudice took place, Cooley's wanton disregard of the potential harm such a class discussion may cause Rosenthal is highly indicative of defendants' carelessness in ensuring that Rosenthal is treated fairly throughout the disciplinary process. Moreover, in light of Cooley's obvious prejudice and animus against Rosenthal's case, he should have recused himself from deciding the appeal in this matter.

## V.    Plaintiff Is Entitled to Summary Judgment Because the Punishment He Received Was Unauthorized, Excessive, and Unfair

The decision by defendants not to award Mr. Rosenthal an MBA degree was disproportionately harsh and excessive. A court in an Article 78 proceeding may annul or amend a decision that "was excessive and an abuse of discretion under the circumstances." *Koupash v. Board of Education*, 72 A.D.2d 885, 886 (3d Dep't 1979). The court must find that "the measure of punishment or discipline imposed is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness." *Pell v. Board of Education*, 34 N.Y.2d 222 (1974).

A punishment is "shocking to one's sense of fairness" if the impact of the penalty on the individual subjected to it "is so severe that it is disproportionate to the misconduct, or to the harm to the agency or the public in general." *Kelly v. Safir*, 96 N.Y.2d 32, 38 (2001);

30

*Koupash*, 72 A.D.2d at 886 (finding dismissal of a school custodian excessive and modifying punishment imposed). This determination is made by the court as a matter of law. *Pauling v. Smith*, 46 A.D.2d 759, 760 (1st Dep't 1974) (annulling a decision to dismiss New York City Department of Social Services employee because a suspension would "more appropriately satisfy the ends of justice").

There should be no doubt that NYU's decision had a profound and devastating impact on Rosenthal. As a student in the part-time program, he spent nearly all of his free time for almost three years working toward his degree. He expended tens of thousands of dollars obtaining the degree and had successfully completed all of his coursework. By refusing to award him the degree, defendants have undone Rosenthal's years of hard work and effort. NYU's penalty is disproportionately harsh when weighed against the misconduct and the fact that Rosenthal had already been punished by a federal court – as expressly contemplated in the NYU Student Disciplinary Procedures that declined to permit disciplinary actions for off-campus, non-academic conduct such as Rosenthal's. Finally, defendants have not demonstrated, have never attempted to demonstrate, and cannot demonstrate that Rosenthal's conduct cause any harm to the University.

The decision to not award Mr. Rosenthal his degree also entirely fails to take into account the many mitigating circumstances in this case, which courts in Article 78 proceedings frequently consider. For example, Rosenthal's conviction was not on university property, was unrelated to his position as a student at the university, and was not otherwise related to the university; Rosenthal had no prior disciplinary problems at NYU; Rosenthal had already completed all credits and requirements, and paid all fees, needed to graduate; and Rosenthal expressed his profound remorse for his actions. Most importantly in light of NYU's clear

31

policies and procedures prohibiting schools from punishing students for conduct that has already been punished by a court, Rosenthal has been severely punished for his wrongful conduct. He has served his time, successfully completed probation, and went over and above his community service hours. He was already punished by the judicial system, and will continue to suffer collateral consequences from his felony convictions for many years to come.

Moreover, the determination against Rosenthal was based the fact that he had pled guilty to criminal conduct. Defendants did not investigate, consider, or base the decision not to confer an MBA degree on Rosenthal any harm to the Stern School or the University, or on any negative effect of the conduct on Rosenthal's standing in the academic community. Rather, it simply concluded, without more, that the conviction constituted a violation. It is clear that Rosenthal showed extraordinarily poor judgment disclosing his client's confidential information to his brother. But as Rosenthal's allocution clearly demonstrates, his crime involved a single instance of consciously avoiding federal securities law by revealing the existence of a confidential deal. Hernstadt Decl., Exh. 3 at NYU 45-52. Rosenthal was not charged with, and did not plead to personally trading on or deriving any benefit from the information he revealed.

The penalty inflicted on Rosenthal for non-violent, off-campus conduct that had no impact on the University or any of its members or students, was also unprecedented. In *Quercia v. NYU*, 838 N.Y.S.2d 538 (1st Dept 2007), for example, the First Department found that a long suspension of a student who was discovered to have been dealing drugs out of his dormitory room (ten ounces of marijuana, $1,740 in cash, a scale, and two boxes of Ziploc bags were discovered in his room) was not arbitrary and capricious and was substantially in keeping with the University's own published rules. Rosenthal's criminal conduct, however, had no connection to NYU, and defendants did not follow its own published rules and procedures in

32

pursuing a complaint against him. Such conduct is thus arbitrary and capricious: NYU cannot

punish Rosenthal more harshly than other students without adequate justification. *See Klein v.*

*Levin,* 305 A.D.2d 316, 320 (1st Dep't 2003) (a decision under review in an Article 78

proceeding is deemed "arbitrary and capricious" if the adjudicating body "neither adheres to its

own prior precedent nor indicates its reason for reaching a different result on essentially the same

facts") (*quoting Matter of Charles A. Field Delivery Serv., Inc.*, 498 N.Y.S.2d 111 (1985)).

Rosenthal's conduct was illegal and extremely foolish, but he paid dearly for it.

Defendants' conduct in wiping out years of work, in violation of their own procedures and rules,

was excessive and unfair. As such, it should be annulled.

## CONCLUSION

For all of the foregoing reasons, NYU's determinations must be annulled and

judgment should be entered awarding Mr. Rosenthal his diploma, together with any such other

and further relief as may be deemed just and proper.

Dated: New York, New York
        February 1, 2010

By: _Edward Hernstadt_

Edward Hernstadt
HERNSTADT ATLAS LLP
11 Broadway, Suite 615
New York, New York 10004
T: 212-809-2501
Attorneys for Plaintiff Ayal Rosenthal

33