New York University Office of General Counsel
Nancy Kilson (NK 4557),
Associate General Counsel
70 Washington Square South, Rm. 1158
New York, New York 10012
Tel.: (212) 998 2258
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

AYAL ROSENTHAL,

                    Plaintiff,                08 CV 5338 (LAK)
                                                ECF Case

      v.

NEW YORK UNIVERSITY, *et al.,*

                    Defendants

_____

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

## Table of Contents

Table of Authorities ………………………………………………………………..iii

Preliminary Statement ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 2
Introduction.................................................................................................................. 2
The Government's Investigation of Rosenthal ............................................................. 3
Rosenthal's Service as a Teaching Assistant Under Criminal Investigation................. 4
Rosenthal's Guilty Plea................................................................................................. 5
The Stern Faculty Vote To Bring A Disciplinary Case Against Rosenthal................... 6
The Applicable Disciplinary Rules ............................................................................... 8
The Disciplinary Complaint Against Rosenthal ........................................................... 10
Rosenthal's Hearing Before the Judiciary Committee................................................. 13
The Faculty Vote Against Conferring Rosenthal's Degree .......................................... 16
Rosenthal's Lawsuit..................................................................................................... 18

ARGUMENT ............................................................................................................... 20
The Summary Judgment Standard ................................................................................ 20

Point One : This Court Should Grant Summary Judgment
Dismissing Count Four (Breach of Contract) ............................................ 20

A.    There Was No Material Procedural Violation ............................................. 21
B.    The University And Stern Acted Within Their Academic Discretion.......... 23

Point Two : There Is No Genuine Dispute That Rosenthal's
Article 78 Claims Lack Merit As A Matter of Law................................... 25

Count Five.................................................................................................... 25
Count Six ..................................................................................................... 26
Count Seven ................................................................................................. 28

Point Three : Even If Rosenthal Had a Viable Claim, He Would Not Be
Entitled To A Degree or Damages........................................................ 29

Conclusion ................................................................................................................... 30

# Table of Authorities

*A. and B. v. C. College*,
  863 F.Supp. 156 (S.D.N.Y. 1994) ................................................................ 30

*Al-Khadra v. Syracuse Univ.*,
  291 A.D.2d. 865, 737 N.Y.S.2d 491 (4th Dep't 2002) ................................. 26

*Bhandari v. Trustees of Columbia Univ.*,
  2000 WL 310344 (S.D.N.Y.  Mar. 27, 2000) ...................................... 21, 24

*DeQuito v. New School for General Studies*,
  2009 WL 4841058 (1st Dep't. Dec. 17, 2009) ..................................... 21, 27

*Dinu v. President and Fellows of Harvard Coll.*,
  56 F.Supp.2d 129 (D. Mass. 1999) .............................................................. 23

*Donohue v. Baker*,
  976 F.Supp. 136 (N.D.N.Y. 1997) ............................................................... 22

*Ebert v. Yeshiva Univ.*,
  28 A.D.3d 315,  813 N.Y.S.2d 408 (1st Dep't 2006) ............................ 21, 27

*Fernandez v. Columbia Univ.*,
  16 A.D.3d 227, 790 N.Y.S.2d 603 (1st Dep't 2005) ............................ 26, 27

*Fraad-Wolff v. Vassar*,
  Coll., 932 F.Supp. 88 (S.D.N.Y. 1996) ....................................................... 21

*Galiani v. Hofstra Univ.*,
  118 A.D.2d 572, 499 N.Y.S.2d 182 (2d Dep't 1986) ................................... 26

*Harris v. Trustees of Columbia Univ.*,
  98 A.D.2d 58 (1st Dep't 1983)
  *rev'd,* 62 N.Y.2d 956, 468 N.E.2d 64, 479 N.Y.S.2d 216 (1984) ............... 24

*Kramer v. Kinney*,
  87 A.D.2d 870, 449 N.Y.S.2d 312 (2d Dep't 1982) ..................................... 28

*Kreisler v. New York City Transit Auth.*,
  2 N.Y.3d 775, 812 N.E.2d 1250, 780 N.Y.S.2d 302 (2004) ........................ 27

*Majewski v. State Univ. of  N.Y.*,
  295 A.D.2d 944, 744 N.Y.S.2d 590 (4th Dep't 2002) ................................. 22

*Mary M. v. Clark*,
    100 A.D.2d 41, 473 N.Y.S.2d 843 (3d Dep't 1984).................................................... 22

*Moghimzadeh v. Coll. of Saint Rose*,
    236 A.D.2d 681, 653 N.Y.S.2d 198............................................................................ 21

*Ollman v. Special Bd. of Adjustment No. 1063*,
    527 F.3d 239 (2d Cir. 2008)...................................................................................... 20

*Olsson v. Board of Higher Educ.*,
    49 N.Y.2d 408, 426 N.Y.S.2d 248, 402 N.E.2d 1150 (1980)................................ 24, 29

*O'Sullivan v. New York Law School*,
    68 Hun. 118, 52 N.Y.St. Rep. 14, 22 N.Y.S. 663 (1st Dep't 1893) ....................... 23, 25

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*,
    2009 WL 2957789 ................................................................................................... 24

*Pell v. Board of Educ.*,
    34 N.Y.2d 222, 313 N.E.2d 321, 356 N.Y.S.2d 833 (1974)........................................ 27

*Quercia v. New York Univ.*,
    41 A.D.3d 295, 838 N.Y.S.2d 538 (1st Dep't 2007)............................................... 21, 27

*Sabin v. State Univ. of New York Maritime College*,
    92 A.D.2d 831, 460 N.Y.S.2d 332 (1st Dep't 1983)............................................... 26, 27

*Swett v. Colgate Univ.*,
    176 A.D.2d 11, 578 N.Y.S.2d 713 (3d Dep't 1992).................................................... 21

*Tedeschi v. Wagner*,
    Coll., 49 N.Y.2d 652, 404 N.E.2d 1302, 427 N.Y.S.2d 760 (1980)............................. 21

*Trahms v. Trustees of Columbia Univ.*,
    245 A.D.2d 124, 666 N.Y.S.2d 150 (1st Dep't 1997)................................................. 27

*United States v. Pierre*,
    285 Fed. Appx. 828 (2d Cir. 2008)............................................................................. 5

*Wasson v. Trowbridge*,
    382 F.2d 807 (2d Cir. 1967)..................................................................................... 22

## **Statutes**

18 U.S.C. §§ 371 and 3551, et seq. ....................................................................................... 7

New York University Office of General Counsel
Nancy Kilson (NK 4557),
Associate General Counsel
70 Washington Square South, Rm. 1158
New York, New York 10012
Tel.: (212) 998 2258
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

AYAL ROSENTHAL,

                    Plaintiff,                 08 CV 5338 (LAK)
                                                     ECF Case

        v.

