New York University Office of General Counsel
Nancy Kilson (NK 4557)
Associate General Counsel
70 Washington Square South, Rm. 1158
New York, New York 10012
Tel.: (212) 998 2258
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AYAL ROSENTHAL,

                    Plaintiff,

    v.

NEW YORK UNIVERSITY, *et al.*,

                    Defendants

08 CV 5338 (LAK)
ECF Case

**DECLARATION OF
THOMAS F. COOLEY**

---

STATE OF NEW YORK         )
COUNTY OF NEW YORK      ) ss.:
SOUTHERN DISTRICT OF NEW YORK  )

    Pursuant to 28 U.S.C. § 1746, I, Thomas F. Cooley, hereby declare as follows:

    1.    I am the Paganelli-Bull Professor of Economics in the Stern School of Business ("Stern") of New York University ("NYU") and professor of Economics in the Faculty of Arts & Science of NYU, a position I have held since May 1999. From 2002 until January 15, 2010 I was the Dean of Stern. I am a named defendant in this matter.

    2.    I respectfully submit this Declaration in support of the motion of all Defendants for summary judgment dismissing the Second Amended Complaint of the

: 285856-1

plaintiff, Ayal Rosenthal ("Rosenthal") (the "Complaint"). I have personal knowledge of the facts set forth below.

3. Rosenthal began his studies as a part-time Masters of Business Administration ("MBA") degree candidate in Stern's Langone Program in January 2005. He remained a Stern student until October 2007 when, as a result of a disciplinary process and on academic grounds that I describe more fully below, the Stern faculty voted not to confer his MBA degree because of, among other things, his violation of the Stern MBA Code of Conduct.

4. During the course of his studies at Stern, Rosenthal served as a teaching assistant in certain courses and was, therefore, a part-time employee of Stern. As a part-time employee, Rosenthal was subject to the NYU "Code of Ethical Conduct," which requires all University employees to, among other things, "at all times, [act] in accordance with the highest professional and community ethical standards." A copy of the relevant portion of the Code of Ethical Conduct is annexed as Exhibit 1.

5. Rosenthal completed the coursework for his MBA degree in December 2006. But for the disciplinary proceedings described below, he would have received his degree "as of" January 2007.

6. In early February 2007, however, one of my colleagues, Stern professor Bruce Buchanan, advised me in an electronic mail message that he had learned that the SEC had charged a number of individuals, including Rosenthal and several of his family members, with "running an insider trading operation . . . ." A copy of Professor Buchanan's message is annexed as Exhibit 2. In his message, Professor Buchanan noted that Rosenthal, "in addition to receiving stolen information from his father [was] charged

with leaking confidential information from PwC to the family hedge fund [Aragon] for the purpose of insider trading." *Id.*

7. On February 12, 2007, the day after I learned from Professor Buchanan of the SEC charges against Rosenthal, I raised the issue of Rosenthal's misconduct at a meeting of Stern Vice Deans. A copy of the minutes of the Vice Deans' meeting is annexed as Exhibit 3. As the minutes reflect, at the meeting, the Vice Deans reached a consensus that "the School should review whether [Rosenthal's] criminal activity ... means that has not fulfilled the explicit and implicit requirements of the degree." Exh. 3 at 2.

8. Meanwhile, the *Wall Street Journal* and the *New York Law Journal* published articles on February 9, 2007 reporting on the guilty pleas of Rosenthal and several of his family members to charges involving insider trading. Copies of these articles are annexed as Exhibit 4. Professor Buchanan noted the *Wall Street Journal* article and brought it to my attention on February 13, 2007.

9. At about the same time, I received and reviewed a transcript of Rosenthal's plea hearing in federal court. A copy of the transcript of that hearing is annexed as Exhibit 5.

10. On February 22, 2007, the Stern faculty held a regularly scheduled meeting to vote on, among other things, the approval of MBA candidates for graduation from Stern as of January 2007. I attended this meeting. The minutes accurately reflect that the faculty approved the award of degrees to some 155 January 2007 MBA degree candidates. *See* Exhibit 6, annexed. The faculty also unanimously voted, however, that

"the case of Ayal Rosenthal, having pleaded guilty to the intent to commit securities fraud, be remanded to the Stern School's Judiciary Committee and [its] procedures." *Id.*

11. As I understand this Court has previously recognized, under NYU's Bylaws, "[d]egrees in course are granted by the Board [of Trustees] to candidates recommended by the President [of the University] on certification by a faculty as having fulfilled the requirements for a degree." Bylaws § 63(a) (Exhibit 7, annexed.) The Stern faculty never certified that Rosenthal was qualified to receive the MBA degree. Instead, based on the February 22, 2007 faculty vote to remand Rosenthal's case to the Stern Judiciary Committee, I began working with my colleagues in the Dean's office to draft a written complaint against Rosenthal on that day.

12. My colleague Lee Sproull, formerly Stern's Vice-Dean of Faculty, signed the resulting faculty complaint, which was dated February 28, 2007. I reviewed and commented on the complaint while it was in draft form, and received a copy of the final, executed version from Dean Sproull. A true and correct copy is attached as Exhibit 8.

