# Exhibit 1

30

```
1              G. FRASER
2         MS. KILSON:  Don't guess.
3    A.    I couldn't tell you.
4    Q.    More than one semester?
5    A.    Yes.
6    Q.    More than a year?
7    A.    I don't know.
8    Q.    And in those instances were
9    complaints filed by the faculty against the
10   students?
11   A.    No.
12   Q.    Was a complaint filed by
13   anybody against the students?
14   A.    Yes.
15   Q.    Who?
16   A.    The administration.
17   Q.    Who in particular?
18   A.    The office of admissions.
19   Q.    Was that complaint referred to
20   the judiciary committee?
21   A.    No.
22   Q.    Did Dean Cooley decide the
23   discipline that was imposed himself?
24   A.    I believe Dean Cooley decided
25   based on consultation with perhaps vice
```

31

```
1              G. FRASER
2    Deans or, you know, senior members of the
3    Stern community.
4    Q.    Were you part of the
5    consultations?
6    A.    Not directly with Dean Cooley,
7    no.
8    Q.    Did you just learn the
9    ultimate result but not the basis for the
10   decision?  Withdrawn.
11        Did Dean Cooley ever talk to
12   you about this particular situation?
13   A.    No.
14   Q.    Were these two separate
15   situations or didn't it sort of arise
16   together?
17   A.    They were related to the same
18   general situation.
19        MR. HERNSTADT:  Can we mark
20   this in the transcript.  I may come
21   back to you later and ask for more
22   information and I understand --
23        MS. KILSON:  Don't get too
24   optimistic.
25        MR. HERNSTADT:  I'm just
```

32

```
1              G. FRASER
2    telling you.
3         MS. KILSON:  I know.  Off the
4    record.
5         (Discussion held off the record.)
6    Q.    Under the rules, the student
7    disciplinary rules, can the Dean impose any
8    kind of discipline on a student, summarily
9    impose any kind of discipline on a student
10   that is less than the suspension set forth
11   in the authority section that we've talked
12   about earlier?
13        MS. KILSON:  Objection to
14   form.
15   A.    I don't know if there is a
16   case of that so, I mean, I don't know if
17   I'm the person to make a decision on that.
18   Q.    In the Stern School who is the
19   person who makes decisions about --
20   withdrawn.
21        What is the role of the
22   judiciary committee at the Stern School?
23   A.    To educate students and the
24   student population about the honor code and
25   the code of conduct, to investigate, adhere
```

33

```
1              G. FRASER
2    any potential violations of the honor code
3    and code of conduct.
4    Q.    Is that an independent
5    committee?
6    A.    I'm not sure what you mean by
7    that.
8    Q.    Fair enough.  By that I mean
9    is it independent of the administration?
10   A.    I am still not sure what you
11   mean by independent.
12   Q.    Does the judiciary committee
13   make its own decisions or are those
14   decisions determined by the Stern School
15   administration?
16   A.    The judiciary committee makes
17   their decisions as a committee, yes,
18   independent of the administration.
19   Q.    Does the judiciary committee
20   have any contact with the administration in
21   making those decisions?
22        MS. KILSON:  Objection to the
23   form of the question.
24   A.    With regard to making the
25   decisions I would say no.  Certainly I am a
```

9  (Pages 30 to 33)

62

```
 1            G. FRASER
 2   allege Mr. Rosenthal had violated?
 3       A.    That's correct.
 4       Q.    Did you review the complaint
 5   when you got it?
 6       A.    When I received this?
 7       Q.    Yes.
 8       A. .  Yes.
 9       Q.    When you looked at it did you
10   look at the -- you notice in the complaint
11   it refers to the NYU Stern MBA Code of
12   Conduct and the NYU Code of Ethical
13   Conduct?
14       A.    Yes.
15       Q.    Do you see that?
16       A.    Yes.
17       Q.    On the second page it also
18   refers to the Stern honor code and the
19   University code of ethical conduct?
20       A.    Yes.
21       Q.    When you got this complaint
22   did you review the codes that were referred
23   to in the complaint?
24       A.    No.
25       Q.    What did you do with this when
```

63

```
 1            G. FRASER
 2   you got the complaint?
 3       A.    I forwarded this to the chair
 4   of the judiciary committee who at the time
 5   was Tim Colven.
 6       Q.    Let me ask you to take a look
 7   at what we will mark as Exhibit 30.
 8           (Plaintiff's Exhibit 30 marked for
 9            identification.)
10       Q.    Before you turn to that, let
11   me ask you a couple more questions if I
12   could about the February 28th complaint.
13           Is it typical when a complaint
14   is lodged against a student that it will be
15   sent to you in the form of a letter of
16   complaint?
17       A.    Yes. Either it's a letter or
18   an e-mail, but usually I receive a formal
19   communication.
20       Q.    Is it typical that the letter
21   from the faculty member or from whoever is
22   making the complaint is reviewed by Dean
23   Cooley before it is transmitted to you?
24           MS. KILSON: Objection to the
25       form of the question.
```

64

```
 1            G. FRASER
 2       A. .  I couldn't tell you.
 3       Q.    Are you aware of that ever
 4   happening during your time at NYU?
 5       A.    Again, when I receive a
 6   complaint, partially to stay impartial, I
 7   forward it on.
 8           I don't inquire who has
 9   reviewed documents, who's written documents.
10   I just receive a formal complaint and I pass
11   it on to the chair or vice chair.
12       Q.    Is it typical that the faculty
13   will vote as a whole to lodge a complaint
14   against a student?
15           MS. KILSON: Objection to the
16       form.
17       A.    Could you reask the question?
18       Q.    Is it typical that the faculty
19   of the Stern School will vote at, say, a
20   Stern School faculty meeting to lodge a
21   complaint against a student?
22           MS. KILSON: Same objection.
23       A.    Faculty members will vote to
24   confer degrees. I would say there's no --
25   every case is unique, so I would say there
```

65

```
 1            G. FRASER
 2   isn't the same standard process. Even, we
 3   talked about the policies and procedures or
 4   guidelines that are followed, so I wouldn't
 5   say that there's a typical situation one
 6   way or the other.
 7       Q.    Are you aware during your time
 8   at NYU of any other complaint against a
 9   student being sent to you as a result of
10   the vote of the Stern School faculty?
11           MS. KILSON: Objection to the
12       form of the question.
13       A.    No, I am not aware.
14       Q.    Looking at the e-mail that's
15   been marked as Exhibit 30, this is a
16   document Bates stamped NYU 263, and it's an
17   e-mail from you to Lee Sproull and CCed to
18   Thomas Cooley and Kim Corfman.
19           Is this an e-mail that you sent
20   at or about the time that you received the
21   complaint?
22       A.    Yes.
23       Q.    It says in the first line, it
24   notes that you have alerted and reviewed
25   the case with the MBA judiciary committee
```

17 (Pages 62 to 65)

66

G. FRASER
1  chair and vice chair. Do you see that?
2
3  A.    Yes.
4  Q.    Did you do that?
5  A.    Yes.
6  Q.    Did you meet with them
7  personally or talk to them on the phone or
8  what?
9  A.    I met with them personally.
10 Q.    Who is the vice chair?
11 A.    Amy Margolis.
12 Q.    Did you meet with the chair
13 and the vice chair pursuant to the Stern
14 School, the school disciplinary rules?
15        MS. KILSON: Objection to the
16        form of the question.
17 A.    I met with them and provided
18 them with the materials from Lee Sproull.
19 Q.    Why did you do that?
20 A.    I typically do that.
21 Q.    Do you do that because that's
22 what the disciplinary rules set forth do or
23 you do that because it's your custom?
24        MS. KILSON: Objection to the
25        form of the question.

