UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
AYAL ROSENTHAL,

                    Plaintiff,

          -against-                          08 Civ. 5338 (LAK)

NEW YORK UNIVERSITY, et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

Edward Hernstadt
HERNSTADT ATLAS LLP
*Attorney for Plaintiff*

Nancy Kilson
OFFICE OF GENERAL COUNSEL
NEW YORK UNIVERSITY
*Attorney for Defendants*

LEWIS A. KAPLAN, *District Judge.*

        In 2005, plaintiff Ayal Rosenthal, then an employee of Pricewaterhouse Coopers ("PwC") and a part-time MBA student at the Stern School of Business ("Stern") of New York University ("NYU"), tipped his brother to material non-public information regarding an impending transaction involving publicly traded companies to which he had become privy through his job at PwC. The brother traded on the basis of the tips. In February 2007, just three months after Rosenthal completed his Stern course requirements, he pleaded guilty to conspiracy to commit securities fraud. After internal deliberation, NYU decided not to grant the degree. Rosenthal

thereafter brought this action for a declaration that the degree in fact had been awarded and for damages.

*Facts*

*Rosenthal's Conviction While a Stern School Student*

Rosenthal enrolled in Stern's part-time MBA program in January 2005.[1]  At that time, he was a certified public accountant and an employee of PwC, where he had worked since 2001.[2]  In May 2005, while Rosenthal still was enrolled at Stern, he learned from his supervisors at PwC material nonpublic information concerning a pending acquisition of a public company.  He "agreed to tell [his] brother Amir Rosenthal the names of two companies that were involved in a complicated transaction that [Ayal Rosenthal] was working on."[3]

In the following year, the federal government began a criminal investigation of Rosenthal's conduct.[4]  Rosenthal nevertheless continued his studies at Stern without revealing the investigation to the school.[5]  He obtained positions as a teaching assistant in three Stern courses in the fall of 2006, including, ironically, a course on professional responsibility.[6]  He completed all of

---

[1] Pl. 56.1 St. [DI 68] ¶ 6.

[2] Def. 56.1 St. [DI 54] ¶ 9.

[3] Kilson Decl. Ex. C. at 102-03 (authenticating deposition exhibits attached as Ex. D) and deposition exhibit 9 (plea minutes), at 83-84 [hereinafter "Plea Minutes"].

[4] Def. 56.1 St. ¶¶ 13-14.

[5] *Id.* at ¶¶ 25-26.

[6] Pl. 56.1 St. ¶ 7; Def. 56.1 St. ¶ 22.

his MBA degree requirements in December 2006, before Stern learned that he was the subject of a criminal investigation.[7]   In the following month, Dean Thomas Cooley sent Rosenthal a letter stating that "[t]he Faculty has recommended to the President and Board of Trustees of New York University that your degree be conferred as of January 22, 2007."[8]   In fact, however, the president and trustees never conferred the degree.[9]

*Stern Brings a Disciplinary Case*

On February 8, 2007, Rosenthal pleaded guilty to a one-count information charging him with conspiracy to commit securities fraud.[10]   Several days later, Dean Cooley learned of Rosenthal's guilty plea.   He and Stern's vice deans agreed that Stern should review whether Rosenthal had satisfied the "explicit and implicit requirements of the degree."[11]   In the meantime, Stern held up Rosenthal's diploma.[12]

---

[7]

Pl. 56.1 St. ¶ 6.

[8]

Hernstadt Decl. Ex. 3 at NYU 54.

[9]

Rosenthal so conceded at closing argument today.   In addition, Rosenthal's Rule 56.1 Statement contends only that he completed the course work for the degree and that he "should have received his MBA degree." DI 80 ¶ 8.   He fails to deny, and therefore by virtue of S.D.N.Y. CIV. R. 56.1 admits, that he was not certified as qualified to receive the degree, that this was a prerequisite to the awarding of the degree under NYU's Bylaws, and that the faculty recommended to the president and trustees that the degree not be awarded. *Compare* Def. 56.1 St. [DI 54] ¶¶ 42-43, 96, *with* Pl. 56.1 St. [DI 80].

[10]

Pl. 56.1 St. ¶ 44; Def. 56.1 St. ¶ 27.

[11]

Def. 56.1 St. ¶ 35.