NEW YORK UNIVERSITY, *et al.,*

                    Defendants

_____

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

### <u>Preliminary Statement</u>

    Defendants, New York University ("NYU" or the "University"), the NYU Stern

School of Business ("Stern") and Dean Thomas F. Cooley ("Dean Cooley") respectfully

submit this Memorandum of Law in support of their motion for summary judgment

dismissing the Second Amended Complaint of Plaintiff, Ayal Rosenthal ("Rosenthal") in

its entirety.  The claims properly remaining in the Second Amended Complaint are only

three:  (1) Count Four, alleging that NYU and Stern breached a contract with Rosenthal,

allegedly by improperly imposing discipline upon him; (2) Count Six, alleging that the

Defendants' decision to impose discipline on Rosenthal was arbitrary, capricious, and/or an abuse of discretion; and (3) Count Seven, alleging that the decision did not rest on substantial evidence.  Rosenthal cannot meet his burden of proving any of these claims, as a matter of law.  Moreover, Rosenthal improperly ignores that the decision not to confer his degree, although in part the result of a disciplinary process, had a distinctly academic component.  It is dispositive that the Stern faculty found Rosenthal academically unqualified to receive the MBA degree, a decision this Court should not second guess under well-settled New York law.  For all of these reasons, Defendants are entitled to summary judgment.

Remarkably, in his Second Amended Complaint, Rosenthal has restated certain additional claims that this Court dismissed in the Court's July 21, 2009 Order ruling on Defendants' motion to dismiss.  By service of a draft pretrial order on February 1, 2010, Rosenthal advised that these claims are now withdrawn.  In any event, they are no longer before this Court under the law of the case doctrine.

## STATEMENT OF FACTS

### Introduction

Rosenthal began his studies as a part-time Masters of Business Administration ("MBA") degree candidate in Stern's Langone Program in January 2005.  At the time, he was a certified public accountant and an employee of PricewaterhouseCoopers LLP ("PwC"), where he had worked since 2001.  Before beginning his studies at Stern, on January 22, 2005, Rosenthal signed Stern's "MBA Code of Conduct," as Stern required all MBA students to do.   Defendants' Rule 56.1 Statement ("DR56") ¶¶ 1, 3, 9.  By executing the Code of Conduct, Rosenthal affirmed that he understood that Stern

"[s]tudents are expected in all of their actions to reflect personal honesty, integrity and respect for others." *Id.*, ¶ 4.

Rosenthal was enrolled in part-time summer classes at Stern in late May 2005, when he learned certain confidential information from his supervisors at PwC in connection with a pending acquisition of one of PwC's clients. *Id.*, ¶ 10. As a PwC employee, Rosenthal had received certain "manuals [that] emphasized the inappropriateness of insider trading." *Id.*, ¶ 11. Nonetheless, in late May 2005, "in breach of duties [he] owed to [PwC] and other professional duties, [Rosenthal] communicated . . . material, non-public information concerning the contemplated transaction . . . to [his brother] Amir Rosenthal so that Amir Rosenthal could use the information to execute profitable securities transactions." *Id.*, ¶ 12. Rosenthal recently testified, in substance, that he does not know whether this conduct reflected honesty, integrity, and respect for the rights of others, the values he committed to uphold when he signed Stern's MBA Code of Conduct. *Id.*, ¶ 109.

### The Government's Investigation of Rosenthal

By early 2006, Rosenthal knew that the government had begun an investigation related to his or his relatives' trading activities. This investigation led to criminal proceedings against Rosenthal. *Id.*, ¶¶ 13, 14. He therefore retained criminal defense counsel early in 2006. *Id.*, ¶ 15. By May 2, 2006, Rosenthal had resigned his position with PwC. *Id.*, ¶ 16. It is surely no coincidence that Rosenthal resigned his position at PwC eight days before it received a comprehensive subpoena from the SEC for records relating to its investigation. *Id.*, ¶ 17. Rosenthal did not tell PwC about the investigation when he left his job there, however. (Kilson Dec. Exh. C at 56.). Barely a week later,

3

PwC received an extensive subpoena from the SEC concerning Rosenthal.  Declaration of Richard J. DeMarco, executed on January 12, 2010, Exhibit 1.  Within two weeks of his resignation from PwC, Rosenthal received a $500,000 check from Aragon Partners LP ("Aragon").  *Id.*, ¶ 18.  Aragon is a hedge fund that received the proceeds of illegal trading activities of one or more of Rosenthal's family members.  *Id.*, ¶ 19.  In addition to the $500,000 check, Rosenthal received further payments from Aragon to pay his taxes and his criminal defense attorneys.  *Id.*, ¶ 20.  Rosenthal recently admitted that, after he stopped working at PwC, he supported himself using the money he received from Aragon, which may have been "tainted" because it came from illegal activity.  *Id.*, ¶ 21.

### Rosenthal's Service as a Teaching Assistant Under Criminal Investigation

Following his resignation from PwC, Rosenthal sought and obtained positions as a teaching assistant in three courses at Stern: Financial Accounting & Reporting (Summer 2006), Principles of Accounting (Fall 2006) and, most ironically, Professional Responsibility (Fall 2006).  Rosenthal had previously been a teaching assistant in two Stern courses, during the Fall 2005 and Spring 2006 semesters.  Stern compensated Rosenthal for each of his stints as a teaching assistant in the form of tuition remission payments.  *Id.*, ¶¶ 22-24.

Rosenthal admittedly did not disclose to any of the Stern faculty members who hired him as a teaching assistant that, while he served in that capacity, he was the subject of an ongoing criminal investigation involving insider trading that he had engaged in, violating both his obligations to PwC and its clients and the commitment he had made to Stern in the MBA Code of Conduct.  *Id.*, ¶ 25.  Because he was a teaching assistant and part-time employee of Stern, Rosenthal's criminal conduct also violated the NYU "Code

of Ethical Conduct," which requires all University employees to, among other things, "at all times, [act] in accordance with the highest professional and community ethical standards." *Id.*, ¶¶ 6-7.  Nor did Rosenthal disclose his criminal violation and guilty plea to Stern until after they had been publicly reported in the news media. *Id.*, ¶¶ 26-27.

### **Rosenthal's Guilty Plea**

On February 8, 2007, in a hearing before Judge Gleeson of the Eastern District of New York, Rosenthal pled guilty to a one-count information charging him with conspiracy to commit securities fraud. *Id.*, ¶ 28.  In his allocution, Rosenthal stated that he had "consciously turned a blind eye to what would have otherwise been obvious . . . : that [his] brother was going to trade, in violation of United States securities laws, on [the] information that [Rosenthal] provided to him." *Id.*, ¶ 29.  Rosenthal has alleged before this Court that the University, in imposing discipline on him, failed to recognize that he pled guilty only to "conscious avoidance" of the securities laws.[1]  Rosenthal was charged with and pled guilty to conspiracy to engage in securities fraud, however.  Kilson Dec. Exh. D-8 at 4.

Moreover, on May 30, 2007, when Judge Gleeson sentenced Rosenthal to 60 days' incarceration, he expressed considerable skepticism about Rosenthal's attempts to minimize his guilt by asserting he had engaged only in "conscious avoidance."  Judge Gleeson stated:

> There's a difference between a mistake and what happened here.  This isn't a mistake.  You are an adult, you're well educated.  You lack the circumstances that render your

---

[1] "Conscious avoidance" is a type of knowledge that requires proof that a defendant "deliberately contrive[ed] not to learn … key facts …."  *United States v. Pierre*, 285 Fed. Appx. 828, 830 (2d Cir. 2008). It in no way suggests innocence.