13. The faculty complaint notes that Rosenthal "was in serious violation of the NYU Stern MBA Code of Conduct and the NYU Code of Ethical Conduct in actions he took while a matriculated student at Stern." *Id.* at 1. Further, the complaint notes the NYU Policy on Student Conduct that "'[s]tudents are expected to conduct themselves as mature and law-abiding members of both the University community and the general community." *Id.* In addition, the complaint correctly notes that Rosenthal had entered a plea of guilty before Judge Gleeson "to conspiracy to commit securities fraud . . . in an insider trading scheme involving his father, brother and a childhood friend." *Id.*

14. In the complaint, Dean Sproull went on to note the Stern faculty's belief that, in light of his guilty plea, Rosenthal "was not qualified to receive the degree of Master of Business Administration." *Id.* at 2. She further noted the faculty vote to remand Rosenthal's case to the Judiciary Committee, and asked that committee "at the earliest opportunity to review the case and provide its recommendations to the Dean of the School." *Id.* Although the Stern faculty could have decided on its own not to confer Rosenthal's degree on academic grounds, I believed that a Judiciary Committee proceeding would be appropriate to give Rosenthal an opportunity to explain his conduct.

### The Applicable Disciplinary Rules

15. Attached to this Declaration as Exhibit 9 is a true and correct copy of Stern's "Policies and Procedures, Student Disciplinary Rules" in effect during 2007 (the "Policies and Procedures"). The Policies and Procedures provide that "[s]tudent discipline is the responsibility of the faculty of [Stern] . . . ." . Exh. 9 at 5. The Policies and Procedures reflect, however, that the Stern faculty has delegated its disciplinary authority to Stern's "MBA Judiciary Committee" (the "Judiciary Committee"). *Id.* Pursuant to the Policies and Procedures, the Judiciary Committee "has jurisdiction over disciplinary matters involving matriculated and continuing MBA students of Stern" in situations involving violations of the MBA Code of Conduct and Honor Code, University Policies and Procedures, and federal, state or local laws. *Id.*

16. Rosenthal has argued that certain University-wide disciplinary rules, rather than Stern's rules, should govern his case. Rosenthal's argument is completely wrong, because Stern's Policies and Procedures, rather than the University-wide rules, generally govern disciplinary proceedings against Stern students except in the case of

infractions that affect parts of the University in addition to Stern. There was no such issue in Rosenthal's case. The University-wide rules themselves reflect that each faculty within the University may formulate its own procedural rules. *See* Exhibit 10, annexed, at p. 229 § E.

### The Disciplinary Complaint Against Rosenthal

17. As the Policies and Procedures reflect, at the relevant time, a disciplinary proceeding against a Stern student began with the filing of a complaint by "[a]ny member of the faculty, administration or staff, or any student." Exh. 9 at 7, § 4.a.

### Rosenthal's Hearing Before the Judiciary Committee

18. Rosenthal's Judiciary Committee hearing took place on September 13, 2007. On October 1, 2007, I received a written report from Melchior Ochoa, who had chaired the Committee, reporting on the result of the hearing. A true and correct copy of Mr. Ochoa's report is annexed as Exhibit 11. The report reflects that the Judiciary Committee decided to recommend that Mr. Rosenthal should not receive his MBA degree.

### The Faculty Vote Against Conferring Rosenthal's Degree

19. At an October 3, 2007 meeting of the Stern faculty, Professor Buchanan advised the faculty of the result the Judiciary Committee hearing. A true and correct copy of the minutes of the October 3, 2007 faculty meeting is annexed as Exhibit 12. As the minutes reflect, after discussion, the faculty approved a motion "[t]hat Mr. Ayal Rosenthal not be recommended to the NYU President and Board of Trustees for a degree of Masters of Business Administration." Exhibit 12 at 2.

20.     After the faculty's vote, by letter dated October 25, 2007, I wrote to Rosenthal to advise him that, based on his guilty plea, he would not receive his degree. A true and correct copy of my October 25, 2007 letter is annexed as Exhibit 13. In my letter, I emphasized to Rosenthal that his guilty plea had been the "deciding factor" in the decision not to confer his degree.

21.     Rosenthal submitted an appeal to me from this decision on December 14, 2008. A true and correct copy of Rosenthal's appeal document is annexed as Exhibit 14.

22.     I rejected Rosenthal's appeal by letter dated February 19, 2008. A true and correct copy of my letter is annexed as Exhibit 15.

23.     In my February 19, 2008 letter, I addressed and rejected various procedural and jurisdictional objections Rosenthal asserted.

24.     In addition, in my letter, I explained the important academic considerations that were involved in the decisions not to confer Rosenthal's degree and to reject his appeal. As I told Rosenthal in my letter, the MBA Code of Conduct reflects Stern's philosophy that Stern students, as future business leaders, should respect the values of personal honesty, integrity and respect for the rights of others. Stern's curriculum reflects and teaches this philosophy, and business ethics are a central and integral part of the educational program at Stern, as I also explained in my letter.

25.     Indeed, by requiring all new MBA students to sign the MBA Code of Conduct, Stern emphasizes the importance it places on business ethics as each student begins his or her studies. Rosenthal should have learned from the beginning of his academic career at Stern that insider trading is unlawful, unethical and unacceptable, but apparently failed to internalize this critical lesson.

26. In light of Stern's academic values, conferring an MBA degree on Rosenthal would have undermined the school's position as a moral authority on business ethics and devalued the integrity of a Stern degree. Nor could the faculty in good faith confer on Rosenthal the certification of mastery of the MBA curriculum that a Stern MBA degree is supposed to represent.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on January 26, 2010.

_____
Thomas F. Cooley