67

G. FRASER
2  A.    Again, those are guidelines so
3  I would say I typically do that.
4  Q.    What did you say to them to
5  the best of your recollection when you met
6  with them?
7  A.    That we have a case. I
8  forwarded the documentation to them.
9  Q.    What did you forward them,
10 just the February 28th letter?
11 A.    Yes.
12 Q.    Anything else?
13 A.    I don't recall giving them
14 anything else.
15 Q.    Two lines down you say:
16        Typically the committee will
17 assign an investigator and based on
18 information provided will conduct an
19 investigation which will determine a
20 hearing.
21        Why do you say typically?
22 A.    Once again, speaking to the
23 fact that these are guidelines, I was
24 explaining to Lee how the process works.
25 Q.    When you say these are

68

G. FRASER
2  guidelines, you are referring to the
3  student disciplinary rules?
4  A.    Yes.
5  Q.    Why do you say they are
6  guidelines?
7  A.    Because every case is unique.
8  Q.    Right, but every case has to
9  follow these disciplinary rules; is that
10 correct?
11        MS. KILSON: Objection to the
12        form.
13 A.    I am not saying that every
14 case does. I am saying this is the process
15 we use to drive how the committee works.
16 Q.    This goes back to what I was
17 asking earlier. Is this a mandatory
18 process or is it an optional process?
19        MS. KILSON: Objection.
20 A.    They are guidelines.
21 Q.    Where does it say that they
22 are guidelines?
23 A.    It doesn't.
24 Q.    So why do you say that they
25 are guidelines?

69

G. FRASER
2  A.    Because they are.
3  Q.    What is the basis for saying
4  that though?
5        MS. KILSON: Objection to the
6        form.
7  A.    I'm not sure of the question.
8  Q.    Under Authority in the
9  policies and procedures of the student
10 disciplinary rules, the first page it says
11 that:
12        The faculty hereby delegates
13 its authority to the MBA judiciary committee
14 acting pursuant to rules and regulations
15 hereby prescribed or subsequently amended.
16        Assuming that the rules haven't
17 been amended, doesn't that say that these
18 are the rules that have to be followed?
19        MS. KILSON: Objection, form.
20 This is becoming argumentative.
21 A.    It doesn't say rules. It says
22 policies and procedures, student
23 disciplinary rules.
24 Q.    So then look at the second
25 sentence under Authority, number one, the

18  (Pages 66 to 69)

82

G. FRASER

1
2  A.    I think the site wasn't
3  updated.
4  Q.    But as of about April 2007,
5  Tim Colven stopped being the chair; is that
6  correct?
7  A.    That's correct.
8  Q.    And Amy Margolis stopped being
9  the vice chair; is that correct?
10  A.    That's correct.
11  Q.    Do you know who took over
12  those rules?
13  A.    Yeah.  They are listed here.
14  Mel Ochoa became the new chair and Jameela
15  Williams became the vice chair.
16  Q.    Was Mel Ochoa the chair from
17  about April 2007 to April 2008?
18  A.    That's correct.
19  Q.    And who became the vice chair?
20  A.    Jameela Williams.
21  Q.    When did you first start
22  dealing with Mr. Ochoa and Ms. Williams in
23  connection with the Rosenthal matter?
24  A.    It was before the end of the
25  semester.  I would say it was April, May

83

G. FRASER

1
2  2007.
3  Q.    Once a case is forwarded to
4  the judiciary committee, is it the
5  responsibility of the committee and the
6  chair of the committee to ensure that NYU
7  and Stern School rules are followed?
8  A.    I think it's their
9  responsibility to evaluate the case.
10  Q.    Do they have any obligation to
11  ensure that NYU and Stern School rules are
12  followed?
13      MS. KILSON:  Objection, form.
14  A.    I would say they have a
15  responsibility.
16  Q.    Were you the faculty adviser
17  or the administration adviser?
18  A.    The faculty adviser.
19  Q.    Did you have any
20  responsibility as faculty adviser to the
21  committee to ensure that NYU and Stern
22  School rules were followed or was the
23  matter basically handed over to the
24  committee?
25  A.    The matter is typically handed

84

G. FRASER

1
2  over to the committee.
3  Q.    Do you have any kind of
4  responsibility to make sure that the
5  committee is following, the appropriate
6  rules and regulations?
7  A.    I would say I act as an
8  adviser, so I certainly work with the
9  committee if they have some questions about
10  the procedure.
11      I actually assist them in --
12  when it gets to a hearing.  In addition to
13  committee members and faculty, we also -- it
14  is my responsibility to ask two students who
15  are not involved in the process to sit in on
16  the committee hearing as well too.
17  Q.    Who are the two students that
18  sat in on the Rosenthal hearing?
19  A.    Spencer Jones was one, and I
20  can't recall the name of the other student.
21  I'm sure it is in the documentation.
22  Q.    How did you select them?
23      MS. KILSON:  Objection, form.
24  A.    I selected them randomly.
25  Q.    Did you ask them if they knew

85

G. FRASER

1
2  anything about the matter before you
3  selected them?
4  A.    I did not.
5  Q.    Did you determine after you
6  selected them whether they knew anything
7  about the case?
8  A.    I determined that they did
9  not.
10  Q.    Once you handed the complaint
11  to Tim Colven and Amy Margolis on or about
12  March 1, 2007, whose responsibility was it
13  to move the case forward at its earliest
14  opportunity?
15  A.    That is the chair and the vice
16  chair.
17  Q.    Do you know what happened
18  between March 1 and, let's say, April 5th,
19  2007 in connection with the investigation?
20      MS. KILSON:  Objection, form.
21  A.    I don't know directly what
22  happened, no.
23  Q.    Did you have any conversations
24  with -- did you talk to Amy Margolis at all
25  about the Rosenthal case?