[12]

Hernstadt Decl. Ex. 12 at NYU 755 ("The faculty will vote next week whether or not to recommend (to the President and Board of Trustees) Ayal Rosenthal along with the January

4

On February 22, 2007, the Stern faculty held a regularly scheduled meeting to recommend MBA candidates to the president and board of trustees for graduation from Stern.[13]  It voted that "the case of Ayal Rosenthal, having pleaded guilty to the intent to commit securities fraud, be remanded to the Stern School's Judiciary Committee" (the "Committee"), which is authorized to make a disciplinary recommendation to the Stern faculty pursuant to the Stern Policies and Procedures.[14]  One week later, the Stern faculty brought a disciplinary complaint against Rosenthal.[15]  It alleged that Rosenthal "was in serious violation of the NYU Stern MBA Code of Conduct and the NYU Code of Ethical Conduct in actions he took while a matriculated student at Stern" and noted that "[s]tudents are expected to conduct themselves as mature and law-abiding members of both the University community and the general community."[16]  It requested that the Committee "at the earliest time [] review the case and provide its recommendations to the Dean of the School."[17]

---

2007 MBA degree candidates.  Until further notice, please delete his graduation information from all systems. . . . [A]lso halt the printing/making of his diploma, immediately.") (Feb. 13, 2007 email).

[13]

Def. 56.1 St. ¶ 39.  Under NYU's Bylaws, "[d]egrees in course are granted by the Board [of Trustees] to candidates recommended by the President [of the University] on certification by a faculty as having fulfilled the requirements for a degree."  Bylaw § 63(a).

[14]

Def. 56.1 St. ¶¶ 39-41, 50.

[15]

*Id.* ¶ 45.

[16]

*Id.* ¶¶ 46-47.

[17]

*Id.* ¶ 50.

*The Judiciary Committee Hearing*

In May 2007, Melchior Ochoa, the student chair of the Committee, notified Rosenthal of the faculty complaint and concluded that the Committee should hold a disciplinary hearing.[18]  He then began to try to find a date on which both Rosenthal and a quorum of Committee members would be available, which was difficult during the summer months.[19]  Rosenthal replied to one of those efforts by stating that he had "taken some time off this summer in part based on your previous communication that there would not be an opportunity to hold a quorum until September" and "can be available after Labor Day."[20]  Rosenthal did not inform Ochoa that he had been sentenced to sixty days in prison and would serve time at FCI Otisville from mid-July through September 11, 2007.[21]

Two days after Rosenthal was released from Otisville, the Committee held a hearing in connection with the faculty complaint.  Rosenthal and a quorum of Committee members, including two faculty members and seven students, attended.[22]  The Committee, however, did not permit Rosenthal's counsel to attend.[23]  Rosenthal read to the Committee a prepared statement in which he challenged its jurisdiction and contended that "my plea was for conscious avoidance of securities laws, which is materially different from a customary guilty plea as a matter of both law

---

[18]

*Id.* ¶ 68.

[19]

*Id.* ¶¶ 73-74.

[20]

Ochoa Decl. Ex. 4.

[21]

Def. 56.1 St. ¶ 75.

[22]

*Id.* ¶¶ 79-81.

[23]

Pl. 56.1 St. ¶ 89.

and fact."[24]  That statement, the Court notes parenthetically, itself was misleading.[25]

After the hearing concluded, the Committee found that it had jurisdiction over Rosenthal and, on the basis of his admissions at the hearing and his guilty plea, that he had violated Stern's Honor Code and Code of Conduct.[26]  It unanimously voted to recommend that "Mr. Rosenthal shall not be conferred his degree . . . but may transfer his completed coursework, credits, and grades to another school that will accept them."[27]  It recommended also that Rosenthal's grade in professional responsibility be changed to an "F."[28]

*The Stern Faculty Vote*

At a meeting on October 3, 2007, the Stern faculty approved a motion that Rosenthal "not be recommended to the NYU President and Board of Trustees for a degree of Masters of Business Administration."[29]  Later that month, Dean Cooley advised Rosenthal by letter of the

---

[24]

Ochoa Decl. Ex. 5 (Rosenthal's prepared statement).