> crime understandable that so often exist[] in the criminal
> cases that come into this courthouse.
>
> You made a choice to violate the duty of confidentiality.
> I'm not a hundred percent persuaded that . . . the
> knowledge component of this crime is really filled by just
> conscious avoidance given your circumstances.

DR56 at ¶ 31.

### The Stern Faculty Vote To Bring A Disciplinary Case Against Rosenthal

Rosenthal completed the coursework for his MBA degree in December 2006.

DR56 ¶ 8.  But for his criminal conviction, he would have received his degree as of

January 2007.  *Id.*  In early February 2007, however, it came to the attention of a Stern

professor, Bruce Buchanan, that the SEC had charged a number of individuals, including

Rosenthal and several of his family members, with "running an insider trading operation

. . . ."  DR56 ¶ 32.  Buchanan noted that Rosenthal, "in addition to receiving stolen

information from his father [was] charged with leaking confidential information from

PwC to the family hedge fund [Aragon] for the purpose of insider trading."  *Id.*, ¶ 33.

Professor Buchanan reported this information to Stern's Dean, defendant Cooley, on

February 11, 2007.  *Id.*, ¶ 32; Cooley Dec., Exh. 2.

On February 12, 2007, the day after Dean Cooley learned of the SEC charges

against Rosenthal, the Dean raised the issue of Rosenthal's misconduct at a meeting of

Stern Vice Deans.  The minutes of the meeting reflect that there was a consensus among

the Vice Deans that "the School should review whether [Rosenthal's] criminal activity

. . . means that he has not fulfilled the explicit and implicit requirements of the degree."

DR56 ¶¶ 34-35.

Meanwhile, the *Wall Street Journal* and the *New York Law Journal* published

articles on February 9, 2007 reporting on the guilty pleas of Rosenthal and several of his

family members to charges involving insider trading.  Professor Buchanan noted the *Wall Street Journal* article and brought it to the attention of Dean Cooley and others at Stern on February 13, 2007.  At about the same time, Dean Cooley received and reviewed a transcript of Rosenthal's guilty plea hearing and allocution.  *Id*., ¶¶ 36-38.

On February 22, 2007, the Stern faculty held a regularly scheduled meeting to vote on, among other things, the approval of MBA candidates for graduation from Stern as of January 2007.  The minutes reflect that the faculty approved the award of degrees to 155 MBA degree candidates.  The faculty also unanimously voted, however, that "the case of Ayal Rosenthal, having pleaded guilty to the intent to commit securities fraud, be remanded to the Stern School's Judiciary Committee and [its] procedures."  *Id.*, ¶¶ 39-41.

This Court has previously recognized that, under NYU's Bylaws, "[d]egrees in course are granted by the Board [of Trustees] to candidates recommended by the President [of the University] on certification by a faculty as having fulfilled the requirements for a degree."  DR56 ¶ 42; *Rosenthal v. New York Univ*., Order dated July 21, 2009 at 2.  The Stern faculty never certified that Rosenthal was qualified to receive the MBA degree.  Instead, based on the faculty vote to remand Rosenthal's case to the Stern Judiciary Committee, representatives of the Stern Dean's office began working on a written complaint against Rosenthal on the day of the February 22, 2007 faculty meeting.  Lee Sproull, formerly Stern's Vice Dean of Faculty, signed the resulting faculty complaint, which was dated February 28, 2007.  DR56 ¶¶ 43-45.

The faculty complaint noted that Rosenthal "was in serious violation of the NYU Stern MBA Code of Conduct and the NYU Code of Ethical Conduct in actions he took while a matriculated student at Stern."  *Id.*, ¶ 46.  Further, the complaint noted the NYU

Policy on Student Conduct that "[s]tudents are expected to conduct themselves as mature and law-abiding members of both the University community and the general community." *Id.*, ¶ 47. In addition, the complaint correctly noted that Rosenthal had entered a plea of guilty before Judge Gleeson "to conspiracy to commit securities fraud . . . in an insider trading scheme involving his father, brother and a childhood friend." *Id.*, ¶ 48.

In the complaint, Dean Sproull went on to note the Stern faculty's belief that, in light of his guilty plea, Rosenthal "was not qualified to receive the degree of Master of Business Administration." *Id.*, ¶ 49. She further noted the faculty vote to remand Rosenthal's case to the Judiciary Committee, and asked that committee "at the earliest opportunity to review the case and provide its recommendations to the Dean of the School." *Id.*, ¶ 50.

### The Applicable Disciplinary Rules

Stern's "Policies and Procedures, Student Disciplinary Rules" in effect during 2007 (the "Policies and Procedures") provide that "[s]tudent discipline is the responsibility of the faculty of [Stern] . . . ." *Id.*, ¶ 52. The Policies and Procedures reflect, however, that the Stern faculty has delegated its disciplinary authority to Stern's "MBA Judiciary Committee" (the "Judiciary Committee"). *Id.*, ¶ 53. Pursuant to the Policies and Procedures, the Judiciary Committee "has jurisdiction over disciplinary matters involving matriculated and continuing MBA students of Stern" in situations involving violations of the MBA Code of Conduct and Honor Code, University policies and procedures, and federal, state or local laws. *Id.*, ¶ 54. The Judiciary Committee is empowered to make recommendations only, not final decisions.

8

Rosenthal cannot establish that there was any material violation of the Stern
Policies and Procedures in his case.  Accordingly, since the outset of this litigation, he
has tried to confuse matters by arguing that certain University-wide rules, rather than
Stern's rules, should govern.  Rosenthal's argument is completely wrong, because under
the University-wide rules, Stern's Policies and Procedures generally govern disciplinary
proceedings against Stern students, except in cases impacting both Stern and other
components of the University in addition to Stern.  Cooley Dec. ¶ 16 and Exh. 9, Exh. 10
at p. 229 § E.  There was no infraction affecting any part of the University other than
Stern in Rosenthal's case.  DR56 ¶ 55.  Moreover, the University-wide disciplinary rules
contemplate that each school will formulate its own disciplinary rules, exactly as Stern
has done here.  Cooley Dec. Exh. 10 at p. 229, § E.

In his complaint, Rosenthal relies on a document he labeled Exhibit H, which he
attributes to Thomas Grace, NYU's Director of Community Standards and Compliance.
According to the Second Amended Complaint, Exhibit H "opin[es] on the [Judiciary]
committee's jurisdiction and procedures."  Second Amended Complaint ¶ 46, and
Exh. H.  Mr. Grace, however, is not the author of Exhibit H, as he testified.  Kilson Dec.
Exh. E at 45-46.[2]  Moreover, although Exhibit H contains excerpts of email messages that
Grace wrote, Grace could not and did not analyze the impact of *Stern's* disciplinary rules
on Rosenthal at any time.  Instead, as Grace testified, in his job, he handles cases that
concern more than one school or college within NYU, or problems arising from the
NYU residence halls.  *Id.* at 10-12.  Grace further explained that he has no formal
relationship with Stern, and deals with cases involving Stern students only "if a Stern

---

[2]  Exhibit H to the Second Amended Complaint was marked as Exhibit 4 for purposes of the Grace
deposition.

student [gets] in a fight with a student from another school," which was not the problem here.  *Id.* at 13.