22  (Pages 82 to 85)

86

G. FRASER

1
2     A.      I had conversations with Tim
3  and Amy, typically together.  I might have
4  had a conversation with Tim one on one, so
5  I had conversations with either Tim
6  directly or Tim and Amy directly.
7     Q.      Did you have conversations
8  with them, either Tim individually or the
9  two of them together, in the first four or
10 five weeks after you gave them the
11 complaint?
12    A.      Yes.
13    Q.      When were those conversations,
14 to the best of your recollection?
15    A.      They would provide updates on
16 their evaluation of the case.
17    Q.      What did they say in those
18 updates?  What was their evaluation?
19    A.      I think it was what we talked
20 about.  They were evaluating whether this
21 was a judiciary hearing or investigation or
22 if it was a request from the faculty
23 separate from the judiciary committee to
24 evaluate a situation that would help them
25 determine whether they would grant a

87

G. FRASER

1
2  degree.
3     Q.      Did they reach some sort of
4  conclusion about which it was?
5     A.      I don't think they ever
6  reached a conclusion before graduating,
7  before turning over their responsibility to
8  Mel Ochoa.
9     Q.      Do you remember if they turned
10 over their responsibility to Mel Ochoa in
11 mid April, late April, early May?  Do you
12 remember when?
13    A.      No.
14    Q.      Do you know if they attempted
15 to make a determination whether there was a
16 violation of the rules alleged that had
17 been filed in the faculty's complaint?
18         MS. KILSON:  Objection, form.
19    A.      I don't believe they felt
20 there was a violation because I think they
21 had to evaluate the merit of the case.
22    Q.      What do you mean by the merit
23 of the case?
24    A.      Whether it was something that
25 would go formally through the judiciary

88

G. FRASER

1
2  committee or the judiciary committee was
3  acting as an adviser.
4     Q.      Is there anything in the Stern
5  School disciplinary rules that provides for
6  the disciplinary committee acting as an
7  adviser to the faculty?
8         MS. KILSON:  Objection to
9     form.
10    A.      I would say the way that the
11 leaders of the judiciary committee at the
12 time, they looked at it as an option that
13 they were given an ad hoc request, given
14 that the request came out of a meeting to
15 the faculty to decide whether they wanted
16 to confer the degree or not.
17    Q.      Again, is there anything in
18 the rules that provides for that type of
19 process as opposed to -- withdrawn.
20         Is there anything in the rules
21 that provides for that type of process?
22         MS. KILSON:  Objection, form.
23    A.      I would say based on the
24 faculty meeting there was discussion of
25 uncertainty as to whether to award the

89

G. FRASER

1
2  degree to Ayal.
3         I think based on that Tim
4  Colven and Amy Margolis felt comfortable
5  taking the position that this was
6  potentially a case where it was about Ayal
7  should receive his degree or not from the
8  faculty which would then be separate than an
9  honor code or code of conduct case.
10    Q.      Why would that be separate
11 from an honor code or code of conduct case?
12    A.      That was their interpretation.
13    Q.      Did you agree with that
14 interpretation?
15    A.      It's not my role to comment.
16 My role is to allow them to determine how
17 they will manage a process.
18    Q.      In managing a process are they
19 required to follow the procedures set forth
20 in the disciplinary rules?
21         MS. KILSON:  Objection, form.
22    A.      I would say that if it was
23 that situation they would seek to follow
24 the guidelines, but again, I think they
25 were evaluating whether it was a case for

23 (Pages 86 to 89)

98

G. FRASER

1
2    MR. HERNSTADT:  I call for the
3  production of any code of conduct
4  signed by Ayal Rosenthal.
5    (Request.)
6    MS. KILSON:  I will take that
7  under advisement.
8    Q.    Looking back at Exhibit 1, the
9  second page of the exhibit, on the
10  left-hand side which is page 226 of
11  University policies procedures, it says
12  student disciplinary procedures.
13    A.    Yes.
14    Q.    And do Stern School students
15  have to follow the student disciplinary
16  procedures of the University?
17    MS. KILSON:  Objection, form.
18    A.    I would say the Stern School's
19  policies outweigh the University's.
20    Q.    So if there's a conflict
21  between the Stern School policies and the
22  University policies, then the Stern School
23  policies would control?
24    MS. KILSON:  Objection, form.
25    Q.    Is that correct?

99

G. FRASER

1
2    A.    I would say this is the role
3  of the chair to determine what activity to
4  take given that students agree to all the
5  code of conducts that I mentioned.
6    Q.    If the Stern School
7  disciplinary rules say one thing and the
8  University disciplinary rules say a
9  different thing, which rules would apply to
10  the Stern School students?
11    MS. KILSON:  Objection, form.
12    A.    I would say the Stern ones.
13    Q.    Why do you say that?  What is
14  the basis for that statement?
15    A.    I think that in signing the
16  code of conduct, it lists the NYU Stern
17  code of conduct and it also states in
18  addition that a student agrees to abide by
19  the code of conduct by the University as
20  well.
21    Q.    You are looking in Exhibit 7,
22  page 4 of 12, NYU 74, the second paragraph
23  on that page?
24    A.    Yes.
25    Q.    Where it says, In addition?

100

G. FRASER

1
2    A.    Yes.
3    Q.    In looking at that paragraph,
4  the last sentence says:
5    Conduct that violates the code
6  may be subject to both student or University
7  discipline.  Do you see that?
8    A.    Yes.
9    Q.    Where it says violates code,
10  what code is being referred to there?
11    A.    I believe it's talking about
12  the NYU code.
13    Q.    The NYU code of conduct?
14    A.    Yes.
15    Q.    What does matriculating and
16  continuing student mean?
17    A.    Someone who is enrolled.
18    Q.    Is that matriculated means
19  that a student is enrolled in the school?
20    A.    That's my interpretation,
21  yeah.  Again, I don't oversee the Office of
22  Records and Registration, so I'm sure they
23  have a formal definition of that.
24    Q.    Have you ever seen a
25  definition like that written down?

101

G. FRASER

1
2    A.    Of matriculation?
3    Q.    Of matriculated and
4  continuing.  That's a term that's found in
5  the student disciplinary rules, Exhibit 7,
6  page NYU 75, which is page 5 of 12 under
7  jurisdiction.
8    A.    Yes.
9    Q.    Where it says:
10    The committee has jurisdiction
11  over disciplinary matters involving
12  matriculated and continuing MBA students.
13    MS. KILSON:  Objection to
14  form.  What is the question?
15    Q.    My question is what is the
16  definition of a matriculated and continuing
17  MBA student?
18    A.    I would say students that are
19  members of the Stern community that are
20  enrolled in course work or still -- or
21  their degrees have not been conferred, they
22  have continuation of academic studies.
23    Q.    Would it include students that
24  are not enrolled in any classes and not
25  continuing any studies?

26  (Pages 98 to 101)

# Exhibit 2

kcorfman@stern.nyu.edu, Gary Fraser, 01:32 PM 4/17/2007, Re: [Fwd: Rosenthal Case]

To: kcorfman@stern.nyu.edu, Gary Fraser <gfraser@stern.nyu.edu>
From: Thomas Grace <tg3@nyu.edu>
Subject: Re: [Fwd: Rosenthal Case]
Cc: Tom Grace <thomas.grace@nyu.edu>, Lee Chamberlin <leona.chamberlin@nyu.edu>
Bcc:
Attached:

·Kim and Gary,

As I indicated to Kim, these are my opinions/thoughts on the matter.  However, any "formal"
decision/advice absolutely should come from Lee Chamberlin who should be consulted
before proceeding.

Tom


At 01:15 PM 4/17/2007, Kim Corfman wrote:
  Hi Gary,

I just had a long conversation with Tom Grace and I think I have a clearer picture of the situation
and our options.  (I'm copying Tom, so he can correct me if I'm wrong.)