[25]

Rosenthal in fact pleaded guilty to conspiracy to commit securities fraud in violation of 18 U.S.C. § 371.  While his allocution satisfied the requirement of "knowing" misconduct on a conscious avoidance theory, Rosenthal admitted that he had known that his brother, to whom he had tipped insider information "was an active trader of securities" and that he "turned a blind eye to [the fact] that [his] brother was going to trade in violation of United States securities law on information that [he] provided to him."  Plea Minutes at 83-84.  That admission was the "legal equivalent" of actual knowledge.  *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003).  It stands on no lesser footing.  *Id.*

[26]

Def. 56.1 St. ¶ 92.

[27]

*Id.* ¶ 93.

[28]

*Id.*

[29]

*Id.* ¶ 96.

faculty's decision not to recommend conferral of the degree.  The Dean noted that Rosenthal's guilty plea had been the "deciding factor" at "every stage of the proceeding."[30]  Although Rosenthal appealed the decision on December 14, 2007, Dean Cooley rejected his appeal approximately two months later.[31]

*This Action*

      Rosenthal brought this action in June 2008.  The complaint alleges that the Stern faculty lacked jurisdiction to discipline him and that defendants failed to comply with their own published disciplinary rules and procedures.  It asserts also that Rosenthal violated neither the Stern Honor Code nor the Stern Code of Conduct and that defendants' decision, in any event, was "fundamentally unfair."  Rosenthal seeks, among other things, damages for breach of an implied contract[32] and an order pursuant to Article 78 of the New York Civil Practice Law[33] directing defendants to confer his degree.[34]

      The parties have consented to try this case to the Court on a record consisting of the parties' cross motions for summary judgment and certain additional evidence.[35]  This contains the

---

[30]
     Cooley Decl. Ex. 13.

[31]
     Def. 56.1 St. ¶¶ 101-02.

[32]
     Am. Cpt. [DI 22] ¶¶ 78-82.

[33]
     N.Y. CPLR Art. 78.

[34]
     Am. Cpt. ¶ 88.

[35]
     *See* June 15, 2010 Stipulation [DI 89].

Court's findings of fact and conclusions of law.

*Discussion*

The relationship between a university and its students is based upon an implied contract.[36]  Rosenthal asserts that "the terms of the implied contract are supplied by the school's bulletins, circulars, and regulations made available to the student."[37]  He argues that they breached that contract on the theories that (1) the Stern faculty lacked jurisdiction to withhold his degree, (2) defendants failed to follow their own disciplinary procedures,[38] and (3) Rosenthal did not violate any applicable code of conduct.

I.    *Faculty Authority to Confer Degrees*

As an initial matter, Rosenthal proposes an elaborate jurisdictional and procedural argument that cherry picks from NYU's various rules and regulations.  Defendants have risen to the bait, framing the case largely in those terms.  But this is a misconception.  The University Bylaws (the "Bylaws") expressly confer upon the faculty of each school the authority to determine "the

---

[36]

*Vought v. Teachers Coll., Columbia Univ.*, 127 A.D.2d 654, 511 N.Y.S.2d 880, 881 (2d Dep't 1987).

[37]

Pl. S.J. Mem.[DI 66] 6 (citing *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998)); *see also* Pl. 56.1 St. ¶ 13 ("The rules, policies, and procedures cited by the parties, which constitute the contract, are set forth in the NYU Bylaws ("Bylaws"), NYU University Policy on Student Conduct, NYU Student Disciplinary Procedures, Stern Honor Code, Stern Code of Conduct, Stern Student Disciplinary Rules, NYU Rules for the Maintenance of Public Order, and NYU Code of Ethical Conduct.").

[38]

The test is whether they "substantially observed" their rules. *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 658, 660, 427 N.Y.S.2d 760 (1980).

standards of academic achievement to be attained for each degree offered" and "to certify to the President, for recommendation to the Board, qualified candidates for degrees and certificates."[39] While the Stern faculty's decision to withhold Rosenthal's degree followed the form of a disciplinary proceeding, it determined pursuant to its duly-conferred authority that Rosenthal was not fit to receive a degree on the basis of his admitted felonious conspiracy to commit securities fraud.  That decision was fully within the faculty's power and discretion.[40]  It was neither arbitrary nor capricious.  Thus, Rosenthal's contentions are entirely without merit on that ground alone. While his procedural arguments are beside the point, the Court nevertheless turns to them in an abundance of caution.