Stern consulted Grace early in the disciplinary process against Rosenthal, and Grace responded based on his experience dealing with infractions of the University-wide disciplinary rules, not the Stern rules.  Grace advised Stern that he did not "have jurisdiction over these things" and that Stern should "look to [its] own policies."  Kilson Dec. Exh. E at 52.  Grace never reviewed the faculty complaint against Rosenthal (*id.* at 37)*, or any materials from Stern's Judiciary Committee relating to Rosenthal, or any correspondence concerning Rosenthal's disciplinary proceeding.  *Id.* at 64.  Grace's views apply in a different context.   Rosenthal misinterprets those views in a factually baseless effort to find a procedural violation that does not really exist.

### The Disciplinary Complaint Against Rosenthal

Stern's governing Policies and Procedures permit institution of a disciplinary proceeding on the filing of a complaint by "[a]ny member of the [Stern] faculty, administration or staff, or any student."  DR56 ¶ 56.  If a complaint requires fact-finding, the rules require the Chair of the Judiciary Committee to appoint an investigative committee to recommend further action as necessary, or (in cases of insufficient evidence) dismissal of the complaint.  Cooley Dec. Exh. 9 at p. 7, § 4.b.  In Rosenthal's case, the Chair of the Judiciary Committee reasonably concluded that no investigative committee was necessary, because Rosenthal had pled guilty in open court to the criminal securities law violation on which the faculty complaint and Judiciary Committee proceeding rest.  DR56 ¶¶ 67, 69.  This decision was unassailable.  An investigation of

the facts underlying the complaint would have served no purpose, since the complaint rested on Rosenthal's own sworn judicial admission of guilt. *Id.*

Once the Judiciary Committee decides to proceed to handle a complaint, the Policies and Procedures require the Chair to form a hearing panel, which must contain a quorum of at least two faculty committee members, the Chair, and four student members. Cooley Dec. Exh. 9 at p. 7, § 4.e. Notably, although Stern's Policies and Procedures recognize that Stern students have "the right [to] a fair and timely hearing in accordance with these rules," they do not set specific deadlines within which Stern must either notify an accused of a proceeding or convene a disciplinary hearing. *Id.,* p. 5, § 1.

In Rosenthal's case, there was a delay of several weeks before the Judiciary Committee, through its incoming Chair, Melchior Ochoa, actively began work on the matter. DR56 ¶ 59. This delay occurred in part because of the unusual nature of the violation. Nearly all student disciplinary matters at Stern in the past had involved commonplace academic violations such as plagiarism or cheating. DR56 ¶¶ 60-61. Stern initially was uncertain how to proceed with Rosenthal's case, which involved an unusual and much more serious issue, a plea of guilty to a securities violation. Stern administrators therefore discussed the question of "jurisdiction" with each other and with the Judiciary Committee during March and April 2007. DR56 ¶¶ 59-63.

The delay also occurred in part because Timothy Colvin, the Stern student who initially chaired the Judiciary Committee at the time of the faculty complaint against Rosenthal, was approaching graduation and did not schedule a committee hearing for Rosenthal before leaving the school. DR56 ¶ 64; Kilson Dec. Exh. F at 12-13, 31-34, 59, 84, 88. Accordingly, Colvin's successor, Melchior Ochoa, became responsible for

handling the Judiciary Committee hearing against Rosenthal in early May 2007.  DR56
¶¶ 57, 64.

   Ochoa promptly began work on the case by analyzing whether the case was
within the "jurisdiction" of the Judiciary Committee.  *Id.*, ¶ 65.  Ochoa concluded that the
Judiciary Committee as a whole should decide the jurisdiction question at a committee
hearing.  *Id.*, ¶ 76.  Ochoa further concluded that Rosenthal's guilty plea was a sufficient
basis to have a hearing, which he promptly began attempting to schedule.  *Id.*, ¶ 67.  In
addition, having concluded that the case should proceed to a hearing, in mid-May 2007,
Ochoa told Rosenthal about the faculty complaint, pursuant to Stern's Policies and
Procedures.  *Id.*, ¶ 68; Cooley Dec. Exh. 9 at p. 7, § 4.d ("If the Investigative Committee
or the Chair concludes there is sufficient evidence to suspect a Violation, the Chair will
notify the  . . . accused.")

   Ochoa then sent many messages to Rosenthal and to the members of the Judiciary
Committee attempting to find a date when both Rosenthal and a quorum of committee
members could attend a hearing in person or by telephone.  DR56 ¶ 73.  The academic
year had already ended, however, and the student members of the committee were away
from the University for summer internships.  Accordingly, Ochoa had difficulty obtaining
a quorum of Committee members.  *Id.*, ¶ 74.

   Moreover, unbeknownst to Mr. Ochoa, from mid-July through mid-September
2007, Rosenthal was serving a sentence at FCI Otisville pursuant to his guilty plea.
Shortly before reporting to Otisville, Rosenthal disingenuously told Ochoa in an
electronic mail message that he (Rosenthal) had "taken some time off this summer in part
based on your previous communication that there would not be an opportunity to hold a

quorum until September" and "can be available after Labor Day." DR56 ¶ 75. Although Rosenthal admittedly never bothered to advise Ochoa of this fact, he was in Otisville until September 11, 2007. *Id.* Rosenthal's Judiciary Committee hearing was scheduled for September 13, 2007, two days after his release. DR56 ¶ 80.

Rosenthal testified that he experienced "frustration" because he was unable to learn during the late winter or spring of 2007 when he would receive a degree. DR56 ¶ 77. Although Rosenthal may have been unhappy, particularly as he probably realized that he would fail to obtain his degree before Defendants learned of his crime and guilty plea, he did not suffer any prejudice.

### Rosenthal's Hearing Before the Judiciary Committee

Rosenthal's Judiciary Committee hearing began with the committee members reviewing written materials, including the faculty complaint and Ochoa's May 20, 2007 analysis of the case. Rosenthal then came in to the hearing room. The Committee did not allow him to bring counsel with him, because the applicable Stern Policies and Procedures do not allow counsel to appear. DR56 ¶¶ 85-87.

A quorum of Committee members attended, including two faculty members (Dean Fraser and Professor Rachel Kowal), the Chair, and seven student members including the Chair, in accordance with Stern's Policies and Procedures. *Id.*, ¶ 81; Cooley Dec. Exh. 9 at § 5.a ("To constitute a valid disciplinary hearing, the Hearing Panel must contain a quorum of one faculty member, in addition to the presiding Chair, and three student members all of whom are present during the entire hearing").

Rosenthal waived his right to bring witnesses to the hearing.  After the Chair read the faculty complaint, Rosenthal read a prepared statement, which he left in written form when departing from the hearing room.  DR56 ¶¶ 88-89.

The hearing gave Rosenthal an opportunity to explain his misconduct and move the panel members to exercise leniency on his behalf.  *Id.*, ¶ 51.  He failed to take advantage of this opportunity, and said nothing to suggest that he accepted responsibility for the conduct underlying his guilty plea.  Ochoa Dec. Exh. 5.