- The NYU Office of Legal Counsel has the official word on matters of jurisdiction. ·If Lee
  Chamberlin says there is reason to believe harm was done to the University (in this case, to
  the University's reputation) through Rosenthal's actions, our judiciary process has
  jurisdiction. ·
- Our Judiciary Committee's job is to determine a) to what degree the student's behavior
  damaged or endangered the School's reputation and b) what punishment is appropriate.
- If they feel the damage is minimal, they can recommend that no punishment be exacted.
- A judiciary process may only rule on behavior that has occurred and the impact of that
  behavior on the University.  Therefore, they should only recommend withholding the degree if
  they believe the amount of damage he did warrants that particular punishment. A judiciary
  process may not recommend withholding the degree because they don't want the damage to
  be greater.
- If the Committee feels that withholding the degree does not fit the offense (in nature and/or
  severity), other penalties might be imposed (e.g., a notation of sanction on the transcript, a
  requirement that he take ethics instruction, delaying the degree, etc.).
- If the judiciary process does not result in a recommendation satisfactory to the School, an
  administrative process can be invoked.

Gary, would you please make sure the Judiciary Committee understands all this?

Thanks,
Kim

Here are three pertinent sections from the Students Guide to NYU from Tom:

1) From page 222 "Rules of Conduct"



NYU000022

http://www.nyu.edu/students.guide/policies/student_discipline.pdf
 A. All members of the University Community - students, faculty members, and members of the
staff - shall comply with city, state, and federal laws and ordinances affecting the maintenance of
order on University premises.    Students who engage in behavior that violates these standards will
be subject to the disciplinary process in the following manner:

   1.  Conduct that is violative of such laws and ordinances occurring on University premises may
be subject to both University discipline and                 public sanctions as circumstances may
warrant or dictate.

2.   Conduct that is violative of such laws and ordinances occurring off-University premises will
ordinarily not be subject to University discipline,                 unless such conduct          a)
seriously affects the interests of the University or the position of the member within the University
community; or              b) occurs in close proximity to University premises and is connected to
violative conduct on University premises.

**2) From page 224 "University Policy on Student Conduct". ( second paragraph of section
2. Rules of Conduct)**

2. Basic Rules of Conduct. Students are expected to conduct themselves as mature and law-
abiding members of both the University community and the general community, and to comply with
requests of the administrative authorities of the University for maintenance of order on University
premises. Behavior which jeopardizes the health or safety of the University community, or disrupts
the educational activities and supporting services of the University, is subject to review and
possible penalty in accordance with the procedures and practices of the University and its
colleges, schools, or divisions.

Where activities sponsored by student organizations constitute violations of University rules or of
public laws and regulations, sanctions may be imposed on such organizations as well as on
individual students.

The University should not use its powers to interfere with the rights of a student outside the
University campus. In general, a student's off-campus activities should be subject only to sanctions
of the public authorities. Where a student is convicted of a violation of law, he should not be subject
to University discipline for the same offense unless his conduct seriously affects his position as a
member of the academic community.

Where a student's conduct on campus constitutes violations of both University rules and public
law, he may be subject to both University discipline and public sanctions.

**3) From Page 227 - Resolution of Questions of Jurisdiction in Any Particular Case**

C. Resolution of Questions of Jurisdiction in Any Particular Case. While questions of jurisdiction
are not expected to be numerous or difficult, the following procedures shall be used where such
questions arise:

   1. Where a question arises as to whether a case should come within faculty or Senate
jurisdiction, the question shall be referred for decision to            the Office of Legal Counsel of the
University.

NYU000023

kcorfman@stern.nyu.edu, Gary Fraser, 01:32 PM 4/17/2007, Re: [Fwd: Rosenthal Case]

2. The decision of the Office of Legal Counsel shall be both telephoned and mailed to each student who is the subject of the same or a similar     complaint as the one in which the question of jurisdiction has been raised, to the Dean of the faculty of each school in which any such student
is enrolled and to the Chairman of the University Judicial Board (hereinafter defined).

3. If either a student who is the subject of a complaint, or the Dean or Chairman of the Disciplinary Committee of a faculty in which such student is enrolled, or the Chairman of the University Judicial Board disagrees with the decision rendered by the Office of Legal Counsel, such person    shall have the right to appeal the decision to the Committee on Organization and Governance of the University Senate.

4. The Office of the Secretary of the Senate must receive notice of such appeal no later than three days after the initial decision of the Office of     Legal Counsel has been communicated to the person taking the appeal. In cases in which the student has been temporarily suspended or
   dismissed pending disciplinary proceedings, such notice of appeal must be received within eight hours.


------- Original Message -------
Subject: Rosenthal Case
Date: Tue, 17 Apr 2007 08:57:15 -0400
From: Kim Corfman <kcorfman@stern.nyu.edu>
Reply-To: kcorfman@stern.nyu.edu
Organization: NYU Stern
To: Lee Chamberlin <leona.chamberlin@nyu.edu>, Tom Grace <thomas.grace@nyu.edu>
CC: Gary Fraser <gfraser@stern.nyu.edu>


Dear Lee and Tom,

We need your help with this.

Tom, you provided very helpful guidance, which Gary passed along to the
Stern Judiciary Committee. As I understand it, your explanation is
that
off-campus incidents are only subject to University disciplinary action
when there is a direct effect on the University, including damage to
the
University's relationship with an involved external party.

Lee, Tom Cooley's perspective, based on his conversations with you, is
that ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

NYU000024

kcorfman@stern.nyu.edu, Gary Fraser, 01:32 PM 4/17/2007, Re: [Fwd: Rosenthal Case]

~~we give him an MBA degree.~~

At this point, the Judiciary Committee is leaning against taking the
case because they feel no Stern or NYU rule applies.  However, they
haven't heard Tom Cooley's interpretation.

It would be tremendously helpful to us and to the process if you would
help us reconcile these perspectives.

Many thanks,
Kim

--

Kim P. Corfman
Vice Dean for MBA Programs
Professor of Marketing
Stern School of Business, New York University
Henry Kaufman Management Center, 11-56
New York, NY  10012-1126
212-998-0593, 212-995-4212 (fax)

--

Kim P. Corfman
Vice Dean for MBA Programs
Professor of Marketing
Stern School of Business, New York University
Henry Kaufman Management Center, 11-56
New York, NY  10012-1126
212-998-0593, 212-995-4212 (fax)

NYU000025

# Exhibit 3

Search    SternLinks    NYU Stern Home    Site Map    Contact Us

# NYU STERN
NEW YORK UNIVERSITY · LEONARD N. STERN SCHOOL OF BUSINESS

The Downtown Advantage | About Stern | Academic Programs | Admissions | Academic Departments | Faculty & Research | Events | News

» **MBA Students**
  Student Instructions
  Graders & Tutors
  TF-GF Contract
  Grading Voucher
  FAQ

» **Undergraduate Students**

» **Faculty & Administrators**

» **Required Documents**

» **Job Listings**



**Notes on completing the Teaching/Graduate Fellowship Contract:**
For Teaching Fellowships: position size and compensation are affected by course ENROLLMENT, course weight (full or half course), and course CREDIT load. It is your responsibility to make sure you understand how these factors will impact your position. Please consult with the Department Coordinator BEFORE marking a position size; he/she will be able to tell you how these three factors impact your specific position. For more information, see the Compensation Determination Chart on the <u>Policies & Eligibility</u> page by clicking on the link on the left. Please note: There is a 2-position limit during the fall & spring semesters and a 1-position limit during the Winter and Summer sessions.