## II.   *Disciplinary Jurisdiction*

An elaborate framework of rules and regulations governs the University and Stern. Three layers are relevant to the present inquiry: (1) the University Bylaws, (2) the Stern rules, and (3) University-wide rules promulgated by the University Senate.

---

[39]

Hernstadt Decl. Ex. 4 at NYU 1171, Bylaws § 61(b).

[40]

The New York Court of Appeals has held that an educational institution is not required to grant a diploma to a student who fails to meet its standards.  "In order for society to be able to have complete confidence in the credentials dispensed by academic institutions [] it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis."  *Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 413-14, 426 N.Y.S.2d 248 (1980) ("Indeed, the value of these credentials from the point of view of society would be seriously undermined if the courts were to abandon their long-standing practice of restraint in this area and instead began to . . . confer diplomas upon those who have been deemed unqualified."); *see also Harris v. Trustees of Columbia Univ.,* 98 A.D.2d 58, 71, 470 N.Y.S.2d 368 (1st Dep't 1983) (Kassal, J., dissenting) (stating that a student's "fraudulent submission . . . evinced a degree of dishonesty and lack of character" and was "a matter of vital interest to an academic institution"), *rev'd for reasons stated in dissenting opinion,* 62 N.Y.2d 956, 959, 479 N.Y.S.2d 216 (1984).

A.      *University Bylaws*

The assessment of disciplinary jurisdiction properly begins with the Bylaws,[41] which circumscribe the authority of the University Senate and the faculty of each NYU school.  They expressly provide that:

> "Subject to the approval of the Board and to general University policy as defined by the President and the Senate, it is the duty of each faculty to determine . . . the standards of academic achievement to be attained for each degree offered, . . . to make and enforce rules for the guidance and conduct of the students, and to certify to the President, for recommendation to the Board, qualified candidates for degrees and certificates."[42]

They provide also that "[t]he power of suspending or dismissing a student of any school is lodged with the voting faculty of that school."[43]  The Senate, by contrast, has the "power to act upon educational matters and regulations of the academic community that affect more than one school. . . . The Senate shall adopt for its governance rules of procedure not inconsistent with the University charter and bylaws."[44]  The Bylaws thus grant the Stern faculty exclusive jurisdiction and authority to determine Stern's standards of academic achievement, confer degrees, and dismiss students.  The Stern faculty's decision to withhold Rosenthal's degree was an exercise of the authority delegated to it under Bylaws Sections 61(b) and 62, respectively.

---

[41]
    The Bylaws are reproduced in the *NYU Faculty Handbook*, Hernstadt Decl. Ex. 4.

[42]
    *Id.* § 61(b).

[43]
    *Id.* § 62.

[44]
    *Id.* §§ 34-35.

B.  *Stern Policies and Procedures*

The Stern Policies and Procedures (the "Stern Rules") were promulgated by Stern pursuant to its authority under Bylaws Section 61(b) to "make and enforce rules for the guidance and conduct of [its] students."[45]  They provide that "[s]tudent discipline is the responsibility of the faculty of the Stern School of Business" and that the faculty has "delegate[d] its authority to the MBA Judiciary Committee."[46]  The Committee in turn "has jurisdiction over disciplinary matters involving the matriculated and continuing MBA students . . . in the full-time or part-time MBA Programs" of Stern and in situations involving "[v]iolations of the MBA Code of Conduct" and/or "[v]iolations of federal, state or local laws."[47]  In consequence, the disciplinary matter triggered by Rosenthal's criminal violation of the federal securities laws was an appropriate responsibility of the Stern faculty and fell squarely within the Committee's jurisdiction.

C.  *The University Rules*

Notwithstanding the plain terms of the Bylaws and the Stern Rules, Rosenthal contends that the Stern faculty lacked jurisdiction to withhold his degree on the theory that the Stern Rules were inapplicable.  He relies on the University Policy on Student Conduct Preamble (the "Preamble") and the Student Disciplinary Procedures, which were promulgated by the University

---

[45]
      Hernstadt Decl. Ex. 4, Bylaws § 61(b).

[46]
      *Id.* Ex. 8 at NYU 75, § 1.

[47]
      *Id.* § 2.