Instead, Rosenthal proffered baseless arguments that Stern and the University had no jurisdiction over him because he was "not a student nor a member of the Stern community when the criminal proceedings took place," asserting that Stern had "conferred" his degree on January 22, 2007.  *Id.* at 1.  This Court has already recognized that these assertions have no merit.  July 21, 2009 Order at 2.  Rosenthal is not capable of showing otherwise.

In addition, Rosenthal argued that under University-wide disciplinary rules, the University should not impose discipline based on a crime committed off campus.  Ochoa Dec. Exh. 5 at 2.  The Stern disciplinary rules, which Rosenthal chose to ignore, clearly state, however, that the jurisdiction of the Stern Judiciary Committee includes "without limitation . . . [v]iolations of the MBA Code of Conduct . . . [and] . . . [v]iolations of federal, state or local laws," both of which exist in this case.  Cooley Dec. Exh. 9 at p. 5, § 2.

Then, continuing to ignore the applicable Stern rules, Rosenthal argued that the Judiciary Committee had violated his procedural rights.  Ochoa Dec. Exh. 5 at 2-3.  These arguments were and remain frivolous.  Next, ignoring his long tenure as a Stern

teaching assistant, Rosenthal argued without any basis that he was not a University employee and, therefore, not subject to the NYU Code of Ethical Conduct.  *Id* at 3.

Rosenthal also took issue with Dean Cooley's decision to discuss Rosenthal's crime – which had been publicly reported in the *Wall Street Journal* and the *New York Law Journal* – in classes.  *Id*.  The suggestion that the Dean could not make use of public information for pedagogical purposes is simply absurd.

Rosenthal then challenged the statement in the faculty complaint that he had pled guilty in an insider trading scheme involving his family members and suggested that his guilty plea was for "conscious avoidance of securities laws, which is materially different from a customary guilty plea as a matter of both law and fact."  *Id*. at 4.  Indeed, Rosenthal denied that he had pled guilty to intent to commit securities fraud.  The transcript of Rosenthal's plea allocution, which was the basis for the faculty complaint against Rosenthal (Cooley Dec. Exh. 8) and available to the Judiciary Committee at the hearing (DR56 ¶ 90) utterly belies these arguments.

Finally Rosenthal argued that the University "can not demonstrate any harm or damage to the University's relationship with an involved external party." Ochoa Dec. Exh. 5 at 4.  This argument is simply irrelevant, as the University had no obligation to demonstrate any such harm or damage.   Rosenthal's argument to the contrary rests on rules that apply in different kinds of cases, as noted above.  This argument is unpersuasive.

Shortly after the conclusion of the hearing, the Judiciary Committee unanimously voted to impose discipline on Rosenthal.  DR56 ¶ 92.  As the Stern Policies and Procedures required, the Chair of the Judiciary Committee prepared minutes of the

hearing in accordance with the Rules.  *See* Ochoa Dec. ¶ 15 and Exh. 6.  By letter dated

October 1, 2007, Mr. Ochoa then notified Dean Cooley in accordance with the Stern

Policies and Procedures that the Judiciary Committee recommended as a sanction "that

Mr. Rosenthal shall not be conferred his degree . . . but may transfer his completed

coursework, credits and grades to another school that will accept them."  The Committee

further recommended that Stern revise Rosenthal's academic transcript to change his

grade for Professional Responsibility to an "F."  DR56 ¶ 93.

Ochoa explained that the Committee had concluded that it had jurisdiction over

Rosenthal because he "was a student when he violated the Honor Code and Code of

Conduct, when criminal proceedings took place and he pleaded guilty to conscious

avoidance of the securities laws, and when the [faculty] complaint was submitted . . . ."

Ochoa Dec. Exh. 7 at 1.  These conclusions are all beyond any genuine dispute,

particularly in light of this Court's July 21, 2009 Order.  Moreover, the Judiciary

Committee rejected Rosenthal's procedural arguments, noting that he was not relying on

Stern's rules.  *Id*. at 2.  Finally, rejecting Rosenthal's argument that the Committee had to

demonstrate harm to the University, the Chair noted that Rosenthal had violated Stern's

Honor Code and Code of Conduct based on his admissions at the Judiciary Committee

hearing and his guilty plea, and that he was, therefore, subject to the recommended

sanctions.  *Id*.

### The Faculty Vote Against Conferring Rosenthal's Degree

The Stern faculty was the ultimate decision maker here.  At an October 3, 2007

meeting, that faculty approved a motion "[t]hat Mr. Ayal Rosenthal not be recommended

to the NYU President and Board of Trustees for a degree of Masters of Business

Administration."  Following the faculty's vote, by letter dated October 25, 2007, Dean

Cooley wrote to Rosenthal to advise him that, based on his guilty plea, he would not

receive his degree.  In his letter, the Dean noted that it was his prerogative to accept, deny

or modify the Judiciary Committee's recommendations.  DR56 ¶¶ 95-98.  The Dean

emphasized that, at every stage of the proceeding, Rosenthal's guilty plea had been "the

deciding factor."  *Id.*, ¶ 100.

Rosenthal submitted a voluminous but meritless appeal from this decision on

December 14, 2008.  The Dean rejected Rosenthal's appeal by letter dated February 19,

2008.  *Id.*, ¶ 101-02.  In denying Rosenthal's appeal, Dean Cooley noted that Stern had

jurisdiction over Rosenthal because he had been a "matriculated and continuing MBA

[student]" at Stern when he committed the underlying violation.  *Id.*, ¶ 103.  The Dean

further noted that the Stern Judiciary Committee has "jurisdiction over 'violations of

federal, state or local laws'," among other things.  *Id.* ¶ 104.

Rosenthal had argued that Stern should have allowed him to attend his Judiciary

Committee hearing with an attorney, an argument that Dean Cooley rejected, noting

among other things that Rosenthal had suffered no prejudice since he had not requested

that witnesses attend the hearing, and that Rosenthal's "allocution in federal court [had]

obviated the need to summon witnesses to [his] crime."  *Id.*, ¶ 105.  In addition, Stern's

Policies and Procedures do not authorize counsel to participate in a Judiciary Committee

hearing.  *Id.*, ¶ 106.  Similarly, the Dean rejected Rosenthal's reliance on certain

University-wide procedural rules which he correctly characterized as "inapplicable," *id.*

at 4, since Stern was entitled to apply its own rules.  *Id.*, ¶ 112.

Dean Cooley also stressed the academic component of Stern's decision not to confer the MBA degree on Rosenthal. He noted that Stern's MBA Code of Conduct "encompasses the Stern School's philosophy that its students – as future business leaders – have an obligation to adhere to . . . principles [of personal honesty, integrity and respect for others] in their behavior." *Id.*, ¶ 108. He further noted that Stern's curriculum reflects this philosophy, and that Stern has "made business ethics a central and integral component of its business education program." *Id.*, ¶ 110. It was clear to the Dean from Rosenthal's guilty plea that he had failed to internalize the ethical component of the MBA curriculum at Stern. Cooley Dec. ¶ 25. Dean Cooley accordingly observed that conferring an MBA degree on Rosenthal would have "undermine[d] the Stern School's position as a moral authority on business ethics and the integrity of a Stern degree." DR56 ¶ 111.