**Please note the following and be aware that by proceeding to the TF/GF contract below, you are agreeing to the terms and conditions of this appointment.**

Eligibility: To be eligible for a Fall, Winter or Spring TF/GF position, you must be a Stern MBA student who remains enrolled in MBA courses in the Fall/Spring semester, has previously completed at least 2 semesters at Stern as a MBA student, has a GPA of at least 3.0, and has completed the course or its equivalent. For more details, please refer to the eligibility page and FAQs page. All appointments are for one semester only; therefore you must reapply for a fellowship each term you intend to work. During the Summer, all MBA & MS students are eligible.

This fellowship is a Financial Aid award. Please note: Loan eligibility may be affected when you secure a TF/GF position. As these funds are considered tuition remission, Financial Aid will simply reduce the amount of loans you will need to repay. Please refer all questions to the Stern Financial Aid Office at (212) 998-0790.

Teaching Fellows and Graduate Fellows are entitled to a 15% discount at all NYU Book Centers. Your name and Net ID will be forwarded to the NYU Card Center where it will then be recorded on the Student Information System (SIS). The bookstores can then scan your ID to verify that you get the discount. Please allow 10 business days after submitting your contract for this information to be added to your account.

Please click <u>here</u> to download the TF/GF Contract.

---

| | | | | |
|---|---|---|---|---|
| The Downtown Advantage | Academic Departments | Prospective Students | Recruiters | SternLinks |
| About Stern | Faculty & Research | Admitted Students | Stern Supporters | Site Map |
| Academic Programs | Events | Current Students | Alumni | NYU Stern Home |
| Admissions | News | Faculty | Search | |

Copyright © 2004 Leonard N. Stern School of Business



Search    SternLinks    NYU Stern Home    Site Map    Contact Us

NYU✦STERN
NEW YORK UNIVERSITY· LEONARD N. STERN SCHOOL OF BUSINESS

The Downtown Advantage    About Stern    Academic Programs    Admissions    Academic Departments    Faculty & Research    Events    News

» MBA Students
   Student Instructions
   Graders & Tutors
   TF-GF Contract
   Grading Voucher
   FAQ
» Undergraduate Students
» Faculty & Administrators
» Required Documents
» Job Listings



### Frequently Asked Questions

**What if a TF/GF is receiving student loans?**
As these funds are considered tuition remission, Financial Aid will simply reduce the amount of loans you will need to repay. For example, if a student is receiving loans and becomes a full position TF or GF, the $3600 tuition remission award will be deducted from the loans, effectively making the loan debt smaller by $3,600. <u>For an example of the award's effect on student loans, please click here</u>, or contact Financial Aid at 212-998-0790 for more information.

**Can a student have more than one TF or GF position at the same time?**
Yes, but there is a strict limit of 2 positions, or a total of 20 hours per week. For example, a student could hold a 2 half TF positions and a full TF position for three different courses. Or a GF could work 10 hours per week in one administrative department and 10 hours per week in another administrative department at the same time.

The above applies to the Fall and Spring semesters.

**What are the rules for Summer positions?**
During the summer, all MBA and MS students are eligible to be a Teaching/Graduate Fellow. This includes 1st year students, recently graduated MBA students (with exception to recently graduated international students), part-time students, and MS students. TFs may not exceed the 20 hours per week maximum or 1 position and GFs can work up to 280 hours total during the summer. For additional information regarding ineligibility for graduated international students please click **here.**

**What is the limit on the number of positions that can be held during the Winter Intersession?**
One position or two half positions. This will not impact the 2 position limit placed on the traditional Fall or Spring semesters.

**What is the tuition remission award for a Winter Intersession class?**
Generally, $900 or $1,800 for a 1.5-credit class, $1,800 or $3,600 for a 3-credit class. The amount is determined by the course's enrollment.

**What are the hours for GFs during the Winter Intersession?**
Because the Winter Intersession is approximately five weeks long, Graduate Fellows are eligible to work a half position (a total of 50 hours) or a full position (at total of 100 hours) during the winter term.

NYU Stern - Student Jobs

**Are all courses eligible for a full teaching fellowship?**
Please note that some courses may only be eligible for a half TF (working 5
hours per week) based on enrollment, course weight (full or half), and credit
hours. For further information, course eligibility for TFs is described in the
section on <u>Instructions to Faculty and Administrators</u>.

**How is compensation for teaching fellowships determined?**
Enrollment, course weight (full or half), and credit hours are used to
determine the compensation for a particular course. You should verify the
compensation for a course with the department administrative
coordinator/professor.

**Can a teaching fellow receive additional compensation for private
tutoring?**
No. Students may not make independent arrangements for additional
compensation to tutor students in the class to which they are assigned as a
TF.

**Can an NYU employee work as a Teaching Fellow, Grader, or Tutor?**
No. As an employee, you are not eligible to be compensated for any of these
positions.

**Can a student from a school other than NYU participate in this
program?**
No. This is not allowed.

**Can a TF/GF be paid by check instead of by tuition remission?**
During the Academic Year, payment by check is only permitted if a student
is a full scholarship recipient or is receiving full funding from an external
source such as an employer.  During the Summer Session, all full time
students are eligible to be paid by check since they are not enrolled for any
courses. Checks are issued by the Payroll Office, and check payments are
subject to taxes.

**Are Consortium Fellows or other Scholarship recipients eligible for
these positions?**
Yes, please see above. In such cases, students are paid via a check from
the Payroll Office, which is subject to taxes.

**Can TF/GF tuition remission be credited to the student's tuition bill for
a semester other than the one in which the student is working?**
No. Students must be paid in the semester in which they work.

**Can a student be a TF/GF and a Grader at the same time?**
Yes, but not for the same class, and there is a strict limit of 20 hours of
work per week in total.

**Can a student be a TF/GF and a Tutor at the same time?**
Yes, but not for the same class, and there is a strict limit of 20 hours of
work per week in total.

**Can a student be a Tutor and a Grader at the same time?**
Yes, but not for the same class, and there is a strict limit of 20 hours of
work per week in total.

**Can a class have a TF and a Tutor at the same time?**
This is not permitted at Stern's expense. However, faculty members may use their STARS accounts to pay for eligible TFs, Graders, and Tutors over and above amounts paid for by Stern.

**Can a class have a TF and a Grader at the same time?**
Please see above.

**Can a class have a Tutor and a Grader at the same time?**
Please see above.

**Can a part-time student be a TF/GF?**
Yes, as long as the student meets all other eligibility requirements.

**Can Ph.D. students be TF/GFs?**
Ph.D. students are no longer allowed to participate in this program. Consult the Doctoral Office for more information.