Senate and are set forth in the *University Policies and Procedures*.[48]   Together with the University
Rules for the Maintenance of Public Order, the Preamble and the Student Disciplinary Procedures
comprise a University-wide disciplinary scheme (the "University Rules").

1.      *The University Policy on Student Conduct Preamble*

The Preamble provides that:

"Students are expected to conduct themselves as mature and law-abiding members
of both the University community and the general community. . . . In general, a
student's off-campus activities should be subject only to sanctions of the public
authorities.  Where a student is convicted of a violation of law, he should not be
subject to University discipline for the same offense *unless his conduct seriously
affects his position as a member of the academic community*."[49]

Rosenthal argues that he was not properly subjected to discipline because there was
no determination that his off-campus conduct "seriously affected his position as a member of the
academic community."  He further contends that his violation of federal securities laws "could not
have seriously affected his position as a member of the NYU academic community, since at the time
he pled guilty he had completed his Stern School class work and was no longer a member of the
university community."[50]  His contentions are without merit.

As an initial matter, the Preamble is in the nature of a recital.  It created no

---

[48]         Hernstadt Decl. Ex. 5.

[49]         *Id.* at NYU 253 (emphasis added).

[50]         Pl. S.J. Mem. 13.

enforceable obligations.[51]   While a recital may be useful in resolving any ambiguity,[52] there is nothing ambiguous about the delegation of disciplinary authority in the *University Policy and Procedures*, of which the Preamble and the Student Disciplinary Procedures are a part.  In fact, the Student Disciplinary Procedures expressly were enacted "to implement the principles expressed in" the Preamble.[53]

Even if the Preamble somehow cabined the authority of the relevant Stern bodies, the manner in which it did so would have no bearing here. It addresses "instances of questionable conduct referred to disciplinary committees [that] have involved problems such as the maintenance of order in University buildings and grounds in connections with protest demonstrations, and have frequently involved students from more than one school."[54]   Rosenthal's conduct was plainly distinguishable.  The Preamble therefore did not apply here.  Moreover, the Preamble provides that "[t]hese Bylaws also authorize the University Senate to act upon such matters which affect more than one school."[55]  Like the Bylaws, the Preamble therefore does not indicate that the Senate has jurisdiction, let alone exclusive jurisdiction, where, as here, the matter at issue did not affect more than one NYU school.

Even if that were not so, Rosenthal's contention that the Preamble, which was

---

[51]

  *E.g., United States v. Hamdi,* 432 F.3d 115, 123 (2d Cir. 2005); *Jim Bouton Corp. v. Wm. Wrigley Jr. Co.,* 902 F.2d 1074, 1077 (2d Cir. 1990).

[52]

  *Id.*

[53]

  Hernstadt Decl. Ex. 5 at NYU 254.

[54]

  *Id.* at NYU 253.

[55]

  *Id.*

14

promulgated by the University Senate, prohibited the Stern faculty from withholding his degree is unpersuasive.  The Bylaws confer upon the Stern faculty the authority, among other things, to "certify . . . qualified candidates for degrees."  They provide also that "[t]he Senate shall adopt for its governance rules of procedure not inconsistent with the University charter and bylaws."[56]  The Senate therefore may not impose any measure inconsistent with the Stern faculty's authority under the Bylaws to confer degrees.  Accordingly, any inconsistency between the Senate-promulgated Preamble and the Bylaws must be resolved in favor of the latter.

2.      *The Student Disciplinary Procedures*

Rosenthal relies also on the Student Disciplinary Procedures, which set forth the following disciplinary framework:

"In order to ensure the smooth functioning of University activities and to implement the principles expressed in the University Policy on Student Conduct at New York University and the Rules for the Maintenance of Public Order, the Senate has established the following procedures for disciplinary action:

"I. **Division of Jurisdiction Between the Faculties of the Several Schools and the Colleges and the Senate**.  Under Sections 34(c), 61(b), and 62 of the Bylaws of New York University, jurisdiction over student disciplinary proceedings is granted under certain circumstances to the faculty of the school in which the student is enrolled and under other circumstances to the Senate.  In order to carry out the intention of the Bylaws, the following areas of jurisdiction are designated:

"A.     Cases of Faculty Jurisdiction.