### **Rosenthal's Lawsuit**

Rosenthal filed the first edition of his complaint on or about June 11, 2008, naming NYU, Stern, Dean Cooley, and Melchior Ochoa as defendants, and asserting claims for a declaratory judgment, breach of contract, conversion, unjust enrichment, and tortious interference, and three claims under CPLR Article 78. Defendants moved to dismiss. Before any ruling on that motion, the case was reassigned from the late Judge Sprizzo to this Court, which issued an Order dated January 12, 2009 directing Rosenthal to file an amended complaint revising his allegations regarding diversity jurisdiction. Rosenthal filed his first amended complaint on or about January 16, 2009, asserting the same claims as previously. Defendants again moved to dismiss, and the Court granted that motion in part in its July 21, 2009 Order, directing Rosenthal again to amend his

complaint.  Rosenthal filed his second amended complaint on or about August 1, 2009, and in violation of the July 21, 2009 Order, purported to reassert Counts One (Declaratory Judgment), Two (Breach of Contract based on alleged conferral of degree), and Three (Conversion).  In his Second Amended Complaint, Rosenthal also continued to assert three separate claims under CPLR Article 78.  By service of a draft pretrial order on February 1, 2010, Rosenthal finally "withdrew" the previously dismissed claims.

For the reasons we show below, there are no material triable issues related to the claims (for breach of contract and under CPLR Article 78) that this Court has not yet dismissed.  This Court should, therefore, grant summary judgment dismissing the Second Amended Complaint in its entirety, on the merits and with prejudice.

# ARGUMENT

## The Summary Judgment Standard

It is well settled that:

> Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  A material fact is one that would affect the outcome of the suit under the governing law, and a dispute about a genuine issue of material fact occurs if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party.  A court reviewing a motion for summary judgment must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inference against the movant.

*Ollman v. Special Bd. of Adjustment No. 1063*, 527 F.3d 239, 245 (2d Cir. 2008) (internal citations omitted).

By this standard, Defendants are entitled to summary judgment.

## Point One

### This Court Should Grant Summary Judgment Dismissing Count Four (Breach of Contract)

In Count Four of the Second Amended Complaint, Rosenthal alleges that NYU and Stern breached his contractual rights by subjecting him to discipline.  Rosenthal cannot carry his burden of showing that Stern and NYU failed substantially to observe the applicable Stern Policies and Procedures, however.  Indeed, even if a material procedural violation had occurred – which is not the case – Stern and NYU would have the prerogative to deny a degree to Rosenthal, because the Stern faculty as a whole deemed him academically unqualified to receive it.  Such an academic determination is committed to the discretion of the University.  For both of these reasons, this Court

should grant summary judgment dismissing Rosenthal's breach of contract claim as a matter of law.

    A.   <u>There Was No Material Procedural Violation</u>

    The New York Court of Appeals has articulated the legal standard that governs in any case involving discipline of a university student that is "unrelated to academic achievement." *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 658, 404 N.E.2d 1302, 427 N.Y.S.2d 760 (1980). As we discuss more fully below, the decision to deny a degree to Rosenthal had both academic and non-academic components. Nonetheless, even if no academic issue existed here, the University's obligation would be only to "substantially observe[]" its established disciplinary procedures. *Tedeschi,* 49 N.Y.2d at 660. Numerous courts have followed *Tedeschi* to uphold discipline imposed on a student as long as a university has substantially complied with its disciplinary rules.[3]

    Rosenthal has alleged that NYU should have informed him sooner about the faculty complaint, but cites no Stern rule that required Stern to do so. Moreover, New York courts have recognized that minor delays in student disciplinary proceedings do not give rise to procedural violations, especially where, as here, any delay has a legitimate basis. *See Majewski v. State Univ. of N.Y.,* 295 A.D.2d 944, 945, 744 N.Y.S.2d 590 (4th

---

[3] *See DeQuito v. New School for General Studies*, 2009 WL 4841058 at *1 (1st Dep't. Dec. 17, 2009) (noting substantial compliance with disciplinary rules); *Bhandari v. Trustees of Columbia Univ.*, Dkt. No. 00 Civ. 1735 (JGK), 2000 WL 310344 at *5-*7 (S.D.N.Y. Mar. 27, 2000) (student suspended for lying to obtain academic advantages); *Fraad-Wolff v. Vassar Coll.*, 932 F.Supp. 88 , 91 (S.D.N.Y. 1996) (noting that "whatever the legal theory underlying plaintiff's claim may be, the crucial issue is whether defendant conducted the disciplinary proceedings against plaintiff substantially in accordance with its established procedures," and awarding summary judgment for defendant); *Quercia v. New York Univ.*, 41 A.D.3d 295, 296, 838 N.Y.S.2d 538 (1st Dep't 2007) (undergraduate suspended subject to reinstatement for drug violation); *Ebert v. Yeshiva Univ.*, 28 A.D.3d 315, 813 N.Y.S.2d 408 (1st Dep't 2006) (expulsion of student pursuant to university's disciplinary rules); *Moghimzadeh v. Coll. of Saint Rose*, 236 A.D.2d 681, 681-82, 653 N.Y.S.2d 198 (noting that the due process clause does not apply to private colleges); *Swett v. Colgate Univ.*, 176 A.D.2d 11, 13, 578 N.Y.S.2d 713, 715 (3d Dep't 1992) (noting that students at private colleges have no "due process" rights in the absence of state action, and that inquiry is limited to whether [the school] substantially complied with its published guidelines or rules regarding procedures in a disciplinary proceeding").

Dep't 2002) (noting that a graduate school reasonably delayed a disciplinary hearing to conduct a statistical analysis of test scores before bringing potentially baseless cheating charges). Here, delay occurred because the case was unusual and Stern took time to consider how to proceed. DR56 ¶¶ 59-63; Kilson Dec. Exh. F. at 35-40. Later, it took time to convene a hearing because of the summer recess, and, in part, because Rosenthal (who was about to go to Otisville) consented to a delay. DR56 ¶¶ 73-76. These are all good reasons for delay.

Similarly, the cases recognize that students have no right to have counsel present during school disciplinary proceedings. *See Wasson v. Trowbridge,* 382 F.2d 807, 812 (2d Cir. 1967); *Donohue v. Baker*, 976 F.Supp. 136, 146 (N.D.N.Y. 1997); *Mary M. v. Clark*, 100 A.D.2d 41, 43, 473 N.Y.S.2d 843 (3d Dep't 1984) (noting agreement with "the policy considerations enunciated in cases dealing with student discipline which recognized that the student's welfare is best served by a nonadversarial setting which emphasizes the educational functions of disciplinary proceedings"). Neither the Stern rules nor the University-wide rules required Stern to allow Rosenthal to attend the hearing with counsel, in any event.

Rosenthal has suggested that the Judiciary Committee should have conducted an investigation before proceeding against him. In light of Rosenthal's guilty plea before Judge Gleeson, however, there was no need to investigate. Rosenthal had admittedly committed a crime that violated his obligations under the MBA Code of Conduct.