**Can Ph.D. students be Tutors or Graders?**
Yes but only with the approval of the Doctoral Office.

**Can a student be a TF for a course in which she or he is also enrolled as a student?**
No.

**Can a student get course credit for a class in which she or he is the TF?**
No.

**Can a professor hire a student as a GF to do research?**
No. A GF cannot be a Research Assistant for a professor. Students are hired as Research Assistants through a memo to Human Resources and are paid from the professor's STARS account. These students do not complete a TF/GF contract and do not receive tuition remission.

**Can students participating in the Stern Consulting Corps (SCC) program be a TF/GF?**
Yes. However, there is a strict limit of a total of 2 full positions for SCC interns with a TF/GF position. The SCC internship is considered one full position.

**If I graduated during the Spring term, can I be a teaching fellow or graduate fellow during the Fall semester immediately following the academic year in which I graduated?**
No. If you graduate at the end of the Spring term, you cannot hold a teaching fellowship or graduate fellowship during the following Fall semester. However, you may be eligible to hold either a teaching or graduate fellowship during the summer term of the academic year in which you have graduated. Please note however that you will be paid by check rather than tuition remission.

# Exhibit 4

2/9/2010                          Academic Affairs | Policies & Procedures

‣ Stern Home  ‣ Academic Affairs Home  ‣ Contact Us

# NYU STERN

### NEW YORK UNIVERSITY · LEONARD N. STERN SCHOOL OF BUSINESS   ACADEMIC AFFAIRS

| About Stern | Academic Programs | Faculty & Research | Career Services | Executive Education | Events | News |

| Full-time Students | Part-Time Students | International Programs | Dual Degrees | Special Students | Policies & Procedures | Specializations |

‣ Academic Distinction
‣ Acceleration
‣ Auditing
‣ Business Writing
‣ Consulting Advisors
‣ Course Faculty Evaluation
‣ Credit Maximum
‣ Credit Overload
‣ Deadline for Degree Completion
‣ Doing Business In...(DBi..)
‣ Dual Degrees
‣ Free Course
‣ Grading
‣ Graduation Requirements
‣ Incomplete Grades
‣ Independent Study
‣ Intensive Modules
‣ Leave of Absence (Maintaining Matriculation)
‣ Leaving the New York Area
‣ Other NYU Division Courses
‣ Practical Training
‣ Program Prerequisites
‣ Program Progress
‣ Program Status Change
‣ Specialization Instructions
‣ Stern Courses
‣ Study Abroad
‣ Transfer Credits
‣ Waiving and Substituting a Core Course
‣ Warning Letters

GRADUATION REQUIREMENTS

## Graduation Requirements

### Degree Requirements Completed - Graduation Date on Transcript

- Fall Term - January Graduate
- Spring Term - May Graduate
- Summer Term - September Graduate

Students must graduate the semester that they earn 60 credits and fulfill their degree requirements.  To be considered eligible for graduation, all students must::

### Application for Degree Candidacy - Full-Time M.B.A. Candidate

All MBA and MS students planning to graduate must file an Application for Degree Form with the Office of Records and Registration. Ph.D. candidates should file their application with the Doctoral Office.

### Application for Degree Candidacy - Part-time M.B.A. Candidates

Part-time M.B.A. candidates who wish to have their employers notified of their graduation should file an Employer Notification of Graduation Request Form with the Office of Records and Registration along with their Application for Degree Form.

### Business Writing Requirement

All M.B.A. degree candidates must satisfy the Business Writing Proficiency requirement in order to qualify for graduation.

### Continuous Matriculation

All degree and certificate candidates must maintain continuous matriculation during their entire program. This is normally done by completing relevant course work each Fall & Spring semester. Students in good standing who are making satisfactory progress towards completion of their program but must be away for a Fall and/or Spring semester, must maintain matriculation by paying a fee. Ph.D. candidates must receive approval from the Doctoral Office in order to maintain matriculation by fee.

Also, students permitted to complete a portion of their program at another accredited university must pay the matriculation fee for each Fall and/or Spring semester they are away from Stern.

2/9/2010

→ Weekend Only
  Coding

→ Withdrawing From
  The Program

## Incomplete Grades

For students graduating in May, all courses with <u>incomplete grades</u> (IP or IF) must be completed and graded by the first Friday of May. For students graduating in January or September, all courses with incomplete grades must be completed and graded by the third Monday of the month in which they filed to graduate (ie: January or September).

Incompletes not made up by this deadline will lapse to N in the case of an IP (Incomplete Passing) and F in the case of an IF (Incomplete Failing).

## IMP Courses (Study Abroad and Doing Business In...)

Stern students who participate in the <u>International Management Program (IMP)</u> must receive passing grades in the courses taken abroad. The student will receive Stern credit and a grade of P for courses passed abroad, even though the Stern grade point average will not be affected. Candidates for graduation must have their IMP transcripts submitted to the Office of Records and Registration by the second Friday of the month in which they plan to graduate.

## Scholastic Requirements

All MBA candidates must have a minimum grade point average of 2.5 in order to graduate.

## Transfer Credits

Students granted permission to complete a portion of their program at another accredited institution must receive grades of B or better in the approved courses in order to receive transfer credit. Those who are away from Stern for a Fall and/or Spring semester must <u>maintain matriculation</u> by paying the appropriate fee. In addition, candidates for graduation must have their transcript forwarded to the Office of Records and Registration by the second Friday of the month in which they plan to graduate.

## Tuition and Fees

All financial obligations (including tuition and fees, library fines and books, housing charges) must be met before a student will be allowed to graduate. In addition, the University reserves the right to withhold all information regarding the record of any student in arrears in paying tuition, fees, loans or other charges

 PRINT VERSION

©2010 New York University Leonard N. Stern School of Business
If you encounter problems viewing this website please contact <u>helpdesk@stern.nyu.edu</u>.

2/9/2010                     Academic Affairs | Policies & Procedures

‣ Stern Home  ‣ Academic Affairs Home  ‣ Contact Us

# NYU STERN

NEW YORK UNIVERSITY · LEONARD N. STERN SCHOOL OF BUSINESS  **ACADEMIC AFFAIRS**

About Stern   Academic Programs   Faculty & Research   Career Services   Executive Education ... Events.   News

| Full-time Students | Part-Time Students | International Programs | Dual Degrees | Special Students | Policies & Procedures | Specializations |

‣ Academic Distinction                                             **PROGRAM PROGRESS**

‣ Acceleration

‣ Auditing

‣ Business Writing

‣ Consulting Advisors

‣ Course Faculty Evaluation

‣ Credit Maximum

‣ Credit Overload

‣ Deadline for Degree Completion

‣ Doing Business In...(DBi..)