1.      Cheating, plagiarism, forgery of academic documents with intent to defraud.

2.      Disruption of a lecture hall, laboratory, or any other premises used for academic purposes.

---

[56]

*Id.* Ex. 4 at NYU 1162, Bylaws §§ 34(c), 35 ("The Senate shall adopt for its governance rules of procedure not inconsistent with the University charter and bylaws."), 61(b).

3.      Failure to return library books, or destruction of all or part of a library book or archival document.

4.      Interference with access to classrooms, laboratories, or academic offices.

5.      Physical detention or restraint of a student, instructor, University staff member, or administrator while that person is trying to exercise his/her duties.

"B.      Cases of Senate Jurisdiction.

1.      Disruptive or riotous activity . . .

2.      Violation of dormitory rules . . .

3.      Forgery of instruments of identification . . .

4.      Theft of, or wanton damage to, University property.

5.      Engaging in conduct which interferes with or disrupts any academic function involving more than one school."[57]

"In addition to falling within one of the categories defined in I.A. or I.B. above, certain offenses may violate city, state, or federal laws.  It is the policy of the University to discourage such acts by its members, and such offenses, or persons complaining of such offenses, may be referred to the appropriate outside authority. *To the extent that such acts also fall within one of the categories defined in I.A. or I.B. above, they may also be subject to applicable disciplinary measures within the University.*"[58]

Rosenthal asserts that the Stern faculty lacked jurisdiction to impose discipline on

the theory that his conduct did not fall within the "Cases of Faculty Jurisdiction" or "Cases of Senate

Jurisdiction" enumerated in Section I.   The argument, however, erroneously assumes that the

Student Disciplinary Procedures impliedly prohibit the Stern faculty from disciplining a student who

---

[57]      *Id.* Ex. 5 at NYU 254.

[58]      *Id.* § 1.D. (emphasis added).

commits an infraction not enumerated therein.  This ignores the plain terms of both (a) the Bylaws, which confer upon the Stern faculty the authority to determine academic standards, suspend and dismiss students, and confer degrees, and (b) the Stern Rules, which were promulgated pursuant to that authority.  Even more important, it ignores the fact that any inconsistency between the Senate-promulgated Student Disciplinary Procedures and the Bylaws must be resolved in favor of the latter.[59]  Finally, Rosenthal's arguments are unpersuasive also in view of the University Rules for the Maintenance of Public Order, which he fails to address.

3.      *The University Rules for the Maintenance of Public Order*

Like the Preamble and Student Disciplinary Procedures, the University Rules for the Maintenance of Public Order (the "Public Order Rules")[60] outline a University-wide disciplinary scheme.  Promulgated by the NYU Board of Trustees, the Public Order Rules provide that "authority of the faculty is derived from paragraph 61(b) of the University Bylaws" and that "[d]isciplinary proceedings shall be in accordance with the established practice of a school."[61]  Thus, they expressly provide that the Stern faculty has the authority pursuant to the Bylaws to discipline its students.  The University Rules may not limit that authority.

Moreover, the Public Order Rules provide that "[a]ll members of the University community . . . shall comply with city, state and federal laws and ordinances *affecting the*

---

[59]

Hernstadt Ex. 4 at NYU 1162, Bylaws § 35 ("The Senate shall adopt for its governance rules of procedure not inconsistent with the University charter and bylaws.").

[60]

The Public Order Rules are reproduced in the *NYU Faculty Handbook*, *id.* Ex. 4 at NYU 1115.

[61]

*Id.* Ex. 4 at NYU 1117.

17

*maintenance of order on University Premises.*"[62]  They therefore indicate that the University Rules on which Rosenthal relies are inapplicable where, as here, the unlawful conduct at issue did not relate to the maintenance of order at NYU.

### III.  *Violation of Stern's Code of Conduct and Honor Code*

Based upon the recommendation of the MBA Judiciary Committee and the vote of the Stern faculty, Dean Cooley decided not to award Rosenthal's degree on the ground that Rosenthal's conduct violated Stern's Code of Conduct and Honor Code.  Rosenthal argues that his "violation of federal securities laws is not a behavior that is proscribed by or related to the Stern Honor Code or the Stern Code of Conduct–the two sets of rules that Cooley, the Judiciary Committee and the Faculty ultimately cited to as the provisions violated by Rosenthal and the basis for discipline."[63]

The Stern Code of Conduct provides, among other things, that "[s]tudents are expected in all of their actions to reflect a personal honesty, integrity and respect for others."[64]  Rosenthal maintains that this "aspirational statement" is "too broad and unspecific to be enforceable" as indicated by *Keefe v. New York Law School*.[65]  His argument is meritless.