Rosenthal may raise other objections to the way the Judiciary Committee proceeded, but they are all diversions. This is especially true because the Judiciary Committee acted in a purely advisory role, and the Stern faculty was the real decision

maker here.  The true purpose of the Judiciary Committee hearing was to give Rosenthal

a chance to explain himself – an opportunity he squandered by making the same kinds of

pettifogging arguments he offers in this lawsuit, ignoring his own sworn admission of

culpability in open court before Judge Gleeson

 Nor is there any possible merit to Rosenthal's suggestion that defendants lost the

ability to discipline him because he had completed all degree requirements before

defendants learned about his crime.  Under Stern's governing Policies and Procedures,

Rosenthal was subject to discipline throughout the time that he was a "matriculated and

continuing" Stern student, which remained his status until the faculty vote not to confer

his degree.  DR56 ¶¶ 54, 103.  Moreover, New York cases have long recognized the

prerogative of academic institutions to impose discipline on their students even after they

have fulfilled their degree requirements.  *See O'Sullivan v. New York Law School,* 68

Hun. 118, 52 N.Y.St. Rep. 14, 22 N.Y.S. 663, 665 (1st Dep't 1893); *see also, Dinu v.*

*President and Fellows of Harvard Coll.*, 56 F.Supp.2d 129, 133 (D. Mass. 1999).

 B. <u>The University And Stern Acted Within Their Academic Discretion</u>

 Moreover, the decision not to award the MBA degree to Rosenthal, although

resulting from a disciplinary process, had an unmistakable academic component.  At the

February 22, 2007 Stern Faculty meeting, when the faculty voted to approve degrees for

155 MBA students, it voted in favor of a motion that "the School not certify one

particular candidate [Rosenthal] as *qualified* to receive a Stern MBA degree."  Cooley

Dec. Exh. 6 at 1 (emphasis added); DR56 ¶ 41.  Similarly, in the February 28, 2007

faculty complaint, Dean Sproull noted the faculty's belief that Rosenthal was "not

*qualified* to receive the degree . . . ."  DR56 ¶ 49.  After the Judiciary Committee

recommended that Stern not confer the degree, the Stern faculty met again and voted in favor of a motion that Rosenthal "not be recommended" for the degree. *Id.*, ¶ 96.

Business ethics were an important part of the curriculum at Stern, and Rosenthal was on notice of his ethical obligations from the outset of his studies at the school, when he signed the MBA Code of Conduct. *Id.*, ¶¶ 3-4, 108, 110.  Rosenthal evidently (and admittedly) did not learn that insider trading is not permissible under the MBA Code of Conduct. *Id.*, ¶ 109.  The Stern faculty certainly had the prerogative to conclude that Rosenthal was not worthy of a Stern MBA degree.

It is fundamental that no educational institution is required to issue a diploma to a student who has failed to meet its academic standards, which was the situation here. *Olsson v. Board of Higher Educ.*, 49 N.Y.2d 408, 413-14, 426 N.Y.S.2d 248, 402 N.E.2d 1150 (1980).  Moreover, numerous courts have recognized that a student's dishonest behavior is of "vital interest" to an academic institution. *Harris v. Trustees of Columbia Univ.*, 98 A.D.2d 58, 71 (1st Dep't 1983) (Kassal, dissenting) (noting that a student's "fraudulent submission . . . evinced a degree of dishonesty and lack of character" that was "a matter of vital interest to an academic institution" and that "[t]o rule otherwise would . . . amount to unjustifiable interference in academic affairs"), *rev'd for reasons stated in dissenting opinion,* 62 N.Y.2d 956, 959, 468 N.E.2d 64, 479 N.Y.S.2d 216 (1984); *Bhandari,* 2000 WL 310344 at *7-*8; *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 2009 WL 2957789 at *18-*20, Dkt. No. 5:01-cv-909 (N.D.N.Y. Sept. 11, 2009).

Accordingly, even if this Court concluded that there was a procedural violation in the proceedings against Rosenthal – and for the reasons stated above, Defendants submit that none occurred – that finding would not show that Rosenthal is entitled to prevail on

his breach of contract claim.  To the contrary, Stern was entitled on academic grounds to

withhold his degree, and Rosenthal cannot show otherwise.  For this reason too, this

Court should grant summary judgment dismissing the breach of contract claim.

### Point Two

### There Is No Genuine Dispute That Rosenthal's Article 78 Claims Lack Merit As A Matter of Law

Rosenthal purports to assert three claims under Article 78 in Counts Five, Six and

Seven of his Second Amended Complaint.  He cannot prevail on these claims, and this

Court should, therefore, dismiss them summarily.

### Count Five

Count Five alleges that Stern had no jurisdiction to impose discipline on

Rosenthal.  Stern's rules on their face confer jurisdiction over "disciplinary matters

involving matriculated and continuing MBA students,"  DR56 ¶ 54, which was

Rosenthal's status at the time of the disciplinary proceedings.  DR56 ¶ 5.  That

jurisdiction extended without limitation to "violations of the MBA Code of Conduct" and

of "federal, state, and local laws."  *Id.* at ¶ 83.  The University-wide disciplinary rules

similarly contemplated that violations of "city, state or federal laws" can be "subject to

applicable disciplinary measures within the University."  Cooley Dec. Exh 10 at p. 227 §

D.  The argument that there was no jurisdiction to discipline Rosenthal is, therefore,

entirely frivolous.[4]

---

[4] If Rosenthal's premise is that he had graduated before the discipline occurred, this Court's July 21, 2009 Order is dispositive of Count Five under the law of the case doctrine, for all the reasons stated in Point Four, infra.

**Count Six**

In Count Six, Rosenthal asserts that the decisions of Stern, NYU and Dean Cooley were "arbitrary and capricious and/or an abuse of discretion with respect to the process utilized, the results reached and the punishment meted out."  Second Amended Complaint ¶ 88.  Rosenthal cannot carry his burden of proving this allegation, and Count Six should therefore be dismissed as a matter of law.

    1.   The Process

For the reasons noted in Point II.A, *supra*, the "process" defendants used to discipline Rosenthal substantially complied with the applicable disciplinary rules, and is, therefore, not vulnerable to attack under Article 78.  *See Fernandez v. Columbia Univ.*, 16 A.D.3d 227, 228, 790 N.Y.S.2d 603 (1st Dep't 2005) (noting that a private university is required only to follow its own rules in applying non-academic discipline); *Al-Khadra v. Syracuse Univ.*, 291 A.D.2d. 865, 866, 737 N.Y.S.2d 491 (4th Dep't), *lv. denied*, 98 N.Y.2d 603 (2002) (noting that the question whether a disciplinary decision is arbitrary or capricious turns on whether the university "substantially adhered to its own published rules and guidelines"); *Galiani v. Hofstra Univ.*, 118 A.D.2d 572, 499 N.Y.S.2d 182 (2d Dep't 1986) (noting that a decision to sanction a student based on admitted misconduct was "based upon the exercise of discretion after a full review of the operative facts" and not arbitrary or capricious**);** *McGill v. Columbia Coll.*, 9/26/96 *N.Y.L.J.* 23, col. 3 (Sup. Ct. N.Y. Co. 1996); *Sabin v. State Univ. of New York Maritime College*, 92 A.D.2d 831, 832, 460 N.Y.S.2d 332 (1st Dep't 1983) (noting that expulsion on non-academic grounds requires an institution to follow its rules).