‣ Dual Degrees

‣ Free Course

‣ Grading

‣ Graduation Requirements

‣ Incomplete Grades

‣ Independent Study

‣ Intensive Modules

‣ Leave of Absence (Maintaining Matriculation)

‣ Leaving the New York Area

‣ Other NYU Division Courses

‣ Practical Training

‣ Program Prerequisites

‣ Program Progress

‣ Program Status Change

‣ Specialization Instructions

‣ Stern Courses

‣ Study Abroad

‣ Transfer Credits

‣ Waiving and Substituting a Core Course

## Program Progress

Stern M.B.A. students must complete the following:

- At least one course in the semester for which they are admitted; those who do not, must reapply for admission in a subsequent semester.
- At least 6 credits each academic year.
- At least 24 credits within the first three years.
- All requirements for the degree within the maximum of six years from initial enrollment in the program.

Students who are unable to maintain this pace are not permitted to continue in their degree program. Note that, although students are required to meet only these minimums to remain in the program, it is not possible to complete the M.B.A. degree requirements within the six-year limit at the minimum rates of progress.

## Scholastic Requirements

Students must maintain a minimum grade point average while matriculated in degree programs. (For information on computing the grade point average, see the Examinations and Grades section.)

### _Students who began the program prior to January 1, 2006_

**The following minimums must be met to avoid dismissal or Academic Probation*:**

- 1-14 credits attempted: if GPA is less than 2.1, student is placed on academic probation.
- 15-29 credits attempted: if GPA is less than 2.1, student is dismissed from the program.
- 30 or more credits attempted: if GPA is less than 2.3, student is dismissed from the program.
- 60 credits completed: if GPA is less than 2.5, student is not eligible to graduate and is dismissed from the program.

### _Students who began the program after January 1, 2006_

**The following minimums must be met to avoid dismissal from Stern*:**

- 6-29 credits attempted: if GPA is less than 2.1, student is dismissed from the program
- 30 or more credits attempted: if GPA is less than 2.3, student is dismissed from the program
- 60 credits completed: if GPA is less than 2.5, student is not eligible to

2/9/2010

↪ warning Letters

↪ Weekend Only
   Coding

↪ Withdrawing From
   The Program

Academic Affairs | Policies & Procedures
graduate and is dismissed from the program

**The following minimums must be met to avoid being placed on Academic Probation:**

- 6-29 credits attempted:
  - GPA is less than 2.3
  - Student fails one or more courses
  - Student accumulates more than one incomplete grade

- 30 or more credits attempted:
  - GPA is less than 2.5
  - Student fails one or more courses
  - Student accumulates more than one incomplete grade

*Academic Probation is a period of time given to a student to redeem poor or unsatisfactory academic performance as prescribed by the requirements for minimum program progress.

While on Academic Probation, students will not be considered in "good academic standing" and the Academic Review Committee will have the discretion to limit eligibility and services based on this condition. Program restrictions may include all or any part of the following, but are not limited to: credit limits, eligibility for course registration, GPA requirement, student activities (clubs, treks, conferences, etc.), Study Abroad.

When grades are available after each semester, students who do not meet the minimum requirements are notified by their program's advising office, on behalf of the Academic Review Committee, that they are on Academic Probation or that they may not continue in the program. Students placed on probation must make an appointment with an academic advisor to discuss their situation and plans for improvement. Students who are dismissed from the program and who have registered prior to receiving these letters are withdrawn from their courses and given a full tuition refund. (Students who have low averages are urged not to register for the next term if there is any chance their grade point average will fall below these minimums when all the current semester's grades are reported and recorded.)

### Graduation – Minimum Grade Point Average (GPA)

A 2.5 grade point average is required of all MBA program students to meet eligibility requirements for graduation. Grade point averages include all coursework that appears on the Graduate Stern transcript, whether or not it actually fulfills program requirements.

### Minimum Residency Requirement

Students must complete 75% of their academic program (45 credits) at Stern. All core courses must be completed at Stern. Students may take a maximum of 15 elective credits outside of Stern on IMP courses (Study Abroad), courses at other NYU divisions, or at other AACSB accredited schools.

### Full-Time Student Employment Policy

Full-time students who have completed fewer than 15 credits are strongly discouraged from taking on any type of employment that interferes with their full participation in the MBA program. Any outside employment commitment that negatively impacts the students academic, community or career experience at Stern could be subject to committee review. Students who have completed more than 15 credits and have a GPA of at least a 3.0 are pre-approved to work part time or intern for a maximum of 20 hours per week.

2/9/2010                     Academic Affairs | Policies & Procedures

> Stern Home  > Academic Affairs Home  > Contact Us

# NYU STERN

NEW YORK UNIVERSITY · LEONARD N. STERN SCHOOL OF BUSINESS   **ACADEMIC AFFAIRS**

| About Stern | Academic Programs | Faculty & Research | Career Services | Executive Education | Events | News |

| Full-time Students | Part-Time Students | International Programs | Dual Degrees | Special Students | Policies & Procedures | Specializations |

- › Academic Distinction
- › Acceleration
- › Auditing
- › Business Writing
- › Consulting Advisors
- › Course Faculty Evaluation
- › Credit Maximum
- › Credit Overload
- › Deadline for Degree Completion
- › Doing Business In...(DBi..)
- › Dual Degrees
- › Free Course
- › Grading
- › Graduation Requirements
- › Incomplete Grades
- › Independent Study
- › Intensive Modules
- › Leave of Absence (Maintaining Matriculation)
- › Leaving the New York Area
- › Other NYU Division Courses
- › Practical Training
- › Program Prerequisites
- › Program Progress
- › Program Status Change
- › Specialization Instructions
- › Stern Courses
- › Study Abroad
- › Transfer Credits
- › Waiving and Substituting a Core Course
- › Warning Letters

**POLICIES & PROCEDURES**

## Stern MBA Academic Policies and Procedures

This site contains all of the academic policies and procedures that relate to Stern MBA students. Please click on the policy to the right about which you are interested in learning. Policies that are specific to either the Full-Time or Part-Time programs due to differences in the programs are denoted. If not indicated otherwise, the policies apply equally to all MBA students.

For clarification on a policy and how it effects your personal situation, please consult your academic advising office:

Full-Time MBA

Part-Time MBA; The Langone Program Office

International Programs Office (Exchange Students)

Dual Degree Students

## The MBA Academic Review Committee

Occasionally, a student may have rare and unusual circumstances that might warrant a special exception to a policy. In such cases, the student should submit a written petition to the MBA Academic Review Committee via the online application: http://w4.stern.nyu.edu/academic/affairs/arc/. Students are advised to consult with an academic advisor in the relevant program office before submitting a petition.

The MBA Academic Review Committee is comprised of senior administrators, faculty and program advisors. The committee meets weekly to review petitions and make decisions in consideration of the individual, extenuating circumstances. Please be advised that committee decisions are final and subsequent petitions to the same regard will not be reviewed unless new, compelling information is provided.

Academic Review Committee petitions are reviewed every Friday. Only petitions received before 3:00 pm on Thursdays will be reviewed and a response will be sent by the following Saturday no later than 2:00 pm.