*Keefe* held that the "[p]laintiff fail[ed] to cite any specific provision or

---

[62]

Id. at NYU 1115 (emphasis added).

[63]

Pl. S.J. Mem. 14.

[64]

Hernstadt Decl. Ex. 8 at NYU 72.

[65]

2009 N.Y. Slip Op. 52331U, at *2 (Sup. Ct. N.Y. Co. Nov. 17, 2009).

18

communication from [New York Law School] that would establish an implied contract. One cannot breach a contractual promise that was never made."[66]  Here, by contrast, defendants have pinpointed a specific provision of the Code that Rosenthal has infringed.   Indeed, Stern appropriately emphasizes business ethics as a "central and integral component of its business education program."[67]  Rosenthal's admitted felonious conspiracy to commit securities fraud therefore is a violation of the Stern Code of Conduct.[68]

IV.   *Defendants' Compliance with Published Disciplinary Procedures*

            Rosenthal contends that defendants' disciplinary case against Rosenthal failed to satisfy the procedural requirements of the University Student Disciplinary Procedures.[69]  He alleges a number of procedural violations, including defendants' alleged failure to (1) provide him a timely notice of the faculty complaint,[70] (2) hold a timely disciplinary hearing, (3) tape record the hearing, (4) permit Rosenthal's counsel to attend the hearing, and (5) provide a copy of the Committee's

---

[66]

  *Id.*

[67]

  Cooley Decl. Ex. 15 at R.1964; *see also id.* at 3 (noting that Stern's MBA Code of Conduct "encompasses the Stern School's philosophy that its students–as future business leaders–have an obligation to adhere to . . . principles [of personal honesty, integrity and respect for others] in their behavior").

[68]

  The Stern Honor Code provides that "I will not lie, cheat or steal to gain an academic advantage, or tolerate those who do."  Rosenthal contends that the Honor Code is limited to academic conduct and therefore is inapplicable here.  In view of this Court's finding that Rosenthal infringed the plain terms of the Stern Code of Conduct, however, it is not necessary to resolve that question.

[69]

  Hernstadt Decl. Ex. 5 at NYU 254.

[70]

  "Notice of filing shall be mailed to the student within 48 hours."  *Id.* NYU 255, § II.A.

written report within seven days.[71]  His arguments are without merit.

Rosenthal's contentions rest upon the assumptions that the University Rules govern Rosenthal's disciplinary hearing and that Stern's own disciplinary rules do not apply.  As discussed above, however, the University Rules are inapplicable here because, among other things, they relate to disciplinary infractions involving more than one NYU school and to the maintenance of order on the University campus.  The University Rules indeed acknowledge that "[t]he authority of the faculty is derived from paragraph 61(b) of the University Bylaws.  Disciplinary proceedings shall be in accordance with the established practice of the school."[72] In consequence, the Stern Rules, which were promulgated by the Stern faculty pursuant to the Bylaws, properly govern this dispute.

Unlike the University Rules, the Stern Rules do not provide a right to counsel or require 48-hour notice of the complaint, a copy of the Committee's report within seven days, or tape recording of the hearing.  Nor do the Stern Rules require a "timely" disciplinary hearing.  In any event, Rosenthal consented to postpone the hearing from June to September 2007, knowing that he would be incarcerated during that period.[73]

Rosenthal rejoins that Stern violated its own disciplinary requirements.  He argues that the Stern Rules require the appointment of an investigative committee and the issuance of an investigative report.[74]  He asserts that defendants nevertheless refused to appoint an investigative

---

[71]

*Id.* § II.D.

[72]

Hernstadt Decl. Ex. 4 at NYU 1117.

[73]

Ochoa Decl. ¶ 8.

[74]

Hernstadt Decl. Ex. 8 at NYU 77-79.

committee and that the Committee's recommendation was devoid of factual findings and rested entirely on Rosenthal's guilty plea. He argues in the alternative that the Stern faculty exerted "institutional pressure on students to violate the clear rules of the University and the Stern School."[75] His arguments are unpersuasive.