Moreover, as a matter of law, Rosenthal cannot properly attack the procedures defendants followed under Article 78 unless he can establish that he suffered prejudice as a result of a procedural violation, of which there is no evidence whatsoever. *See Trahms v. Trustees of Columbia Univ.*, 245 A.D.2d 124, 125, 666 N.Y.S.2d 150 (1st Dep't 1997). Even if Rosenthal could show (for example) that Stern violated its rules by failing to conduct an immediate disciplinary hearing – which is not the case – the only resulting harm to Rosenthal was temporary "frustration." DR56 ¶ 77. This does not rise to the level of prejudice.

### 2.   The Result

The "result" – the conclusion that Rosenthal violated the MBA Code of Conduct and NYU Code of Ethical Conduct, based on his plea of guilty to a crime under the federal securities laws -- is unassailable. On their face, both the MBA Code of Conduct and the University Code of Ethical Conduct require honest and ethical behavior. Rosenthal's admitted felony was neither.

### 3.   The Punishment

Finally, this Court cannot disturb the punishment defendants imposed on Rosenthal, denial of his MBA degree, unless this Court finds that it " 'shock[s] one's sense of fairness'…."[5] There is nothing shocking about the decision that Rosenthal, who

---

[5] *Pell v. Board of Educ.*, 34 N.Y.2d 222, 233, 313 N.E.2d 321, 356 N.Y.S.2d 833 (1974) (citations omitted); *see DeQuito*, 2009 WL 4841058 at *1 (expulsion for plagiarism did not shock the sense of fairness); *Quercia*, 41 A.D.3d at 297 (suspension of a student for a drug violation did not shock the sense of fairness); *Fernandez*, 16 A.D.3d at 228 (suspension of a student who sent harassing communications about fellow students did not shock the court's sense of fairness); *Ebert v. Yeshiva Univ.*, 28 A.D.3d 315, 316, 813 N.Y.S.2d 408 (1st Dep't 2006) (expulsion of a university student was not shocking to the sense of fairness); *Kreisler v. New York City Transit Auth.*, 2 N.Y.3d 775, 812 N.E.2d 1250, 780 N.Y.S.2d 302 (2004) (noting that "[a]n administrative penalty must be upheld unless it 'is so disproportionate to the offense as to be shocking to one's sense of fairness,' thus constituting an abuse of discretion as a matter of law"); *Sabin*, 92 A.D.2d at 832 (disenrollment of a student for vandalism, lack of sobriety and possession of drug paraphernalia did not shock the sense of fairness); *Kramer v. Kinney*, 87 A.D.2d 870, 449 N.Y.S.2d

worked for years as a CPA before he began his studies at Stern, should not receive an

MBA, having used confidential PwC information for his (and his family's) unlawful

benefit while he was a student at Stern.  This is particularly true when Rosenthal

indisputably violated the Code of Conduct, and then concealed the facts from Stern for

nearly a year while he was the subject of a criminal and/or SEC investigation.  Just as

Rosenthal left PwC without disclosing the SEC investigation of his misconduct at the

firm, he tried to leave Stern with a degree before his wrongdoing came to light.  This

effort did not reflect honesty, integrity, or respect for the meaning of a Stern degree.

### **Count Seven**

In Count Seven, pursuant to Article 78, Rosenthal purports to assert that the

decision to discipline him by withholding his degree was "not, on the entire record,

supported by substantial evidence," and asks the Court to require Defendants to award

him his diploma.  This Count is utterly frivolous.  There is no genuine dispute that Stern's

decision rested on Rosenthal's guilty plea.  DR56 ¶ 92.  Rosenthal admittedly entered the

guilty plea, and has never withdrawn it.  Kilson Dec. Exh. C at 83, 185; DR56 ¶¶ 28-29.

The guilty plea, on its face, reflects violations of both federal law and the Stern MBA

Honor Code, among other things.  The Stern Policies and Procedures on their face

authorize imposition of discipline up to and including dismissal for such violations.

Cooley Dec. Exh. 9 at p.11 § 8.a.vii (dismissal and expulsion).

Moreover, Rosenthal's crime establishes his failure to act with honesty and

integrity.  He did not simply participate in an insider trading scheme, but also admittedly

did so in violation of his confidentiality obligations to his employer, PwC, and PwC's

---

312 (2d Dep't 1982) (a disciplinary sanction suspending one university student and dis-enrolling another did not shock the sense of fairness).

client.  DR56 ¶¶ 10-12, 28-29.  He then failed to disclose to anyone at Stern – including but not limited to the professors for whom he served as a teaching assistant in courses including Professional Responsibility – that he was under investigation and about to plead guilty to a felony securities violation.  DR56 ¶¶ 25-27.  There is much more than substantial evidence to support the discipline Defendants imposed on Rosenthal, and he can never carry his burden to show otherwise.  This Court should, therefore, enter summary judgment disposing of Count Seven.

### Point Three

### Even If Rosenthal Had a Viable Claim, He Would Not Be Entitled To A Degree or Damages

A.  No Degree

Even if Rosenthal had a viable claim of any kind, which he does not, the relief he seeks in his complaint would be inappropriate.  On his Article 78 counts, Rosenthal seeks an award directing Stern to give him an MBA degree.  Any such award, however, would be contrary to New York law.  As the Court of Appeals instructed in *Olsson*:

> [i]n order for society to be able to have complete confidence in the credentials dispensed by academic institutions . . . , it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis.  Indeed, the value of these credentials from the point of view of society would be seriously undermined if the courts were to abandon their long-standing practice of restraint in this area and instead began to . . . confer diplomas upon those who have been deemed to be unqualified.

*Id.*, 49 N.Y.2d at 314.  Stern's faculty deems Rosenthal unqualified to receive an MBA degree, and this Court should not second guess that decision.

B.  No Damages

In the alternative, Rosenthal seeks damages in the amount of the tuition paid to Stern (if this Court does not see fit to award him a degree).[6]  In the unlikely event that this Court finds any liability, it should decline Rosenthal's request for damages, for at least two reasons.  First, Rosenthal cannot document that he (as opposed to his parents and/or former employer) paid any amount of tuition to Stern.  Kilson Dec. Exh. C at 14-18.  Second, as a policy matter, universities should not be liable for damages in student disciplinary cases.  As the late Judge Broderick of this Court recognized, "lawsuits of this type may be extremely harmful to the ability of an educational institution to maintain discipline so that the goals for which students attend are not destroyed."  *A. and B. v. C. College*, 863 F.Supp. 156, 157 (S.D.N.Y. 1994); *see*, *id*. at 158 (noting that a damages award in this context would "intimidate academic decision makers seeking to perform their duties").  Any award of damages in this case would be completely unwarranted.

## Conclusion

For the foregoing reasons, this Court should grant summary judgment dismissing the Second Amended Complaint in its entirety, on the merits and with prejudice.

---

[6] Rosenthal has withdrawn any claim to any additional damages, likely because his felony conviction limits his employment prospects.

Dated:          New York, New York
                February 1, 2010

                                             Respectfully submitted,

                                             NEW YORK UNIVERSITY
                                             OFFICE OF GENERAL COUNSEL

                                   By:   s/_____
                                             NANCY KILSON
                                             Associate General Counsel
                                             70 Washington Square South
                                             New York, New York   10012
                                             Tel.:   (212) 998 2258
                                             Fax:    (212) 995-3048