# Exhibit 5

50

Grace

1  Legal Counsel would be a good office to speak with.
2      MR. HERNSTADT: Let's take five minutes.
3      (Recess.)
4      Q.   Looking at this e-mail, this is number 5,
5  look at the second e-mail down which is at 1:15 p.m.
6  on 4/17. Kim Corfman is writing to Gary.
7      It says "I just had a long conversation
8  with Tom Grace and I think I have a clearer picture
9  of the situation and our options. (I am copying Tom,
10 so he can correct me if I am wrong.)" Then five
11 bullet points follow.
12     Taking a look at those five bullet points,
13 are those the opinions that you shared with Kim
14 Corfman in your conversation with her?
15     MS. KILSON: Objection to the form of the
16 question.
17     A.   I don't believe what she wrote entirely
18 captures my thoughts, my opinions, necessarily, but I
19 wanted -- again, because I thought in prior e-mails I
20 made it clear that I don't know whether -- going back
21 to this one (indicating). "I don't know whether this
22 would be pertinent. I don't know. Look to Stern
23 policies."
24     Q.   Let me ask you, you pointed to Exhibit 2?

51

Grace

1      A.   Right.
2      Q.   You said "I don't know whether this would
3  be pertinent."
4      When you say "this," what are you
5  referring to?
6      A.   This matter, this case.
7      Q.   What do you mean when you say "this would
8  be pertinent"? I don't understand that. Could you
9  explain what you mean by that?
10     A.   You asked me whether or not these four
11 things capture my thoughts. Is that what you asked
12 me?
13     Q.   Yes, whether actually the six bullet
14 points in the 1:15 p.m. e-mail on 4/17 that Kim
15 Corfman says reflects the conversation she had with
16 you, whether those six bullet points are the thoughts
17 and opinions that you gave to Kim Corfman in that
18 conversation.
19     A.   Mostly.
20     Q.   In what way do they not reflect your
21 thoughts and opinions?
22     A.   They don't include the fact that I am
23 saying it's really a Stern matter, not my call.
24     Q.   Where do you say that?

52

Grace

1      A.   I am sorry?
2      Q.   Do you say that in any e-mail that we
3  looked at?
4      A.   Yes.
5      Q.   Where?
6      A.   In this (indicating) one, number 2. In
7  this paragraph I said -- the last three paragraphs --
8  "I'm not sure. I don't know. My office wouldn't do
9  it. I don't have jurisdiction over those things and
10 you should look to your own policies."
11     That's the one piece I think I conveyed
12 that is not in here (indicating). In my e-mail
13 response I made it clear they are opinions and
14 thoughts. I don't rule on those matters.
15     Q.   Kim Corfman copied you so that you could
16 correct her if she was wrong.
17     Did you correct anything?
18     A.   I did not.
19     Q.   The bottom of that e-mail on the first
20 page marked NYU 22, it says "Here are the three
21 pertinent sections from the Student's Guide to NYU
22 from Tom."
23     Do you recognize that as the excerpts from
24 the Student Guide?

53

Grace

1      A.   I do.
2      Q.   Which we marked as Exhibit 1 that you sent
3  to her?
4      A.   Yes. But she called me asking me what I
5  would do. I said "These are the things that dictate
6  what I would do but you need to look to Stern and
7  their policies for what you would do."
8      Q.   When you say "these," you are referring to
9  the bullet points and rules of conduct in the e-mail
10 on Exhibit 5, is that correct?
11     A.   Yes.
12     Q.   Did you ever say that to Ms. Corfman in a
13 telephone conversation, that she needed to look to
14 Stern?
15     A.   I can't recall specifically whether I did
16 or didn't.
17     Q.   To your knowledge, have any NYU students
18 been expelled because of an off-campus crime that was
19 not related to the students' academics or to NYU?
20     A.   Yes.
21     Q.   Please explain.
22     A.   Drug dealing.
23     Q.   Has that happened more than once?
24     A.   Yes.

14  (Pages 50 to 53)

# Exhibit 6

50

```
1              T. COOLEY
2   are guidelines because they are not rules
3   that are handed down by a legislative
4   process or carved in stone. They are a set
5   of behaviors that we agree to.
6      Q.    Does that mean that the
7   judiciary committee could decide not to
8   follow them if they decided not to?
9      A.    They could, and since their
10  role is only advisory to the Dean, that
11  would be something that would be taken into
12  account.
13     Q.    There is nothing in the
14  document that we have looked at so many
15  times that says that they could choose not
16  to follow the procedures, the policies and
17  procedures -- there is nothing in the
18  document that says that they could choose
19  not to follow the policies and procedures;
20  is that correct?
21        MS. KILSON: Objection to the
22  form of the question.
23     A.    Correct.
24     Q.    So is it your opinion that
25  because of the function these policies and
```

51

```
1              T. COOLEY
2   procedures play in the Stern School it's
3   understood that if the judiciary committee
4   decides to deviate from the rules it's
5   okay?
6      A.    No, that's not my opinion.
7      Q.    So what is the basis of your
8   saying they can not follow -- the judiciary
9   committee is not required to follow the
10  policies and procedures? If the basis for
11  that statement is not in the policies and
12  procedures themselves, where do you get it
13  from?
14     A.    Because as I just explained, I
15  will do this again if you insist, these
16  guidelines, these rules, procedures, are
17  designed for the customary kind of
18  infraction that we encounter which includes
19  plagiarism, cheating on exams, things which
20  can be resolved relatively quickly.
21        So our view and my view is that
22  if it required proceeding in a slightly
23  different way to ensure the integrity of the
24  judiciary process, then that would be
25  acceptable.
```

52

```
1              T. COOLEY
2      Q.    Are these policies and
3   procedures designed to address violations
4   of federal law?
5      A.    They do not anticipate
6   violations of federal law. It is a very
7   unusual circumstance.
8      Q.    Is the judiciary committee an
9   independent committee?
10        MS. KILSON: Objection to
11  form.
12     A.    What do you mean by
13  independent?
14     Q.    Can anyone direct the
15  committee to make certain findings?
16     A.    Absolutely not.
17     Q.    You mentioned before that
18  there is a Dean of students that is the
19  adviser to the judiciary committee. Is
20  that Gary Fraser?
21     A.    Yes.
22     Q.    To your knowledge does the
23  judiciary committee follow any other
24  policies and procedures other than the ones
25  in Exhibit 7 that we have been looking at?
```

53

```
1              T. COOLEY
2      A.    To my knowledge, no.
3      Q.    When did you first learn about
4   the potential legal problems faced by
5   plaintiff in this case, Ayal Rosenthal?
6      A.    In early February 2007 on a
7   weekend.
8      Q.    How did you learn about it?
9      A.    I received an e-mail from a
10  colleague.
11     Q.    Do you remember who?
12     A.    Bruce Buchanan.
13     Q.    You referred to him as a
14  colleague because he is a professor at the
15  school?
16     A.    He is a professor at the Stern
17  School.
18     Q.    What did you hear from
19  Professor Buchanan?
20     A.    That a Stern School student
21  who had just recently been a TA in the
22  Professional Responsibility class had been
23  accused of insider trading, and I believe
24  he attached the SEC complaint.
25        MR. HERNSTADT: If there was
```

14  (Pages 50 to 53)