The purpose of an investigative committee and report under the Stern Rules is to determine whether there is a factual basis for a disciplinary complaint. In view of Rosenthal's sworn admission that he had conspired to commit securities fraud, a factual investigation would have served no purpose. Further, Rosenthal's contention that the Stern faculty "pressured" the Committee likewise is immaterial because the Committee was purely advisory under the Stern Rules.[76] It was the Stern faculty who ultimately decided not to confer Rosenthal's degree.[77]

## V.   Alleged Fundamental Unfairness

Rosenthal argues in the alternative that defendants' actions were "fundamentally unfair." He asserts that defendants waited more than three months before notifying him of the

---

[75]

Pl. S.J. Mem. 20.

[76]

In addition, Rosenthal's argument that Thomas Grace, the Director of Judicial Affairs and Compliance in the NYU Division of Student Affairs, expressed doubt that NYU had jurisdiction over Rosenthal in an email that Rosenthal calls the "Grace Memo" is immaterial. Hernstadt Decl. Ex. 17. Grace's interpretation of NYU's disciplinary rules is irrelevant. So too is a document entitled "University Policy Development and Management," which Rosenthal claims is NYU counsel's interpretation of "University-wide policies." Pl. Reply Mem. 4. As Rosenthal himself recognizes, "NYU's rules and procedures set forth, at least in part, the contract between the parties, and parol evidence is not admissible–or necessary–to the interpretation of the applicable rules and procedures as a matter of law." *Id.* at 5.

[77]

Hernstadt Decl. Ex. 4 at NYU 1172, Bylaw § 63(a) ("Degrees in course are granted by the Board to candidates recommended by the President on certification by a faculty as having fulfilled the requirements for a degree.").

faculty complaint and an additional three months before holding a disciplinary hearing.  He asserts also that the Committee and the Stern faculty based their decision to withhold Rosenthal's degree on Rosenthal's alleged violation of the Stern Code of Conduct, which was not mentioned in the faculty complaint,[78] that Stern's deans exerted undue influence on the Committee, and that the punishment was "unauthorized, excessive, and unfair."  His contentions are unavailing.

Rosenthal's allegations of "fundamental unfairness" are generally duplicative of his claims that defendants violated the applicable disciplinary rules and, in any event, are conclusory and immaterial.  His contention that denial of his degree was an "excessive" and "unauthorized" penalty is entirely unfounded.  Rosenthal managed to complete his course requirements only by concealing his criminal investigation from Stern.  In the last analysis, the authority and discretion to determine whether Rosenthal was qualified to receive an MBA degree from Stern properly rested with its faculty, which substantially complied with all applicable disciplinary rules and procedures.

*Conclusion*

For the foregoing reasons, judgment will enter declaring that NYU did not award plaintiff the degree of Master of Business Administration and that it is under no legal obligation to do so.[79]  Plaintiff's claims for relief other than a declaration of the rights of the parties are dismissed.

---

[78]     This argument is meritless.  The faculty complaint plainly states the faculty's belief that Rosenthal "was in serious violation of the NYU Stern MBA Code of Conduct."  Hernstadt Decl. Ex. 14 at 1.

[79]     A court may enter a judgment declaring the rights of the parties regardless of whether those rights are determined to be as the plaintiff contends.  *E.g., 200 Genesee St. Corp. v. City of Utica,* 6 N.Y.3d 761, 762, 811 N.Y.S.2d 288, 289 (2006) (citing *Lanza v. Wagner,* 11 N.Y.2d 317, 334, 229 N.Y.S.2d 380, 393 (1962), *appeal dismissed,* 371 U.S. 74, *cert. denied,* 371 U.S> 901 (1963) (error to dismiss declaratory judgment complaint "merely because the plaintiffs were not entitled to the declaration sought by them" and modifying

22

The Clerk shall close the case.

        SO ORDERED.

Dated:        September 13, 2010

<br>

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

judgment to declare rights in defendants' favor)); SAMUEL W. EAGER, THE DECLARATORY JUDGMENT ACT - LAW AND PRACTICE § 92, subd. 1 (1971); 22A AM JUR2D, *Declaratory Judgments* § 244 (2010).